IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
(NORTHERN DIVISION)

| | | |
|---|---|---|
| JUST PUPPIES, INC. | * | |
| d/b/a JUST PUPPIES TOWSON | | |
| 1028B York Road | * | |
| Towson, MD 21204 | | |
| [Baltimore County, Maryland] | * | |
| | | |
| and | * | |
| | | |
| JUST PUPPIES OF MARYLAND, INC. | * | |
| d/b/a JUST PUPPIES ROCKVILLE | | |
| 2004 Veirs Mill Road | * | |
| Rockville, MD 20851 | | |
| [Montgomery County, Maryland] | * | |
| | | |
| and | * | CIVIL NO.: 21-1281 |
| | | |
| CHARM CITY PUPPIES, LLC | * | |
| d/b/a CHARM CITY PUPPIES & BOUTIQUE | | |
| 8205 Snowden River Parkway | * | |
| Columbia, MD 21045 | | |
| [Howard County, Maryland] | * | |
| | | |
| and | * | |
| | | |
| SOBRAD, LLC | * | |
| d/b/a Pinnacle Pet | | |
| 11863 Kenobi Lane | * | |
| Neosho, Missouri 64850 | | |
| | * | |
| and | | |
| | * | |
| TARA BAKER | | |
| d/b/a Valley View Kennel | * | |
| 16852 Valley Drive | | |
| Glenwood, Missouri 63541 | * | |
| | | |
| Plaintiffs | * | |

v.                                              *

**BRIAN E. FROSH**                              *
**MARYLAND ATTORNEY GENERAL**
**200 St. Paul Place**                          *
**Baltimore, MD 21202**
                                                *

            **Defendant**                       *

                                                *

        *     *     *     *     *     *     *     *     *

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, Sobrad, LLC d/b/a Pinnacle Pet, and Tara Baker d/b/a Valley View Kennel ("Plaintiffs"), by and through their undersigned counsel, hereby file this Complaint against Defendant, Brian E. Frosh, in his official capacity as Attorney General for the State of Maryland, for declaratory, injunctive, and other relief to declare Sections 19-701 and 19-703 of Maryland's Business Regulations Article (banning the sale of dogs and cats by retail pet stores in Maryland effective July 1, 2021) invalid and unconstitutional.  In support, Plaintiffs state as follows:

## Parties, Jurisdiction, and Venue

1.      Plaintiff, Just Puppies, Inc. d/b/a Just Puppies Towson, is a Maryland corporation with its principal place of business as a retail pet store located at 1028B York Road, Towson, Baltimore County, Maryland.

2.      Plaintiff, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, is a Maryland corporation with its principal place of business as a retail pet store located at 2004 Veirs Mill Road, Rockville, Montgomery County, Maryland.

3.      Plaintiffs, Just Puppies Towson and Just Puppies Rockville (jointly referred to as "Just Puppies"), are for-profit establishments that sell and transfer domestic animals to be kept as household pets (retail pet stores).

4.      Plaintiff, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique ("Charm City Puppies") is a Maryland limited liability company with its principal place of business as a retail pet store located at 8205 Snowden River Parkway, Columbia, Howard County, Maryland.

5.      Plaintiff, Charm City Puppies, is a for-profit establishment that sells and transfers domestic animals to be kept as household pets (retail pet store).

6.      Plaintiff, Sobrad, LLC d/b/a Pinnacle Pet ("Pinnacle Pet") is a Missouri corporation with its principal place of business located at 11863 Kenobi Lane, Neosho, Missouri.  Pinnacle Pet is a professional broker of dogs that is licensed by the USDA and the States of Missouri, Pennsylvania, Ohio, Georgia, Colorado, Kansas, and the City of Las Vegas, Nevada.  Pinnacle Pet also is licensed by the USDA to transport the dogs from state to state.  As a broker, Pinnacle Pet transfers dogs for resale by retail pet stores in numerous States across the country, including Maryland.

7.      Plaintiff, Tara Baker d/b/a Valley View Kennel ("Ms. Baker"), is a professional breeder of dogs who is licensed by the United States Department of

Agriculture ("USDA") and the State of Missouri.  As a breeder, Ms. Baker breeds and raises dogs to exclusively sell and transfer to retail pet stores in Maryland.

8.     Defendant, Brian E. Frosh, is the Attorney General of the State of Maryland ("the State"). Under the Constitution of Maryland, the Attorney General shall defend on the part of the State of Maryland all cases pending in all federal courts against the State, or in which the State may be an interested party. Md. Const. art. V § 3.  Mr. Frosh is sued in his official capacity on behalf of the State of Maryland whose General Assembly passed the "Retail Pet Stores and the Task Force to Study Canine Breeding Facilities and Sourcing Standards" on or about April 8, 2020, which goes into effect on July 1, 2021, and bans the sale of all dogs and cats from retail pet stores in Maryland.  The pet store ban was enacted as amendments to Sections 19-701 and 19-703 of the Maryland Business Regulation Article ("2021 Pet Store Ban").

9.     The State is an interested party in this lawsuit and the Attorney General, in his official capacity, shall defend this case on the part of the State.

10.     Plaintiffs challenge the 2021 Pet Store Ban as unconstitutional under various provisions of the United States Constitution and Maryland's Declaration of Rights. Plaintiffs further challenge the 2021 Pet Store Ban as preempted by the Animal Welfare Act ("AWA"). *See* 7 U.S.C. § 2131 ("Congressional Statement of Policy"); (Exhibit 1 at 5 – USDA Animal Care "Blue Book" containing the current AWA and Animal Welfare Regulations) (Revised July 2020)).

11. Plaintiffs' causes of action arise under 7 U.S.C. § 2133, the United States Constitution, and the Federal Declaration of Rights Statute set forth in 28 U.S.C. § 2201(a). Jurisdiction is therefore proper in this Court pursuant to 28 U.S.C. § 1331.

12. Defendant operates on behalf of the State of Maryland and the State passed the law giving rise to the claims set forth in this Complaint.  Venue is therefore proper in this Court pursuant to 28 U.S.C. § 1391(2).

## BACKGROUND FACTS

### Maryland's Retail Pet Store Laws – 2012

13. In 2012, twenty (20) states, including Maryland, enacted legislation to combat what animal activists have deemed "puppy mills."  SB 317, 2012 Md. Gen. Assemb., Reg. Sess. (Md. 2012).  Maryland and other states required strict recordkeeping requirements of breeders and pet stores and provided recourse to consumers for sick animals purchased from pet stores.

14. The term "puppy mill" is "often a very controversial and misunderstood term."  (*See* "Pet Industry and Animal Welfare Organizations Join Forces to Address Puppy Mill Abuse," Business Wire, December 13, 2012).  In 2012, pet industry and animal rights organizations, such as the Humane Society of the United States ("HSUS"), agreed upon a definition of a "puppy mill" as a "dog-breeding operation, which offers dogs for monetary compensation or remuneration, in which the physical, psychological and/or behavioral needs of the dogs are not being fulfilled due to inadequate housing, shelter, staffing, nutrition, socialization, sanitation, exercise, veterinary care, and/or inappropriate breeding."  *Id.*  Such substandard dog breeding operations would not

qualify for licensure by USDA pursuant to the humane standards required by the AWA. (*See* Exhibit 1 at 111-136, AWA Blue Book, Regulations, Part 3, Subpart A – Specifications for the Humane Handling, Care, Treatment, and Transportation of Dogs and Cats).

15.     Legislation to further these goals was approved in Maryland on May 2, 2012 and took effect on October 1, 2012.  SB 317, 2012 Md. Gen. Assemb., Reg. Sess. (Md. 2012).  The enactment of the amendment to Section 19-703 was intended to prevent "retail pet stores" from selling pets sourced from alleged "puppy mills" and protect consumers from pets sourced from breeders employing substandard welfare conditions. A "retail pet store" was defined under the old Maryland statute as "a for-profit establishment open to the public that sells or offers for sale domestic animals to be kept as household pets."  (Exhibit 2a – 001 -- Md. Code Ann., Bus. Reg. § 19-701(j) (2012)).

16.     The 2012 legislation required retail pet stores to provide a written record of breeders and dealers of pets sold in-store, including the state in which the breeder or dealer of the dog is located and the USDA license number.  (Exh. 2a at 010 -- Md. Code Ann., Bus. Reg. § 19-703 (2012)).   This information is required to be posted "conspicuously" on each dog's cage. *Id.*

17.     Pet store owners were required to maintain and post a written record about each dog including the breed, age, and date of birth of the dog.  *Id.*  Pet store owners were also required to maintain a record identifying markings of the dog and documentation of all medical treatments and diagnoses.  *Id.*  At the time of purchase, pet store owners were

6

required to provide to the purchaser a health certificate from a licensed veterinarian certifying the health of the pet.  *Id.*

18.     All records were required to be maintained for one (1) year after the date of sale of the dog and are to be made available to the Consumer Protection Division, *bona fide* prospective purchasers, and the actual purchaser at time of sale.  *Id.*

19.     Purchasers were also entitled to a remedy if, within seven (7) days of purchase, the dog is examined by a veterinarian and found to suffer from a disease or illness adversely affecting the health of the dog.  *Id.*

20.     Pet store owners were subject to enforcement and penalty provisions under Maryland's Consumer Protection Act in the Commercial Law Article for unfair and/or deceptive trade practices for any violation of these laws.  *Id.*

21.     Nonprofit shelters and rescues were, and still are, exempt from the requirements of the consumer protection laws as well as they were exempt from the sourcing requirements set forth in Maryland's 2012 legislation.  (Exh. 2a at 006 -- Md. Code Ann., Bus. Reg. § 19-702 ("This subtitle does not apply to an animal welfare organization or animal control unit operating within a retail pet store.")).

**Maryland's Strict Sourcing Requirements for Retail Pet Stores – 2016**

22.     In 2016, Maryland added Section 19-702.1 to the Maryland retail pet store laws to further combat what animal welfare activists saw as the "puppy mill industry." (Exh. 2a at 007 -- Md. Code Ann., Bus. Reg. § 19-702.1).  The animal welfare activists have characterized all USDA licensed breeders as "puppy mills," regardless of the heightened standards of care these breeders provide to their dogs.

7

23.     Section 19-702.1 required retail pet stores to ensure that breeders and dealers supplying cats and dogs to pet stores meet strict sourcing requirements, including specific licensing and citation information.

24.     The legislation required Maryland pet store owners to ensure that all breeders and dealers sourcing to their pet stores hold a current USDA license under the AWA.  (Exh. 2a -- Md. Code Ann., Bus. Reg. § 19-702.1(b)(1)).  Section 19-702.1 effectively banned local breeders and/or hobby breeders from selling pets to Maryland pet stores because these types of breeders are unregulated and do not hold a USDA license.  (Exh. 1 at 31-- 9 C.F.R. § 1.1 ("[A] dealer…shall not be required to obtain a license . . . under this Act . . . if the size of the business is determined by the Secretary to be de minimis."));  United States Department of Agriculture, *Licensing and Registration Under the Animal Welfare Act*, at 11 (revised February 2019) ("Small-scale breeders and other dealers with gross sales under $500.00 per year are exempt, as long as these sales do not include wild or exotic animals, dogs, or cats.").  USDA regulations state that a USDA license is not required if a breeder maintains a total of four (4) or fewer breeding female dogs and sells only the offspring that were born and raised on the owner's premises.  (Exh. 1 at 43 – 9 C.F.R. § 2.1).  These unregulated breeders are often referred to as "hobby breeders."   Voluntary licensure of hobby breeders by USDA is not permitted.

25.     With the intent to further combat the "puppy mill industry," the legislature also sought to ban "roadside sales" in an effort to "close down the unscrupulous breeders who are entirely unregulated . . . from selling on roadsides and public places." These "roadside sales" encompassed the sales of pets from local "hobby breeders," or animal

8

rescue organizations, as these types of breeders and organizations are completely unregulated.

26.     Amy Jessie of HSUS noted, "Sellers consistently said they were small, local, family breeders but then our investigators actually visited the kennels and found deplorable conditions . . . another real problem from the consumer angle is that you buy a puppy, the puppy is sick . . . you can't find the seller."   Therefore, the 2016 legislation banned the sales of pets from local "hobby breeders" in retail pet store due to the alleged "deplorable conditions" of these breeding operations that were not licensed and regulated by the USDA. The USDA, however, has stated that hobby breeders do not have to be licensed because they generally exceed the humane standards of care required pursuant to the AWA.  Fed. Reg., Vol. 78, No. 181, Sept. 18, 2-13 at 57239.

27.     Prior to the enactment of Section 19-702.1 in 2016, Maryland retail pet stores, such as Just Puppies and Charm City Puppies, obtained some small percentage (less than 20%) of their puppies from good and reputable hobby breeders.  After the law went into effect, Maryland retail pet stores could no longer sell puppies from local Maryland hobby breeders since those breeders were not licensed by USDA.

28.     Pet store owners were also required to ensure that all breeders and dealers sourcing pets had not received certain citations from the USDA.  (Exh. 2a at 007 – Md. Code Ann., Bus. Reg. § 19-702.1(b)(2)).  Breeders and dealers could not have received (i) a citation on final inspection within two years of sale of pet, (ii) citations on two or more consecutive final inspections for a repeat noncompliant item within two years of sale of

pet, (iii) a citation on the two most recent inspections for a no-access violation, or (iv) three

or more citations on the most recent inspection report for any other noncompliant item.  *Id.*

29.    Citations on inspection reports are not violations of the AWA. Finally

determined violations require a notice and hearing, whereafter an administrative law judge

determines if violations have occurred, and if not appealed or upheld on further appeal,

USDA may suspend or revoke a license.   Maryland's legislation restricted pet stores from

sourcing from breeders and dealers with certain USDA citations and prohibited the sale of

pets sourced from unregulated local "hobby breeders."  All of these 2016 laws are no longer

in effect to safeguard Maryland consumers.

### Maryland's 2018 Retail Pet Store Ban

30.    Following the successful enactment of Maryland's 2012 and 2016 sourcing

requirements and consumer protection rights and remedies, animal welfare activists

continued to claim that Maryland's laws were not strong enough to combat alleged "puppy

mills."  (*See* Transcript of Economic Matters Comm.: Meeting on HB 1662 Before the

Gen. Assemb. of Md., 37:5-7 (March 12, 2018)).   These groups alleged, without any

studies, reports, audits, or any other factual evidence, that Maryland retail pet stores were

fueling the growth and establishment of unlicensed and uninspected "puppy mills."  *Id.*

Pet stores in Maryland were prohibited from purchasing pets from unlicensed breeders, and

each store maintained documentary evidence of all purchases from USDA licensed

breeders.   Since no evidence existed that Maryland retail pet stores were somehow

contributing to unlicensed and uninspected "puppy mills" with substandard conditions, the

proponents of the ban and the animal activists resorted to false allegations to support their position.

31.     Animal welfare activists made unfounded claims despite the fact that the Maryland Consumer Protection Division ("CPD") had responded to only a limited number of complaints regarding issues of compliance with Maryland's strict sourcing requirements, and that the CPD had not actually issued any fines as a result of any investigations within the previous three years.[1]

32.     Nonetheless, the Maryland State Legislature decided to enact Maryland's Retail Pet Store Ban in 2018, dubbed the "No More Puppy-Mill Pups Act," becoming one of the first states to pass such a law.  California passed a similar State law that went into effect at the beginning of 2019.   While some local jurisdictions across the Country have passed different types of bans, no other State in the Country has a ban drafted like the one in Maryland.

33.     The "No More Puppy-Mill Pups Act" was enacted on April 24, 2018 and went into effect on January 1, 2020.[2]  HB 1662, 2018 Md. Gen. Assemb., 438th Reg. Sess.

---

[1] State of Maryland, Office of the Attorney General Consumer Protection Division, letter dated March 29, 2018.

[2] On or around August 23, 2019, Plaintiffs Just Puppies, Charm City Puppies, Pinnacle Pet, as well as another Maryland retail pet store and Missouri breeder, filed a lawsuit in the United States District Court for the District of Maryland challenging the constitutionality and validity of the 2018 Pet Store Ban.  See case styled as *Just Puppies, Inc., et al. v. Brian E. Frosh, et al.*, Civil Case No. 1:19-02439-ELH.  On February 7, 2020, the Court granted Defendant's Motion to Dismiss and denied Plaintiffs' Motion for Preliminary Injunction. *Just Puppies, Inc., et al. v. Brian E. Frosh, et al.*, 438 F. Supp. 3d. 448 (D. Md. 2020). Further, on May 6, 2020, the Court denied Plaintiffs' Motion for Leave to Amend.  *Just Puppies, Inc., et al. v. Brian E. Frosh, et al.*, 457 F. Supp. 3d. 497 (D. Md. 497).  Plaintiffs

(Md. 2018) ("2018 Pet Store Ban"). (Exh. 2b). The sponsors used the derogatory and emotionally charged term "puppy mill" in the name of the law to garner political support against retail pet stores and put them out of business.  Nowhere in the law was "puppy mill" defined.  Nowhere in the proposed law and legislative record was there any written statement of legislative purpose as to why the law was being proposed, nor how the law was going to further any legitimate interests in the State of Maryland.

34.     The 2018 Pet Store Ban prohibited all retail pet stores from selling, offering for sale, or otherwise transferring dogs or cats, but set forth an exception to allow retail pet stores to collaborate with an animal welfare organization or animal control unit to offer space for these entities to "showcase cats or dogs for adoption."  (Exh. 2b -- Md. Code Ann., Bus. Reg. § 19-703) (effective January 1, 2020)).

35.     Under the 2018 Pet Store Ban, "retail pet store" was defined as "a for-profit establishment <u>open to the public</u> that sells or offers for sale domestic animals to be kept as household pets."  (Exh. 2b -- Md. Code Ann., Bus. Reg. § 19-701(j) (effective Jan. 1, 2020)) (emphasis added).  "Offer for sale" included "to sell, offer to transfer, offer for adoption, advertise for sale, barter, auction, giveaway, or otherwise dispose of a domestic animal."  (*Id.*, Md. Code Ann., Bus. Reg. § 19-701(h) (effective Jan. 1, 2020)).

---

noted a timely appeal and on April 29, 2021, the United States Court of Appeals for the Fourth Circuit, vacated and remanded the case to the district court based on the amendments to the 2018 Pet Store Ban as discussed below and identified herein as the 2021 Pet Store Ban.  This previous lawsuit is or will be stayed awaiting the outcome of this lawsuit.

36.     The 2018 Pet Store Ban also allowed pet stores to "collaborate" with animal welfare organizations or animal control units to showcase pets for adoption or with "local breeders" to showcase pets for purchase.  (Exh. 2b -- Md. Code Ann., Bus. Reg. § 19-703, § 2 (effective Jan. 1, 2020)).  Both "local breeder" and "showcase" were undefined.

37.     While the 2018 Pet Store Ban prohibited Maryland retail pet stores from selling dogs or cats from regulated sources, the legislation did not prohibit Maryland consumers from: (1) purchasing cats or dogs from out-of-state breeders or brokers on the internet without any face-to-face interaction with the animal they were interested in purchasing, or (2) purchasing cats or dogs in person through unregulated nonprofit animal welfare organizations, shelters, rescues, and local Maryland breeders.

38.     Following the enactment of the 2018 Pet Store Ban, a handful of retail pet stores effected by the law changed their business model such that they were no longer "open to the public" and, therefore, were not considered a "retail pet store" covered by the statute.  Plaintiffs Charm City Puppies and Just Puppies closed their doors to the public and began operating under an appointment-only model, whereby customers could only come to the stores to interact and purchase puppies in person after going through a preliminary screening process and booking a private appointment in advance.[3]

---

[3] The Consumer Protection Division of the Office of the Attorney General of Maryland is currently investigating, through their administrative authority, whether the appointment only/closed to the public business model employed by Just Puppies and Charm City Puppies complies with the 2018 Pet Store Ban.  As of the date of this filing, no determination has been made, and no citations or penalties have been issued.

39.     The appointment-only model, adopted by some of the retail pet stores, is the same one used by certain Maryland USDA licensed breeders, such as Farmsteads Puppy Paradise, LLC, located in St. Mary's County, Maryland ("Farmstead Puppy").   This Maryland breeder breeds, markets, and sells its pure-bred puppies (such as Golden Retrievers, Boston Terriers and Pembroke Welsh Corgis) from its establishment in St. Mary's County, and offers on its website, "We welcome you to call or email us to set up an appointment to visit."  (Exhibit 3 – Farmstead Puppy Paradise Website printout).

40.     Much like Farmstead Puppy, Charm City Puppies requires a non-refundable deposit prior to a prospective customer being permitted to book an appointment and goes through an extensive questionnaire with the customer to ensure that person is in a position to afford and take care of a puppy sold by it.  Charm City Puppies has turned down many prospective consumers from appointments and/or from purchasing a puppy who were not qualified to do so.

41.     Just Puppies also requires each prospective customer to go through an extensive questionnaire to ensure that person is in a position to afford and take care of a puppy sold by it.  Just Puppies also collects a deposit before booking an appointment that goes towards the purchase of a puppy or is forfeited if the person fails to show up to the appointment.   Just Puppies has turned down many prospective consumers from appointments and/or from purchasing a puppy who were not qualified to do so.

42.     Thus, despite the 2018 Pet Store Ban, Plaintiffs Charm City Puppies and Just Puppies closed their doors to the public and adopted the model of some Maryland breeders and have been able to continue to operate and sell puppies.

14

**2021 Pet Store Ban**

43.     Dissatisfied that the 2018 Pet Store Ban did not put the handful of stores in the State still selling dogs out of business on January 1, 2020, the animal welfare activists and Maryland State Senator Ben Kramer ("Senator Kramer"), as the sponsor of the law, embarked on a crusade to close the loopholes of the poorly drafted and ill-conceived 2018 Pet Store Ban to benefit Maryland breeders to the exclusion of breeders and brokers out-of-state.  Senator Kramer amended the law to allow Maryland breeders to continue to operate, but to ensure that retail pet stores go out of business since they will be unable to sell, transfer, or dispose of puppies they acquire from reputable out-of-state UDSA licensed breeders and brokers, or any other source.

44.     All pretenses that the new bill was being proposed by Senator Kramer to eradicate the so-called puppy mill industry were dropped and the act which is now called the "Retail Pet Stores and the Task Force to Study Canine Breeding Facilities and Sourcing Standards," was passed on or about April 8, 2021 ("2021 Pet Store Ban").  (Exhibit 4 -- Md. Code Ann., Bus. Regs. § 19-701, *et seq.*, SB 103 Enrolled Bill). While recognizing the need for a task force to be formed to study and report on the complex industry and marketplace in which pet stores, breeders, and brokers are subject to federal laws and regulations, the amended law continues to ban sales of dogs and cats from retail pet stores and disrupt the entire interstate pet market channel, without the benefit of any findings and recommendations of such task force.

45.     Nowhere in the 2021 Pet Store Ban and legislative record is there any written statement of legislative purpose as to why the law was being proposed, nor how the law

was going to further any legitimate interests in the State of Maryland.  As set forth in the enrolled bill and the Fiscal and Policy Note, the purpose of the 2021 Pet Store Ban is to alter the definition of "retail pet store" to "(1) include brokers; (2) no longer specify that the store must be open to the public; and (3) exclude an establishment at which the animals being sold were born."  Additionally, the bill establishes a Task Force to Study Canine Breeding Facilities and Sourcing Standards to be staffed by the Maryland Department of Agriculture (MDA).  (Exhibit 5 -- SB103 Fiscal and Policy Note).

46.     The 2021 Pet Store Ban adds a new Section 2 that sets forth the requirement that a task force be created to study canine breeding facilities and sourcing standards. Section 2 states:

(a) There is a Task Force to Study Canine Breeding Facilities and Sourcing Standards.

(b) The Task Force consists of the following members:
     (1) one member of the Senate of Maryland, appointed by the President of the Senate;
     (2) one member of the House of Delegates, appointed by the Speaker of the House;
     (3) the Secretary of Agriculture, or the Secretary's designee;
     (4) the Attorney General, or the Attorney General's designee; and
     (5) the following members, selected by the Secretary of Agriculture:
          (i) a small animal veterinarian with significant experience working with canine breeders;
          (ii) an expert in canine behavior with priority given to a specialist from a State university or college;
          (iii) a representative of the American Kennel Club;
          (iv) a representative of Bailing Out Benji;
          (v) a representative of Maryland Votes for Animals;
          (vi) a representative of American Humane;
          (vii) a representative of the Humane Society of the United States;
          (viii) an attorney with a practice concentration in animal welfare law; and

16

(ix) an owner of a small retail pet store.

(b) The Governor shall request that a representative from the U.S. Department of Agriculture's Animal Care program participate in the Task Force.

(c) The President of the Senate and the Speaker of the House shall jointly designate the chair of the Task Force.

(d) The Department of Agriculture shall provide staff for the Task Force.

(f) A member of the Task Force:

(1) may not receive compensation as a member of the Task Force; but

(2) is entitled to reimbursement for expenses under the Standard State Travel Regulations, as provided in the State budget.

(g)   (1) The Task Force shall study canine breeding facilities, including online sales of canines through breeding facilities.

(2) In conducting the study required under paragraph (1) of this subsection, the Task Force shall:

(i) review any achievements made in the past 20 years in combating substandard canine breeding practices;

(ii) identify and assess current efforts being taken in the State, other states, and the federal government to address substandard canine breeding practices;

(iii) identify nongovernmental comprehensive standards for canine breeding and tour facilities in full compliance with those standards;

(iv) determine if any gaps exist between current State, federal, and nongovernmental comprehensive standards for canine breeding;

(v) recommend actions necessary to harmonize canine breeding standards in the State with those of the U.S. Department of Agriculture; and

(vi) recommend any legislative actions necessary to create standards for any person who sells or negotiates the sale or purchase of dogs in the State.

(h) On or before December 1, 2021, the Task Force shall report its findings and recommendations to the Governor and, in accordance with § 2–1257 of the State Government Article, the Senate Finance Committee and the House Economic Matters Committee.

(Exh. 4 -- Md. Code Ann., Bus. Reg. Art. § 19-703 Section 2 (effective July 1, 2021)).

47.     The Fiscal and Policy Notes sets forth the objectives of the task force, which

states:

> The task force must study canine breeding facilities, including online sales
> of canines through breeding facilities.  In conducting the study, the task force
> must:
> - review any achievements made in the past 20 years in combating
>   substandard canine breeding practices;
> - identify and assess current efforts being taken in the State, other
>   states, and the federal government to address substandard canine
>   breeding practices;
> - identify nongovernmental comprehensive standards for canine
>   breeding and tour facilities in full compliance with those
>   standards;
> - determine if any gaps exist between current State, federal, and
>   nongovernmental comprehensive standards for canine breeding;
> - recommend actions necessary to harmonize canine breeding
>   standards in the State with those of USDA; and
> - recommend any legislative actions necessary to create standards
>   for any person who sells or negotiates the sale or purchase of dogs
>   in the State.
>
> By December 1, 2021, the task force must report its findings and
> recommendations to the Governor and the General Assembly.

(Exh. 5).

48.     Instead of waiting five (5) months for the completion of the task force

findings and recommendations, the animal welfare activists and Senator Kramer amended

the laws regarding retail pet stores to make sure they go out of business on July 1, 2021.

49.     Under the 2021 Pet Store Ban, Section 19-703 was amended to state:

> (a) Prohibition. -- A retail pet store may not sell or otherwise transfer or dispose of
> cats or dogs.
>
> (b) Exception. -- This section may not be construed to prohibit a retail pet store from
> collaborating with an animal welfare organization or animal control unit to offer
> space for these entities to showcase cats or dogs for adoption.

(Exh. 4 -- Md. Code Ann., Bus. Reg. § 19-703 (effective July 1, 2021)).  The new prohibition against the sale of dogs and cats in pet stores under Section 19-703(a), eliminated "offer for sale," and the definition for "offer of sale," set forth in Section 19-701(f) was eliminated.   *Id.* -- Md. Code Ann., Bus. Reg. § 19-701(f) and 19-703(a) (effective July 1, 2021).

50.     Section 19-701(g) was also amended to change the definition of a "retail pet store" to "a for profit establishment that sells or offers for sale domestic animals to be kept as household pets, or a 'broker.'"  *Id.*  While a retail pet store includes an establishment that "offers for sale" puppies, the amended law eliminates the definition of "offer for sale." *Id.*  The amended definition of "retail pet store" also removed "open to the public" from the definition.  *Id.*

51.     Section 19-701(g) was also amended to change the definition of a "retail pet store" to add anyone acting as a "broker." (Exh. 4).  Section 19-701(e) broadly defines "broker" as a person who transfers dogs or cats for resale by another person."  *Id.*

52.     Since the new ban eliminated the requirement that retail pet stores had to be "open to the public" to be subject to the ban, local Maryland breeders were in danger of being considered a "retail pet store," since such breeders operated for-profit establishments that sell or offer for sale domestic animals to be kept as household pets.  Senator Kramer needed to save the Maryland breeders from being subject to the law.  Thus, Section 19-701(g) was also amended to clarify that a "'retail pet store" does not include an establishment at which "the animals sold at the establishment were born at the

establishment." (Exh. 4).  The exception allows all Maryland breeders, including Maryland USDA licensed breeders like Farmstead Puppy, to continue to operate unimpeded in the marketplace and breed, market, and sell directly face-to-face to Maryland consumers from their Maryland for-profit establishments.

53.     The 2021 Pet Store Ban eliminates the "statement of intent by the General Assembly" in Section 2 of the 2018 Pet Store Ban that retail pet stores were permitted to "collaborate" with animal welfare organizations or animal control units to showcase pets for adoption or to "purchase from local breeders."  (*See* Exh. 2b; Exh. 5).  The exception to the definition of "retail pet store" (not to include an establishment at which the animals sold were born) now captured the intent to continue to permit consumers to purchase from local Maryland breeders where they could interact with the animal face-to-face.

54.     Section 3 calls for an effective date of July 1, 2021 for 2021 Pet Store Ban and that the task force shall be disbanded as of June 30, 2022.

55.     The Fiscal and Policy Note states that the bill's imposition does not have a material impact on State or local government, but that the small business effect is "meaningful." (Exh. 5).

56.     The 2021 Pet Store Ban on the sale of pets will effectively shift the sale of puppies from regulated retail pet stores (who source puppies from regulated out-of-state breeders and brokers) to Maryland breeders and unregulated marketplaces, such as on the internet, and from unregulated nonprofit animal welfare organizations, rescues, and shelters.

57.     The 2021 Pet Store Ban makes it impossible for out-of-state brokers to sell their dogs or cats within Maryland through retail pet stores or otherwise because a "broker" is now defined as a "retail pet store" under the new law.  Further, the 2021 Pet Store Ban unfairly discriminates and disadvantages against out-of-state breeders because Maryland consumers have no opportunity to interact face-to-face with dogs from out-of-state breeders without traveling out of Maryland to see them in person.  By comparison, Maryland breeders can sell dogs directly to the Maryland consumers in person from their for-profit establishments because the dogs were born in the State at the selling establishment.

58.     The 2021 Pet Store Ban does not in any way ban the sale of dogs and cats by animal welfare organizations, which are defined as "a non-profit organization that has tax-exempt status under § 501(c)(3) of the U.S. Internal Revenue Code, and whose mission and practice is the rescue of animals and the placement of those animals in permanent homes."  (Exhibit 4).  These animal welfare organizations can purchase and obtain dogs and cats from any source and will benefit from the new law in which Maryland consumers face limited choices to be able to go to an establishment and see the animal before purchase. Animal welfare organizations can charge Maryland consumers high "adoption fees" similar to the prices charged in retail pet stores.

59.     The legislative history reflects the fact that the real and actual intent of the 2021 Pet Store Ban was to favor local Maryland breeders to the exclusion of out-of-state breeders and brokers who supply puppies to Maryland's retail pet stores in an effort to put them out of business.  The law was based on numerous fallacies and a bare animus against

retail pet stores that sell puppies and the out-of-state breeders and brokers that supply the puppies.  The legislative history reflects a "bare congressional desire to harm a politically unpopular group," which "cannot constitute a legitimate government interest."  *See United States v. Moreno*, 413 U.S. 528, 534-35 (1973).   In *Moreno*, the Supreme Court of the United States emphasized the importance of analyzing the legislative history to determine the actual intent of the law, which is what the Court should do here.

60.   The sponsor of the law, Senator Ben Kramer, made it very clear during his testimony before the Maryland Senate Economic Matters Committee on March 23, 2021, that the new law was targeted at out-of-state breeders and brokers in an effort to assist Maryland breeders.  Senator Kramer stated that "this bill will just prevent dealing with brokers dealing with Maryland, not the breeders.  You can buy from any breeder.  And like I said, you can even buy from puppy mills. . . ."  (Exhibit 6 –Transcript from Maryland Senate Economic Matters Committee on March 23, 2021, at 29:11-14).  Senator Kramer went on to state:  ". . . you'll notice that no small breeder, no responsible breeder has sent you written opposition or is providing oral opposition.  We are talking these big out-of-state breeders who sell by the thousands that are here in opposition."  *Id*. at 12:2-6.  Mr. Kramer stated, without any evidence in support, "But we've got hundreds of those [breeders] in Maryland.  And those, you know, operations are not part of this bill.  This [bill] deals with the out-of-state massive corporations that are just literally by the thousands turning over puppies every year and sourcing through puppy mills."  *Id*. at 13:13-18.  Further, Senator Kramer stated, without supporting evidence: "But you can buy from any breeder that you choose regardless of size, scale, you know, certainly our small businesses,

<u>our local business I'm guessing will hopefully benefit because if you want that Golden</u>

<u>Retriever, you may go to – and all of our counties have lots of kennels and breeders in</u>

<u>them</u>.   Some of them, you know, hundreds and, you know, hopefully they'll be

beneficiaries and you'll go to, you know, Golden Retrievers of Timonium or Poodles of

Salisbury.   <u>And then our local economy and our mom-and-pop businesses benefit</u>."

(emphasis added).  *Id*. at 22:24 – 23:1-9.

61.     There was no evidence before the legislature that any Maryland retail pet

stores obtained their puppies from such inhumane and substandard breeders.

### Impact on Interstate Commerce

62.     Just Puppies is a family-owned business that started in 1997 in Orlando,

Florida.  Just Puppies opened its first retail pet store in Laurel, Maryland in 1999.  Just

Puppies Towson opened on or about April 15, 2001, and Just Puppies Rockville opened its

store on or around April 15, 2004.  The store in Laurel closed in April 2009 after an expired

lease.

63.     Just Puppies only sells dogs and does not display any other animals for sale

at its stores that are closed to the public.  Just Puppies carries a variety of the most popular

purebred dogs and designer breed puppies.  Approximately 90 – 95 percent of the gross

sales of Just Puppies is from the sale of dogs.  The other 5 – 10 percent of sales is derived

from pet accessories sold in the stores.

64.     Just Puppies, like other similarly situated retail pet stores in Maryland,

sources its dogs from good and reputable USDA and State licensed professional kennels

from outside of Maryland.  Just Puppies purchases approximately 1,500 puppies per year

from out-of-state breeders to sell in its retail stores to Maryland consumers. Upon information and belief, other similarly situated retail pet stores in Maryland purchase similar numbers of puppies from out-of-state breeders to sell to Maryland consumers. The puppies can range in price from $1,500 to $4,500, and thus, the revenues generated by the retail pet stores are in the millions annually. The demand for puppies by Maryland consumers generally exceeds the supply that retail pet stores are able to obtain from out-of-state breeders.

65.     One of the reputable breeders from whom Just Puppies obtains its dogs is Ms. Baker d/b/a Valley View Kennel who operates on her 85-acre farm in Glenwood, Missouri. Ms. Baker has a Class A USDA breeder license and a Missouri breeder license, and she has been operating for approximately three years since 2019, selling various breeds of dogs exclusively to Just Puppies for sale in Maryland. Ms. Baker has not been found in violation of any USDA, State of Missouri, or any other state's regulations. Ms. Baker maintains full and accurate records of all pedigrees and dates of birth, as well as complete health and vaccination records. Ms. Baker routinely has her dogs treated and inspected by licensed veterinarians.

66.     Just Puppies has a USDA transport license, and it transports the dogs from Ms. Baker and other good and reputable licensed breeders in Missouri to Maryland for sale to Maryland consumers. Just Puppies executes a "Record of Disposition of Dogs and Cats" form from the USDA that the breeder has sold the dogs to the store, including the age and description of the puppies being transferred. Just Puppies purchases the puppies from the breeders, like Ms. Baker, in their home state, and Just Puppies transports the puppies to

Maryland.  Annually, thousands of puppies freely flow into the Maryland marketplace from out-of-state breeders to Maryland retail pet stores where Maryland consumers can meet, pet, examine, and interact with these domestic animals before the consumer makes a decision to purchase.

67.     Ms. Baker, like other similarly situated out-of-state breeders in the national marketplace, does not have a website and does not market her dogs for sale to the public. She sells only to Just Puppies in Maryland except for a few working dogs that she sells locally in Missouri.  Selling directly to Maryland consumers would impose substantial and increased costs on Ms. Baker and all other similarly situated out-of-state breeders, as well as the Maryland consumer.  A Maryland consumer and/or the out-of-state breeder would have to incur expensive ground and/or air transportation charges and fees with a company to transport their puppies from out-of-state to Maryland.  To transport a puppy from Glenwood, Missouri (where Ms. Baker is located) to Annapolis, Maryland, this ground and/or air service could cost anywhere from $700.00 up to $2,000.00 per animal. Alternatively, Maryland consumers would have to drive or fly almost 1000 miles each way from Annapolis, Maryland (as an example) to Glenwood, Missouri, and incur substantial travel expenses and inconvenience to see the puppy and transport it back to Maryland. These substantial costs and expenses would double the costs of the dogs purchased for Maryland residents for puppies from out-of-state breeders.

68.     Charm City Puppies opened its store in January 2012 and is family-owned and operated by Maryland residents.  Charm City Puppies carries a variety of the most

popular purebred dogs and designer breed puppies, is closed to the public, and since the enactment of the 2018 Ban, only sells dogs to customers with a pre-booked appointment.

69.     Charm City Puppies derives approximately 90 - 95 percent of its gross revenues from the sale of dogs, and the other approximately 5 - 10 percent of revenues is from pet accessories.

70.     Charm City Puppies, like other similarly situated retail pet stores in Maryland, sources its dogs from USDA licensed and reputable brokers (Class A/B dealers), such as Pinnacle Pet, who only sells to retail pet stores.  Charm City Puppies purchases approximately 600 puppies per year from brokers to sell in its retail store to Maryland consumers.  Upon information and belief, other similarly situated retail pet stores in Maryland purchase similar numbers of out-of-state puppies through brokers to sell to Maryland consumers.  The puppies can range in price from $2,500 to $6,500, and thus, the revenues generated by the retail pet stores are in the millions annually.  The demand for puppies by Maryland consumers generally exceeds the supply that retail pet stores are able to obtain from out-of-state breeders.

71.     Although Pinnacle Pet maintains a website, Pinnacle Pet, like other similarly situated brokers in the national marketplace, does not sell directly to the public, only to retail pet stores.  Pinnacle Pet uses a comprehensive online web portal to showcase dogs from licensed USDA and State professional breeders.  The web portal contains extensive and detailed information on each licensed USDA breeder as well as all health records for the dogs.  When a puppy is purchased through Pinnacle Pet, all data regarding the health records and the breeder information is collected and provided to the retail pet stores, such

as Charm City Puppies, as part of the transaction.  All these documents are ultimately provided to the customer purchasing the puppy.

72.   As a professional broker licensed by the USDA, Pinnacle Pet must submit annual applications for license renewals that report the number of dogs sold annually as well as the dollar amounts received from those sales.  As part of the USDA and State of Missouri licensing requirements, Pinnacle Pet's kennel facilities and transport vehicles are subject to random and unannounced inspections from Missouri and Federal inspectors.  The USDA and Missouri inspectors spend several hours reviewing a checklist of State and Federal regulations to make sure that Pinnacle Pet is in full compliance every year.  If any issues arise during the inspection, a report is provided reflecting any noncompliant items.

73.   Pinnacle Pet has been operating as a broker for over six years and has not been found in violation of any USDA, State of Missouri, or any other state's regulations.

74.   Pinnacle Pet maintains full and accurate records of all pedigrees and dates of birth, as well as complete health and vaccination records.  Pinnacle Pet routinely has its dogs treated and inspected by licensed veterinarians, as required by state and federal laws.

75.   Pinnacle Pet purchases and sells purebred dogs as well as designer breeds from breeders licensed by the USDA and/or other states.  Pinnacle Pet purchases the puppies and obtains possession of them in its kennels for a brief period until the puppies are transported to retail pet stores around the country in specially designed and equipped vans and/or trucks that are also inspected by the USDA and state agencies.

76.   Prior to being transported out of state, all puppies must have a health certificate from a licensed veterinarian.  Once the puppies arrive in Maryland, the pet stores

27

execute a "Record of Disposition of Dogs and Cats" form from the USDA that the broker has sold the dogs to the store, including the age and description of the puppies being transferred.  The form must be completed for each puppy bred by a USDA licensed breeder and broker upon sale, transfer, exchange, or donation.  USDA licensed breeders and brokers are required to maintain all such disposition forms for the USDA upon inspection and for annual reporting purposes. All USDA licensed breeders and brokers must keep their animals in a USDA inspected and approved facility until the animal is sold, transferred, or adopted.  The sale of the puppies from Pinnacle Pet are completed at the time of the delivery of the puppies to the retail pet stores.

77.    Despite the fact that the strict sourcing requirements, record maintenance, and health standards established by the 2012 and 2016 laws are no longer in effect, Just Puppies and Charm City Puppies continue to follow such requirements.  Just Puppies and Charm City Puppies also provide customers limited warranties regarding the health and condition of the puppies purchased by customers.   Just Puppies utilizes licensed veterinarians to examine all puppies at least twice prior to the sale to the public and all puppies are reexamined by an approved veterinarian within five days after purchase. Charm City Puppies also has a licensed veterinarian examine all puppies prior to offering a puppy for sale and provides the customer with a free veterinary exam within several days of the date of sale.

78.    While Just Puppies and Charm City Puppies maintain websites, they do not sell puppies online.  All transactions take place at the pet store locations by appointment

only under the same business model used by some Maryland USDA licensed breeders like Farmstead Puppy.

79.  Once the 2021 Pet Store Ban takes effect on July 1, 2021, Just Puppies and Charm City Puppies will no longer be able to operate their business due to the ban on the sale of dogs which represents 90 – 95 percent of their revenues because these stores source their puppies from breeders and brokers out-of-state.  The puppies they sell are not born at their stores.  Other retail pet stores that sell dogs and cats to the public are expected to go out of business as well.  Maryland residents who work at these stores will lose their jobs.

80.  Maryland USDA licensed breeders like Farmstead Puppy and Maryland hobby breeders will continue to operate and thrive in the new marketplace with less competition now in Maryland from pet stores because the puppies they sell at their establishments were born there.

81.  Customers and Maryland residents will no longer be able to purchase purebred and designer breed dogs in person from appointment-only pet stores in Maryland and will only be able to purchase those puppies from Maryland breeders with an establishment in the State, or rescues and shelters with limited inventory.

82.  Maryland residents seeking to purchase purebred and designer puppies will have to heavily rely on the unregulated internet and print advertising to try to locate such dogs.  Internet pet sales have a notoriously high incidence of fraud and scams which will only increase against Maryland residents now that the Ban has gone into effect. Marylanders without the means to buy and transport such puppies from out-of-state will

not have access to purchase purebred and designer puppies, and will be therefore disadvantaged.

83.    Wealthy Maryland residents may not be as impacted by the ban because such consumers have the time and money to travel out of state to breeders around the country in order to find the specific puppy they want and see it in person.  The increase in time and money associated with having to travel to far away breeders (most of which are in the Mid-West and South) will severely limit the free flow of this congressionally authorized stream of interstate commerce for the purchase of puppies that the consumers most desire and would ordinarily purchase in retail pet stores in Maryland and have face-to-face interaction like consumers can do with all Maryland breeders.

84.    The nature of the interstate and intrastate market in pet sales was expressly described and regulated by Congress when adopting the AWA.  The new legislation will disrupt the free market of professionally bred pets and instead favor Maryland breeders who are exempt from the 2021 Retail Pet Store Ban, and cause Maryland residents to have to utilize the unregulated internet a greater cost and expense (and which has the highest incidence of fraud for this type of online consumer sale), or try to find a dog or cat from the limited inventory available at nonprofit rescues and shelters.

## Online Puppy Scams Increase During COVID-19 Pandemic

85.    According to the Better Business Bureau ("BBB") Scam Tracker, with the rise in demand for puppies during the COVID-19 pandemic, in which consumers had more time to spend training a puppy and sought companionship while at home, came a significant increase in pet scams.  Such scams would occur when a person would pay hundreds of

dollars or more to purchase a puppy online, only to learn that the puppy never existed. *See Online puppy scams rising sharply in 2020, BBB warns*, December 2, 2020, https://www.bbb.org/article/news-releases/23354-bbb-study-update-puppy-scams-rising-in-2020 (last visited: May 24, 2021).

86.      As soon as cities and states imposed restrictions at the beginning of the COVID-19 pandemic, "BBB Scam Tracker saw a spike in pet fraud reports, with nearly 4,000 reports received in 2020 from the U.S. and Canada. Data from BBB Scam Tracker shows more reports about fraudulent pet websites in April than in the first three months of the year combined. The COVID-19 bump is continuing into the holiday season, with consumers reporting 337 complaints to BBB about puppy scams in November 2020, a dramatic increase from 77 for the same month in 2019." *Id*. As reported by the BBB, the median loss to consumers is $750. *Id*.

87.      Pursuant to this new BBB report, "At the current pace, pet scams reported to BBB will be nearly five times as many as in 2017, when BBB published its first in-depth investigative study on pet scams." *Id*. In 2018, pets were the top product of online purchase scams to consumers nationwide – these pet sale scams represented 26.2% of all online purchase scams. (Better Business Bureau, *2018 BBB Scam Tracker Risk Report*, 14 (2018)). [4]

---

[4] Online pet sale scams are so prevalent that several websites have been created for consumers to report fraud and provide notice of scam websites. *See* www.petscams.com (providing a forum to report and view lists of all websites reported to be a pet scam); *see also* www.ipata.org/pet-scams (maintaining a list of pet scams online and advice for consumers seeking to avoid pet scams).

88.     According to the 2017 Report, the Better Business Bureau asserts that complaint numbers only hint at the size of the scheme, as many victims either choose not to file complaints or do not know how to seek assistance.  Better Business Bureau, *Puppy Scams: How Fake Online Pet Sellers Steal from Unsuspecting Pet Buyers*, 4 (September 2017).

89.     The Better Business Bureau suggests consumers avoid pet sale fraud by inspecting pets first-hand before purchase.  Better Business Bureau, *Puppy Scams: How Fake Online Pet Sellers Steal from Unsuspecting Pet Buyers*, 9-10 (September 2017).  However, Maryland's Pet Store Ban will significantly hinder the consumers' ability to inspect pets first-hand since they will no longer be able to visit pets in stores for purchase.

### Unregulated Local Hobby Breeders and Animal Shelters

90.     Although the AWA regulates the licensing and conditions of dog and cat breeders, it does not regulate the conditions of government-sponsored animal shelters, nonprofit animal rescue organizations that sell pets to consumers in face-to-face transactions, or local hobby breeders (a breeder that maintains four (4) or fewer breeding female dogs and sells only the offspring that were born and raised on the owner's premises).

91.     In April 2019, police arrested two individuals in Carroll County, Maryland for charges of animal cruelty after twenty-seven (27) dogs were found dead on their property.  Kate Ryan, *Duo Behind Illegal Md. Breeding Operation Jailed After Dozens of Dogs Found Dead*, WTOP (April 9, 2019).  Twenty-seven (27) more dogs were found inside, alive but in critical need of care.  *Id.*

92.     The individuals arrested were local hobby breeders and were "connected to an unlicensed dog breeding operation" in Carroll County. *Id.* The 2021 Pet Store Ban, in its efforts to eradicate so-called "puppy mills," is intended to encourage Maryland consumers to purchase pets from these unlicensed local hobby breeders and "puppy mills" in Maryland. If retail pet stores are eliminated from the marketplace in Maryland, more and more unregulated local hobby breeders will be encouraged to enter the market leading to the potential for more substandard puppy mills.

93.     In May 2019, Animal Control removed 165 animals from the Animal Welfare Society of Howard County due to "poor conditions." Jess Nocera, *165 Animals Removed from Now-Closed Columbia Animal Shelter*, *The Baltimore Sun* (May 19, 2019). The shelter was subsequently shut down. *Id.* Some animals removed may never be healthy enough for adoption. *Id.*

94.     The Animal Welfare Society shelter was reported to have a foul odor, overcrowding, and a general lack of cleanliness. *Id.* These are the same conditions the Maryland legislation is hoping to eradicate in so-called "puppy mills." This incident highlights the fact that unregulated sources, such as shelters and rescues, lack legal oversight that would require them to maintain certain humane standards of care and cleanliness. The Animal Welfare Society of Howard County was a nonprofit rescue with tax-exempt status under § 501(c)(3) of the IRS Code, and thus would have qualified as an "Animal Welfare Organization" under Maryland's Pet Store Ban.

95.     Furthermore, the sourcing of dogs obtained by animal shelters is currently unregulated. In May 2019, the Center for Disease Control was forced to implement a ban

on dogs imported from Egypt after dogs imported at a Kansas animal shelter tested positive for rabies.  Stephanie Ebbs, *CDC to Block Imports of Dogs from Egypt, Citing Rabies Concerns*, ABC News (May 10, 2019).

96.    Animal rescue organizations throughout the United States often collaborate with large international rescue groups, such as Humane Society International, which work in other countries to "re-home" animals; however, there is no formal way to track where the dogs "rescued" overseas actually come from or what happens to these dogs once they are placed in U.S. homes.  *Id.*  There are frequently large shipments of puppies from overseas puppy mills that are shipped to the United States as "rescue dogs."  *Id.*  There is no way to know the origins of these dogs coming in from foreign countries, but the rescue groups claim they are obtained from "meat dog farms" and are "street dogs."  These claims cannot be substantiated, and upon information and belief, Plaintiffs assert that many of the puppies and purebred dogs are obtained from unregulated breeders in other countries profiting from pet store sourcing bans in the United States.  As unregulated entities, animal shelters can source dogs from these overseas countries with no oversight whatsoever. Maryland's legislation will cause Maryland consumers to have to obtain pets from unregulated animal rescues and shelters, with no verifiable information regarding the pets' history or health.

97.    Additionally, as unregulated entities, animal rescue organizations are able to obtain their animals from the very sources the legislation intends to eradicate, including so-called "puppy mills" with substandard welfare conditions.

98.     Nonprofit "rescues," such as National Mill Dog Rescue, claim to rescue puppies from "puppy mills," but continue to obtain pets from breeders, brokers, and dog auctioneers.[5]  National Mill Dog Rescue, a nonprofit organization, brings in three-million dollars ($3,000,000) per year from "adoption fees," whereby they charge thousands of dollars for certain breeds – just like retail pet stores.  *Id.*  In July 2019, National Mill Dog Rescue was given a cease and desist order by the Colorado State Board of Veterinary Medicine due to falsified vaccination records and unlicensed issuance of vaccines to dogs without a veterinarian present.[6]

99.     Rescue organizations, such as National Mill Dog Rescue, also source their pets to other animal shelters around the country,[7] effectively acting as a broker to Maryland shelters, such as the Maryland SPCA.[8]

## COUNT I
## FEDERAL PREEMPTION

100.    Plaintiffs incorporate Paragraphs 1 through 99 above as fully set forth herein.

101.    In 1966, the AWA was enacted at the federal level to regulate the trade and treatment of dogs and cats to be sold as pets. 7 U.S.C. § 2131.  (Exhibit 1 at 5 – AWA Blue

---

[5] Kim Kavin, *When 'Puppy Mill Rescue' Blurs The Line Between Saving And Selling Dogs*, *Huffington Post* (July 14, 2019).

[6] Chase Golightly, *National Mill Dog Rescue in Peyton Receives Cease and Desist Order from State Board*, KRDO (July 19, 2019).

[7] "Rescue average – 140 dogs/month, about half are transported to rescue partners coast to coast." https://nmdr.org/wp-content/uploads/2014/05/NMDR-Facts-052514.pdf.

[8] ". . . [W]e bring in more than 1,400 animals from other shelters to help save more lives in the community."  Maryland SPCA website, https://www.mdspca.org/about.

Book).  The Congressional Statement of Policy as set forth under Section 2131 of the AWA

states:

> The Congress finds that animals and activities which are
> regulated under [the AWA] are either in interstate or foreign
> commerce or substantially affect such commerce or the free
> flow thereof, <u>and that regulation of animals and activities as
> provided in [the AWA] is necessary to prevent and eliminate
> burdens upon such commerce and to effectively regulate such
> commerce</u>, in order . . .
>> (2) to assure the humane treatment of animals during
>> transportation in commerce; and
>> (3) to protect the owners of animals from the theft of
>> their animals by preventing the sale or use of animals which
>> have been stolen.
>> The Congress further finds that it is essential to regulate,
>> as provided in [the AWA], the transportation, purchase, sale,
>> housing, care, handling, and treatment of animals by carriers
>> or by persons or organizations engaged in . . . holding them for
>> sale as pets or for any such purpose or use.  7 U.S.C. § 2131
>> (emphasis added).

102.   The AWA includes certain licensing requirements and animal welfare

standards to be determined by the USDA for breeders of pets.  (Exh. 1 at 5-28 – AWA Blue

Book -- 7 U.S.C. §§ 2133 – 2160).  The AWA was intended to regulate animals distributed

for sale so that welfare standards, transparency, and accountability were maintained for

those animals through the commercial channel.   The United States Department of

Agriculture, through the Secretary of Agriculture, is responsible for enforcing the AWA.

103.   The AWA defines "dealers," as "any person who, in commerce, for

compensation or profit, delivers for transportation, or transports, except as a carrier, buys,

or sells, or negotiates the purchase or sale of . . . any dog or other animal whether alive or

dead for research, teaching, exhibition, or use as a pet[.]"  (Exh. 1 at 5 – AWA Blue Book -- 7 U.S.C. § 2132(f)).

104.    Under the AWA, a dealer must possess a valid license to buy, sell, or transport in commerce a cat or dog intended for use as a pet.  *See id.* at 8 -- § 2134.

105.    Pursuant to the authority promulgated by the AWA, the USDA created three licensing categories, two of which apply to this case.  (Exh. 1 at 31 – AWA Blue Book -- 9 C.F.R. § 1.1).  A "Class 'A' licensee" is any dealer "whose business involving animals consists only of animals that are bred and raised on the premises."  *Id.*  A "Class 'B' licensee" is any dealer "whose business includes the purchase and/or resale of any animal," including "brokers . . . [who] negotiate or arrange for the purchase, sale, or transport of animals in commerce."  *Id.*  Exempt from USDA licensure are any breeders with four or fewer breeding females that sell only those female's offspring, commonly known as "hobby breeders."  *Id*. at § 2.1(a)(3)(iii).

106.    The AWA defines "retail pet store" as "a place of business or residence at which the seller, buyer, and the animal available for sale are physically present so that every buyer may personally observe the animal prior to purchasing and/or taking custody of that animal after purchase, and where only the following animals are sold or offered for sale, at retail, for use as pets: Dogs, cats, rabbits, guinea pigs, hamsters, gerbils, rats, mice, gophers, chinchillas, domesticated ferrets, domesticated farm-type animals, birds, and coldblooded species."  (Exh. 1 at § 1.1, p. 38 – AWA Blue Book -- 9 C.F.R. § 1.1).

107.    The AWA recognizes the role that retail pet stores play in the national pet market, but exempts retail pet stores from licensure unless they sell "any animals to a

research facility, an exhibitor . . . or another dealer" or do not sell pets in face-to-face sales to consumers.

108.   Licensees must comport with standards of care as set forth by the USDA, including, but not limited to, minimum requirements for enclosures, feeding schedules, sanitation, exercise, veterinary care, and the maintenance of certain records.  The licensees are also subject to annual, random inspections and upon the finding of any finally determined violations, may face civil penalties and the suspension or revocation of their licenses.

109.   The purpose of the AWA, in relevant part, is to regulate the interstate and intrastate sale of dogs and cats sold for the use as pets, and require humane treatment of those pets throughout the marketplace.   Under the AWA, the USDA is authorized to promulgate standards in order to assure humane treatment of animals.  The AWA requires a licensing system for breeders which is promulgated by the USDA.  The AWA states "that regulation of animals and activities as provided in [the AWA] is necessary to prevent and eliminate burdens upon such commerce and to effectively regulate such commerce. . . ." (Exh. 1 at 5 – AWA Blue Book -- 7 U.S.C. § 2131).

110.   The AWA provides that USDA shall cooperate with officials of various states or political subdivisions in carrying out the purposes of the AWA and any state, local, or municipal legislation or ordinance on the same subject.  (Exh. 1 at 17 – AWA Blue Book -- 7 U.S.C. § 2145(b)).

111.   Section 2143 of the AWA provides for the USDA to promulgate standards, rules, regulations and certification process for the process of the humane handling, care,

treatment, and transportation of animals.  (Exh. 1 at pp. 10-12 – AWA Blue Book -- 7

U.S.C. § 2143).  Under this section of the AWA, it states that the AWA "shall not prohibit

any State (or political subdivision of such State) from promulgating standards in addition

to those standards promulgated by [the USDA] under paragraph (1) of this section."  (Exh.

1 at 10-11 – AWA Blue Book -- 7 U.S.C. § 2143) (emphasis added).  The AWA does not

permit any State or political subdivision of such State from promulgating standards related

to any other section of the AWA.

112.    The 2021 Pet Store Ban does not attempt to promulgate any additional or

complimentary standards to those set forth under the AWA; rather, it blurs the lines for

breeders, brokers, and retail pet stores as set forth in the AWA, bans sales of dogs and cats

from retail pet stores and brokers in Maryland, and completely disrupts the entire interstate

pet market channel.

113.    The effect of the 2021 Pet Store Ban is to completely eradicate USDA

licensed brokers (Class B Dealers) from the Maryland market since they are now defined

as a "retail pet store" under Maryland law.  Further, the effect of the 2021 Pet Store Ban is

to completely eliminate and ignore the definition of a "retail pet store" under the AWA

because Maryland pet stores can no longer be a place "at which the seller, buyer, and the

animal available for sale are physically present so that every buyer may personally observe

the animal prior to purchasing and/or taking custody of that animal after purchase."  (Exh.

1 at 38 – AWA Blue Book -- 9 C.F.R. § 1.1).  Unlike the Maryland breeder, the USDA

licensed out-of-state breeder (Class A Dealer), has no way to permit a Maryland buyer to

personally observe the animals in Maryland prior to the Maryland consumers purchasing

39

and/or taking custody of that animal after purchase.  Maryland breeders, on the other hand, are exempt from the definition of a retail pet store because they can sell their dogs from their establishment where the dogs were born.

114.    The 2021 Pet Store Ban thus acts as an impermissible obstacle to the clearly stated purpose and frustrates Congress's purposes and objectives under the AWA, by creating undue burdens on the free flow of commerce which the AWA was intended to prevent.  The 2021 Pet Store Ban is not a permissible exercise of State police powers to add additional standards for animal welfare standards as permitted under Section 2143. The new law is a disruption of the free flow of commerce in the domestic pet marketplace in Maryland.

WHEREFORE, Plaintiffs, Tara Baker d/b/a Valley View Kennel and Sobrad, LLC d/b/a Pinnacle Pet, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, declare the Maryland Pet Store Ban is invalid and federally preempted, and award preliminary and permanent injunctive relief, attorneys' fees, costs, and other such relief as this Court deems just and proper.

## COUNT II

### VIOLATION OF COMMERCE CLAUSE – THE 2021 PET STORE BAN IS DISCRIMINATORY IN ITS PURPOSE AND EFFECT AGAINST OUT-OF-STATE BREEDERS AND BROKERS

115.    Plaintiffs incorporate Paragraphs 1 through 114 above as fully set forth herein.

116.    The Commerce Clause empowers Congress "to regulate commerce . . . among the several states. . . ."  U.S. Const. art. I, § 8, cl. 3.  The Commerce Clause, however, also has a corresponding "negative" or "dormant" aspect that limits the power of state and local governments to enact laws affecting interstate commerce.  *See Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175 (1995); *Huges v. Oklahoma*, 441 U.S. 322 (1979).

117.    Under the dormant Commerce Clause, states may not pass legislation that unjustifiably discriminates against interstate commerce whether on its face, in its effect, or in its purpose*.  Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996).

118.    "Long ago it was settled that even in the absence of a congressional exercise of this power, the Commerce Clause prevents the States from erecting barriers to the free flow of interstate commerce."  *Raymond Motor Transp., Inc. v. Rice*, 434 U.S. 429, 440 (1978) (citing *Great A&P Tea Co.  v. Cottrell,* 424 U.S. 366, 370-371 (1976)).  With regard to the national market for the transportation, purchase, sale, housing, care, handling, and treatment of dogs and cats for sale as pets, Congress has exercised its power to regulate, and enacted the AWA.  7 U.S.C. § 2131.  (Exhibit 1 at 5 – AWA Blue Book).

119.    The Supreme Court has "interpreted the Commerce Clause to invalidate local laws that impose commercial barriers or discriminate against an article of commerce by reason of its origin or destination out of State."  *C & A Carbone, Inc. v. Town of Clarkstown, N.Y.*, 511 U.S. 383, 390 (1994); *Nat'l Ass'n of Optometrists v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012) (explaining that discriminatory statutes seek economic protectionism and are "designed to benefit in-state economic interests by burdening out-

of-state competitors" (quoting *Dep't of Revenue v. Davis*, 553 U.S. 328, 337-38 (2008)). Conversely, a statute that "treat[s] all private companies exactly the same" does not discriminate against interstate commerce. *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342 (2007).

120.    The 2021 Pet Store Ban prohibiting retail pet stores from selling or otherwise transferring or disposing of cats and dogs, discriminates in its purpose and effect against out-of-state breeders and brokers.  To be clear, the 2021 Pet Store Ban is only a ban of the sale and transfer of dogs and cats from retail pet stores – it is not a ban on the sale of dogs and cats from other sources, *i.e.* breeders, shelters, and rescues located in Maryland or sales between Maryland consumers and out-of-state breeders through the internet or otherwise. The 2021 Pet Store Ban does not treat all private entities the same with respect to the sale of dogs and cats unlike other bans that are blanket prohibitions on conduct, such as the trade of horsemeat (*see Empacadora de Carnes de Fresnillo, S.A. de C.V. v. Curry*, 476 F.3d 326, 336 (5th Cir. 2007)), the possession and sale of shark fins (*see Chinatown Neighborhood Ass'n, v. Harris*, 794 F.3d 1136 (9th Cir. 2015)), and the prohibition of force feeding birds to make foie gras (*see Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013)).  The 2021 Pet Store Ban intentionally targets retail pet stores and the out-of-state breeders and brokers who sell through them to be able to get their dogs and cats into the Maryland market for face-to-face sales.

121.    The 2021 Pet Store Ban broadened the definition of a "retail pet store" to include a "broker," which is defined as "a person who transfers dogs or cats for resale by

another." (Exh. 5). Thus, all USDA Class B licensed dealers (brokers) from anywhere in the country are barred from participating in the Maryland market.

122.    The economic protectionism for Maryland is reflected in the 2021 Pet Store Ban through the exception to the definition of "retail pet store," which specifically "does not include an establishment at which the animals sold at the establishment were born at the establishment." A Maryland breeder, whether a hobby breeder, USDA licensed breeder, or any Maryland "puppy mill," can freely sell its dogs and cats to Maryland consumers where the animal available for sale is physically present so that the buyer may personally observe the animal prior to purchasing and/or taking custody of that animal after purchase. While the out-of-state breeder can still sell to a Maryland consumer over the internet or otherwise, the out-of-State breeder has no avenue in Maryland for a face-to-face sale prior to purchase. Further, the practical and intended effect on out-of-State breeders is to unduly increase cost and expense for sales to the Maryland consumer and interfere with the free flow of dogs and cats into the Maryland marketplace.

123.    The 2021 Pet Store Ban's purpose is to interfere with the supply of dogs and cats from out-of-state breeders and brokers in Maryland through retail pet stores.

124.    As Senator Kramer (the sponsor of the law) stated clearly in committee: ". . . you'll notice that no small breeder, no responsible breeder has sent you written opposition or is providing oral opposition. We are talking these big out-of-state breeders who sell by the thousands that are here in opposition." (emphasis added). Mr. Kramer stated, "But we've got hundreds of those [breeders] in Maryland. And those, you know, operations are not part of this bill. This [bill] deals with the out-of-state massive corporations that are just

literally by the thousands turning over puppies every year and sourcing through puppy mills." Further, Senator Kramer stated: "But you can buy from any breeder that you choose regardless of size, scale, you know, certainly our small businesses, <u>our local business I'm guessing will hopefully benefit because if you want that Golden Retriever, you may go to – and all of our counties have lots of kennels and breeders in them</u>. Some of them, you know, hundreds and, you know, hopefully they'll be beneficiaries and you'll go to, you know, Golden Retrievers of Timonium or Poodles of Salisbury. <u>And then our local economy and our mom-and-pop businesses benefit</u>." (emphasis added).

125.    The 2021 Pet Store Ban was intentionally designed to discriminate against interstate commerce by interfering with the free flow of dogs from out-of-state breeders and brokers to Maryland consumers through retail pet stores who will now have no channel for face-to-face interaction with the consumer in Maryland before sale. No such restrictions are placed on the Maryland breeders who can sell from their for-profit establishment.

126.    Maryland has no legitimate local purpose to justify any discrimination against interstate commerce and out-of-state breeders or brokers in favor of local Maryland breeders who can sell directly from their establishments to the Maryland consumers. Any alleged health, safety, and welfare concerns set forth by the State are illusory. If such health, safety, and welfare concerns were not illusory, the State would apply the law evenhandedly to apply to all breeders in Maryland and not give them an unfair and unjustified competitive advantage.

127.    Further, underscoring the complex nature of the national marketplace of sale and distribution of cats and dogs, the 2021 Pet Store Ban created a task force to study and understand the marketplace and make findings and recommendations.  Instead of waiting for the reports of the task force, the State broadened the ban on dog and cat sales in retail pet stores and interfered with the free flow of out-of-state cats and dogs from breeders and brokers that have no avenue for in person sales.

128.    As a direct and proximate cause of Maryland's Pet Store Ban, Plaintiffs, Ms. Baker and Sobrad, LLC d/b/a Pinnacle Pet, and those similarly situated throughout the United States, have been and will continue to be significantly harmed and suffer economic damages.

WHEREFORE, Plaintiffs, Tara Baker d/b/a Valley View Kennel and Sobrad, LLC d/b/a Pinnacle Pet, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, declare the Maryland Pet Store Ban is unconstitutional, and award preliminary and permanent injunctive relief, award attorneys' fees, costs, and other such relief as this Court deems just and proper.

### COUNT III

### VIOLATION OF COMMERCE CLAUSE – THE 2021 PET STORE BAN IS DISCRIMINATORY IN ITS PURPOSE AND EFFECT AGAINST IN-STATE RETAIL PET STORES

129.    Plaintiffs incorporate paragraphs 1 through 128 above as fully set forth herein.

130.    The 2021 Pet Store Ban was enacted to ban brokers completely from the Maryland marketplace and harm and disadvantage out-of-state breeders by removing any access to consumers in Maryland in retail pet stores, where they had the ability to meet and bond with puppies in person before sale.  The Maryland breeders are explicitly exempted from the definition of "retail pet store" because they are permitted to sell their animals from their for-profit establishments where the animals were born.  In order to achieve the goal of banning brokers and effectively banning out-of-state breeders from the Maryland marketplace, the legislation only prohibits retail pet stores from selling cats and dogs to Maryland consumers.  The 2021 Pet Store Ban discriminates in purpose and effect against interstate commerce through all in-state retail pet stores who are prohibited from the sale or transfer of cats and dogs because those Maryland retail pet stores obtain their animals from out-of-state breeders and brokers.

131.    All in-state Maryland breeders, whether USDA licensed breeders, hobby breeders, or puppy mills, can sell directly to Maryland consumers.  So, the purported "puppy mills" and the unregulated hobby breeders, as they are located in Maryland and the animals are born at their establishment, can sell to the Maryland consumer but the stores themselves cannot.  This does not serve to advance any legitimate local State interest whatsoever.

132.    Maryland breeders are permitted to sell their dogs and cats directly to the Maryland consumer by appointment at their establishments, like Farmstead Puppy. Maryland rescues and shelters can sell dogs and cats at their establishments without any requirement that the animals be born there.  The law discriminates against the stores that

sell animals not born onsite in favor of the in-state breeders who are able to sell directly to consumers without any legitimate rationale local interest.

133.    The 2021 Pet Store Ban encourages and intentionally permits only breeders, rescues, and shelters located in Maryland where Maryland consumers can go in person and see the animals they may want to purchase as domestic pets before they buy them.  There is no requirement that dogs or cats at shelters and rescues have to be born at those facilities. The elimination of the retail pet store as an establishment able to sell dogs and cats born out-of-state impermissibly interferes in the national pet market and the free flow of numerous breeds in Maryland that may not be otherwise available to the Maryland consumer.  In the United States, the American Kennel Club dog breed list includes 190 breeds of dogs.  Worldwide the World Canine Organization (known by its French title Federation Cynologique Internationale (FCI)) lists 360 officially recognized breeds. (See "How Many Dog Breeds Are There?," Jean Marie Bauhaus, Hill's, October 2, 2018). Breeders, rescues, and shelters located in Maryland are unable to meet the demand of this diverse marketplace and Maryland consumers should have access to all such breeds through the interstate pet market.  The retail pet store is the avenue to this interstate pet market giving Maryland consumers access to dogs and cats bred across the country, and the 2021 Pet Store Ban seeks to eliminate this stream of commerce.  Providing access to the pet of their choosing has been shown to increase the likelihood of lifelong pet ownership.

134.    The State is discriminating against interstate commerce by banning sales of dogs in retail pet stores based on the origin of their products, which violates the Commerce

Clause. *See Chemical Waste Management, Inc. v. Hunt*, 504 U.S. 334 (1992). The 2021 Pet Store Ban discriminates against in-state pet stores because it cuts off their supply of puppies from all brokers and out-of-state breeders to be able to sell in person to the Maryland consumer, and severely limits the options for Maryland consumers to see these pets before they buy them only from Maryland breeders, rescues, and shelters.

135.   There is no plausible or conceivable rationale or legitimate State interest under the State's police powers to protect the health, safety, and welfare of its citizens, to support a law which permits the sale of puppies by any person or entity so long as those animals are born at their establishment – including puppy mills, but does not allow retail pet stores to transfer and/or sell the animals from any broker or out-of-state breeders.

136.   As a direct and proximate cause of the 2021 Pet Store Ban, Just Puppies and Charm City Puppies will go out of business, as will other retail pet stores in Maryland that sell dogs and cats.

WHEREFORE, Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc., d/b/a Just Puppies Rockville, and Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, and declare that the Maryland Pet Store Ban is unconstitutional, and award preliminary and permanent injunctive relief, award attorneys' fees, costs, and other such relief as this Court deems just and proper.

## COUNT IV

### VIOLATION OF THE COMMERCE CLAUSE – UNDUE BURDEN ON INTERSTATE COMMERCE (PIKE BALANCING) AGAINST RETAIL PET STORES, OUT-OF-STATE BREEDERS AND BROKERS

137.   Plaintiffs incorporate Paragraphs 1 through 136 above as fully set forth herein.

138.   Even if the Court does not find the 2021 Pet Store Ban is discriminatory in its purpose and effect under Counts II and III, the new ill-conceived Maryland law still violates the Commerce Clause under the balancing test set forth in *Pike v. Bruce Church*, 397 U.S. 137, 142 (1970).  Legislation is deemed to violate the Commerce Clause if it unduly burdens interstate commerce, and such burden is clearly excessive in relation to a purported local benefit.  Maryland's 2021 Pet Store Ban places an undue burden on interstate commerce for retail pet stores, brokers, and out-of-state breeders, and such burdens are excessive in relation to any purported local benefits to Maryland which are illusory.

139.   Under the 2021 Pet Store Ban, the practical effect of the law creates an excessive undue burden on out-of-state regulated USDA licensed breeders and all brokers who will be prohibited from selling to any retail pet stores in Maryland because their animals are not born at an in-state establishment.  The practical effect is to create an obstacle to compliance with Federal laws and regulations under the AWA for the retail pet stores, the USDA licensed breeders and the brokers.

140.   Selling directly to Maryland consumers would impose substantial and increased costs and burden on Ms. Baker and all other similarly situated out-of-state breeders, as well as the Maryland consumer.  A Maryland consumer and/or the out-of-state breeder would have to incur expensive ground and/or air transportation charges and fees with a company to transport their puppies from out-of-state to in Maryland.  For example, to transport a puppy from Glenwood, Missouri (where Ms. Baker is located) to Annapolis, Maryland, this ground and/or air service could cost anywhere from $700.00 up to $2,000.00, per animal.  Alternatively, Maryland consumers would have to drive or fly almost 1000 miles each way from Annapolis, Maryland to Glenwood, Missouri, and incur substantial travel expenses and inconvenience to see the puppy and transport it back to Maryland.  These substantial costs and expenses would double the costs of the dogs purchased for Maryland residents for puppies from out-of-state breeders, and thus impose a substantial burden on entire interstate and intrastate commerce in the pet market.

141.   The same increased cost burdens would be true for brokers (who will be barred from selling at any establishment in Maryland under the 2021 Pet Store Ban) if they changed their business model and sold direct to Maryland consumers.

142.   The USDA inspected and approved transport vans used by brokers are large vehicles that cannot access certain areas because of size and weight restrictions.  Further, Maryland law prohibits the transfer of dogs and cats in a public place.  *See* Md. Code Ann, Bus. Reg. § 19-105.  If brokers prearranged sales with a Maryland consumer, it cannot be "at a regularly scheduled or recurring event."  *Id.*  Thus, for example, a broker would be in

violation of Maryland law if it tried to meet consumers every Monday morning at the same public parking lot in Maryland to deliver its puppies to consumers.

143.   If breeders and brokers were to personally deliver puppies by transport to individual Maryland consumers throughout the State, it would be extremely expensive to do so, and would involve the purchase of new expensive smaller transport vehicles to enable deliveries directly to consumers' homes.  Further, the added cost to breeders and brokers (and Maryland consumers) for personal transport is estimated to be as much as $2,000.00 per sale of a puppy to a Maryland consumer.  The actual operation and practical effect of the ban is that it will be too burdensome and expensive for out-of-state breeders and brokers to deliver their puppies to Maryland consumers without the ability to sell through retail pet stores.

144.   The practical effect of the 2021 Pet Store Ban is to unduly burden all out-of-state breeders and brokers in favor of in-state breeders, rescues, and shelters which will be the only establishments where Maryland residents to see the animals in persons before the sale which is a critical factor when purchasing a household pet.  Breeders, rescues, and shelters located in Maryland can sell their dogs and cats directly to Maryland consumers in person without restrictions and further, the cost of delivery and/or pick-up is minimal for Maryland consumers.

145.   The dogs supplied by these out-of-state breeders and brokers are the most desirable by many consumers, including puppies, smaller breeds, purpose bred and/or designer bred dogs that are often hypoallergenic, and they are not readily available from shelters, rescues, or even from Maryland breeders.  Shelters, rescues, and local Maryland

breeders cannot meet the demand of the Maryland consumers for the purpose bred and designer bred puppies.

146.   The 2021 Pet Store Ban also creates an excessive burden for retail pet stores, which will not be able to stay in business as storefronts for local nonprofit rescues, and shelters to show their dogs and cats, whereby they can only try to earn a profit on accessories.  Currently, the sale of dogs constitutes 90 - 95 percent of the business of local retail pet stores.   The pet stores cannot stay in business only selling dog food and accessories because they cannot compete with the large nationwide pet stores such as Pet Smart or Petco.

147.   Furthermore, any alleged legitimate local Maryland interest served by 2021 Pet Store Ban is illusory.  The purported purpose behind the 2018 Pet Store Ban was to eradicate so-called "puppy mills" and reduce the number of animals in shelters.  However, there is and was no studies, reports, surveys, audits, or any other factual evidence to support any connection between Maryland's retail pet stores and the unlicensed and uninspected "puppy mills," or breeders who are breeding in substandard conditions.  Plaintiff retail pet stores never obtained puppies from substandard puppy mills and any testimony from animal activists or unsupported statements from proponents of the bill are false and defamatory.  Licensed veterinarians for each of the Plaintiff retail pet stores will certify under oath that the puppies supplied by the stores to the public are of general good health and quality and there is no evidence that such puppies came from puppy mills.  In fact, Senator Kramer admitted that the Maryland consumer can still purchase its animals from in-state puppy mills.

148.   The other purported State interest is protecting consumers from purchasing unhealthy animals; however, this interest is significantly undermined by the fact that the 2018 Retail Pet Store Ban and the 2021 Pet Store Ban removed any and all consumer protections related to the purchase of puppies.  No reports or studies support this assertion and the sworn statements from the licensed veterinarians for each of the Plaintiff retail pet stores refutes such claims.  Furthermore, animal shelters and rescue organizations are known to be the highest risk of spread of infectious disease amongst its residents, and potentially staff members.

149.   Just Puppies and Charm City Puppies source their dogs from reputable licensed professional breeders and not substandard, unlicensed or uninspected breeders, commonly referred to as "puppy mills."

150.   Contrary to the alleged intentions of the legislation, the 2021 Pet Store Ban will only serve to promote the purchase of puppies from unregulated sources such as the internet, Maryland breeders, and nonprofit rescues and shelters, thereby undermining the increase in animal welfare interests the State claims to have.

151.   The excessive undue burdens on commerce outweigh the purported local State benefits.  The few Maryland retail pet stores that still sell dogs and cats will go out of business as a result of the ban.  Out-of-state breeders and brokers have no way to sell their puppies to consumers in person within the State.  The increased cost of transporting puppies from out-of-state breeders and brokers to consumers in Maryland will be cost prohibitive and thus interfere with the free flow of puppies to Maryland consumers in favor of local Maryland breeders, rescues, and shelters.

152.   As a direct and proximate cause of 2021 Pet Store Ban, all Plaintiffs will be economically impacted when the ban takes effect and Just Puppies and Charm City Puppies will go out of business.  As such, the effects of the 2021 Pet Store Ban on in-state retail pet stores is far beyond incidental and is excessive.

153.   The 2021 Pet Store Ban creates barriers against out-of-state USDA licensed breeders (and the retail pet stores) for the sale of puppies to Maryland consumers by interfering with the flow of interstate goods in the national pet market and placing added burdens and costs that are excessive in relation to any purported benefits.

WHEREFORE, Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, Tara Baker d/b/a Valley View Kennel, and Sobrad, LLC d/b/a Pinnacle Pet, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, declare the Maryland Pet Store Ban is unconstitutional, and award preliminary and permanent injunctive relief,  award attorneys' fees, costs, and other such relief as this Court deems just and proper.

## COUNT V

## <u>VIOLATION OF EQUAL PROTECTION CLAUSE</u>

154.   Plaintiffs incorporate Paragraphs 1 through 153 above as fully set forth herein.

155.    The Fourteenth Amendment of the United States Constitution states that no state shall deny any person within its jurisdiction the equal protection of the laws.  U.S. Const. amend. 14.

156.    The guarantee of equal protection "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To prevail on an equal protection challenge, a plaintiff "'must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'"  *Kolbe v. Hogan*, 849 F.3d 114, 146 (4th Cir. 2017) (*en banc*) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).

157.    Plaintiffs, including other similarly situated Maryland retail pet stores, and out-of-state breeders and brokers, are all considered an "animal enterprise" under Federal law as defined under the Animal Enterprise Terrorism Act ("AETA"), 109 P.L. 374, 120 Stat. 2652 (2006), and should be considered a suspect and protected class for the purpose of constitutional analysis under the Equal Protection clause.  The AETA defines "animal enterprise" as a "commercial . . . enterprise that . . . sells animals . . . for profit . . ." and "pet store, breeder. . . ."  *Id.* Sec. 43(d)(1).

158.    The 2021 Pet Store Ban treats Plaintiffs and other Maryland retail pet stores, out-of-state breeders, and brokers, differently than other similarly situated Maryland rescues and shelters that are permitted to sell dogs and cats (for large adoption fees) at their facilities without the animals being born at the rescues or shelters.  The retail pet stores,

breeders, brokers, rescues, and shelters are all part of the national pet market and there is no rational basis to treat these entities differently under the law.

159.    Just because a rescue or a shelter filed for exempt status as a non-profit under §501(c)(3) of the I.R.S. does not mean that such entities are not profitable.

160.    Nonprofit "rescues," such as National Mill Dog Rescue, claim to rescue puppies from "puppy mills," but continue to obtain pets from breeders, brokers, and dog auctioneers.[9]  National Mill Dog Rescue, a nonprofit organization, brings in three-million dollars ($3,000,000) per year from "adoption fees," whereby they charge thousands of dollars for certain breeds – just like retail pet stores.  *Id.*

161.    Rescue organizations, such as National Mill Dog Rescue, also source their pets to other animal shelters around the country,[10] effectively acting as a broker to Maryland shelters, such as the Maryland SPCA.[11]

162.    The 2021 Pet Store Ban was motivated by bare animus against out-of-state breeders and brokers and Maryland retail pet stores – all of which were improperly labeled "puppy mills" to garner political support.  Thus, the law should be subject to a heightened rational basis test, whereby the law "must further some legitimate State interest other than

---

[9] Kim Kavin, *When 'Puppy Mill Rescue' Blurs The Line Between Saving And Selling Dogs*, *Huffington Post* (July 14, 2019).

[10] "Rescue average – 140 dogs/month, about half are transported to rescue partners coast to coast." https://nmdr.org/wp-content/uploads/2014/05/NMDR-Facts-052514.pdf

[11] ". . . [W]e bring in more than 1,400 animals from other shelters to help save more lives in the community."  Maryland SPCA website, https://www.mdspca.org/about.

those specifically stated in the congressional 'declaration of policy.'" *United States v. Moreno*, 413 U.S. 528, 534 (1973).

163.   The legislative history reflects the fact that the real and actual intent of the 2021 Pet Store Ban was to favor Maryland breeders to the exclusion of out-of-state breeders who supply puppies to Maryland's retail pet stores in an effort to put them out of business.   The law was based on numerous fallacies and a bare animus against retail pet stores that sell puppies and the out-of-state breeders that supply the animals.   The legislative history reflects a "bare congressional desire to harm a politically unpopular group" which "cannot constitute a legitimate government interest." *See United States v. Moreno*, 413 U.S. 528, 534-35 (1973).

164.   Maryland retail pet stores, and out-of-state breeders and brokers are prohibited from selling dogs and cats to Maryland consumers in person in a Maryland establishment where they can be inspected by the consumers prior to purchase.   Maryland's unregulated non-profit rescues and shelters are treated differently, are permitted to sell dogs and cats from any source, and there is no requirement that any of the animals be born at their establishments.   Retail pet stores, such as Just Puppies and Charm City Puppies, will be unable to operate and will go out of business.   Out-of-state breeders and brokers, such as Ms. Baker and Pinnacle Pet, will also be unable to operate in Maryland due the excessive burdens and costs.

165.   There is no legitimate State interest in banning retail pet store sales, as no studies, reports, surveys, audits, or any other evidence has been shown whatsoever to support the purported interest in reducing "puppy mills" through a ban.   Maryland's retail

pet stores do not source their dogs from unlicensed and uninspected sources or "puppy mills." The result of the 2021 Pet Store Ban will be to increase internet sales with unregulated and unlicensed breeders and increase importation of out-of-state and internationally sourced dogs from unknown and unregulated sources, thus creating less protection for dogs in breeding operations, instead of the supposed intended "reduction." The State fails to show that the 2021 Pet Store Ban will result in any increased consumer protections or welfare standards for dogs.

166.    Maryland has no factual justification whatsoever to discriminate against retail pet stores, and out-of-state USDA licensed brokers and breeders. Thus, the 2021 Pet Store Ban creates a task force to study the complex national marketplace. The law, however, enacts the ban without the results of any task force findings and recommendations.

167.    There was no evidence presented during the legislative session showing that Maryland consumers were being defrauded by in-state pet stores, nor was there any evidence provided that showed that retail pet stores in-state were not fulfilling their duty of full disclosure and consumer protections under the existing state law to citizens who purchased puppies from them. There also was no evidence showing that puppies sold by in-state retail pet establishments were unhealthy or dying after consumer purchases, nor was there evidence that pet store puppies were contributing to shelter populations.

168.    The 2021 Pet Store Ban was motivated by animus against a politically unpopular group (retail pet stores, out-of-state breeders, and brokers) who were all labeled "puppy mills." The resulting law is not rationally related to any legitimate local State

interest under the State's police powers to address the health, safety, and welfare of its citizens.  To the contrary, the ban of the sale of cats and dogs is limited and targeted only at retail pet stores and out-of-state breeders and brokers.  In-state local unregulated shelters and rescues (who may obtain dogs from out-of-state USDA licensed breeders and brokers) may still sell and showcase in pet stores without any consumer protection and disclosure requirements that were in place prior to the ban, resulting in increased costs to the Maryland consumer to find the purebred puppies they desire or rely on the internet and hope they do not get scammed.

169.   As a direct and proximate cause of 2021 Pet Store Ban, all Plaintiffs will be severely economically impacted, and Just Puppies and Charm City Puppies will go out of business.

WHEREFORE, Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, Tara Baker d/b/a Valley View Kennel, and Sobrad, LLC d/b/a Pinnacle Pet, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, declare the Maryland Pet Store Ban is unconstitutional, and award preliminary and permanent injunctive relief, award attorneys' fees, costs, and other such relief as this Court deems just and proper.

## COUNT VI

## <u>VIOLATION OF DUE PROCESS CLAUSE (VOID FOR VAGUENESS)</u>

170.    Plaintiffs incorporate Paragraphs 1 through 169 above as fully set forth herein.

171.    Under the Fifth Amendment, "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law. . . ."  U.S. Const. amend V.

172.    "[T]he void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an arbitrary or discriminatory way."  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citing *Grayned v. City of Rockford*, 408 U.S. 104, 108-09 (1972)).

173.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *Fox TV Stations, Inc.*, 567 U.S. at 253 (citing *Connally v. General Constr. Co.*, 269 U. S. 385, 391 (1926) ("[A] statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law"); *Papachristou v. Jacksonville*, 405 U. S. 156, 162,  (1972) ("Living under a rule of law entails various suppositions, one of which is that '[all persons]  are entitled to be informed as to what the State commands or forbids'" (quoting *Lanzetta v. New Jersey*, 306 U. S. 451, 453 (1939) (alteration in original)). This requirement of clarity in regulation is essential to the

protections provided by the Due Process Clause of the Fifth Amendment. *See United States v. Williams*, 553 U. S. 285, 304 (2008). "It requires the invalidation of laws that are impermissibly vague." *Fox TV Stations, Inc.*, 567 U.S. at 253.

174.    Under the 2021 Pet Store Ban, Section 19-703 was amended to state:

(a) Prohibition. -- A retail pet store may not sell or otherwise transfer or dispose of cats or dogs.

(b) Exception. -- This section may not be construed to prohibit a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption.

(Exh. 5 -- Md. Code Ann., Bus. Reg. § 19-703 (effective July 1, 2021)).   The new prohibition against the sale of dogs and cats in pet stores under Section 19-703(a), eliminated "offer for sale," and the definition for "offer of sale," set forth in the Section 19-701(f) was eliminated.   *Id*. -- Md. Code Ann., Bus. Reg. § 19-701(f) and 19-703(a) (effective July 1, 2021).

175.    Section 19-701(g) was also amended to change the definition of a "retail pet store" to "a for profit establishment that sells or offers for sale domestic animals to be kept as household pets, or a 'broker.'"   (Exh. 5).   While a retail pet store includes an establishment that "offers for sale" puppies, the amended law eliminates the definition of "offer for sale." *Id*.

176.    Under Section 19-703(a), the term "transfer" is not defined, and under Section 19-703(b), the term "showcase" is undefined.

177.    If anyone violates the 2021 Pet Store Ban, such violation may be deemed an unfair and deceptive trade practice under Title 13 of the Commercial Law Article, and

subject to enforcement and penalty provisions contained in Title 13, including fines.  *See* Md. Code Ann., Bus. Reg. § 19-706.

178.   One possible interpretation of 19-703(a) may be that a retail pet store may "showcase" and "offer to sell" (including "advertise for sale") cats and dogs, since those undefined terms are specifically not included in 19-703(a).   Such an interpretation, however, would seemingly be in conflict with Section 19-703(a) prohibition on actually selling, or otherwise transferring or disposing of cats and dogs.  The statute does not define "transfer" or "dispose."  If a retail pet store can "showcase" or "offer for sale" dogs and cats, how can they possibly do so without the ability to transfer or dispose of the animals or consummate the sale?  The vagueness of the undefined terms makes it so "that men of common intelligence must necessarily guess at its meaning and differ as to its application." Such statute should be declared void.

179.   The vagueness further underscores the conflict with the definitions of a retail pet store, breeders, and brokers under the AWA and creates compliance issues thereunder. Because the 2021 Pet Store Ban is vague as to the store's abilities to showcase, offer for sale, and transfer, it is equally unclear if the regulations promulgated by the AWA now apply to Maryland retail pet stores and if they do apply, how so.

180.   If a retail pet store cannot sell or transfer but can only showcase, then under the AWA it is not a retail pet store and thus, not exempt from federal licensing requirements.  If the Maryland pet stores are no longer exempt "retail pet stores" under the AWA, then they may be considered Class B dealers (brokers), involving the resale of any animal, or Class C licensees (exhibitors), involving the showing or displaying of animals

to the public.  (*See* Exh. 1 -- § 1.1 -- AWA Bluebook).  Under either licensee class, the pet stores would be subject to a complex regulatory scheme regarding their licensing requirements, holding facilities, and subject to stringent holding periods.

181.    Retail pet stores in Maryland are not permitted to "showcase" puppies owned by USDA breeders that are not present during the "process," as defined by regulation. (See Exh. 1, § 1.1 -- AWA Bluebook).  This is the case because Class A breeders are not permitted to exhibit their puppies in other locations without notification and permission by USDA and can only do so for specified time periods. *Id*.  To make matters even more complicated, retail pet stores are specifically excluded from the definition of "exhibitor" and therefore are unable to obtain Class C (exhibitor) licenses.  Even if they were permitted to "showcase," retail pet stores in Maryland still cannot sell or transfer or dispose of puppies,

182.    Further, all USDA licensed breeders and brokers must keep their animals in a USDA inspected and approved facility until the animal is sold, transferred, or adopted. Thus, a USDA licensed breeder and broker may not facilitate the birth of their puppies in order to sell them in a retail pet store (or other facility) that is not maintained and controlled by them and that does not meet the standards of the USDA (and is also subject to random inspection by the USDA).  In Maryland, prior to the ban, USDA licensed breeders and brokers delivered, sold, and transferred the puppies to the stores when they arrived in Maryland.  Thus, the breeders and brokers were no longer responsible for the care of the puppies at that time because they no longer owned them.  The 2021 Pet Store Ban permits selling dogs for sale in retail pet stores only if those dogs were born at the establishment;

however, USDA licensed breeders and brokers, even those located in Maryland, cannot participate because the stores are not USDA certified and inspected.  If the breeders and brokers cannot maintain their USDA licenses and still showcase in Maryland retail pet stores.  Thus, showcasing in pet stores interferes with the breeders' and brokers' ability to fulfill their USDA licensing requirements and creates an impermissible obstacle.

183.    The undefined terms in the 2021 Pet Store ban make the Maryland statute void for vagueness and the Court should declare the law unconstitutional on that basis.

184.    While recognizing the need for a task force to be formed to study and report on a complex industry and marketplace in which pet stores, breeders, and brokers are subject to Federal laws and regulations, the 2021 Pet Store Ban continues to ban sales of dogs and cats from retail pet stores and disrupt the entire interstate pet market channel, without the benefit of any findings and recommendations of such task force.

185.    As a direct and proximate cause of 2021 Pet Store Ban, all Plaintiffs will be severely economically impacted, and Just Puppies and Charm City Puppies will go out of business.

WHEREFORE, Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, Tara Baker d/b/a Valley View Kennel, and Sobrad, LLC d/b/a Pinnacle Pet, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, declare the Maryland Pet Store Ban is unconstitutional, and award preliminary and permanent

injunctive relief,  award attorneys' fees, costs, and other such relief as this Court deems just and proper.

## COUNT VII

## VIOLATION OF MARYLAND DECLARATION OF RIGHTS ANTI-MONOPOLY CLAUSE

186.    Plaintiffs incorporate Paragraphs 1 through 185 above as fully set forth herein.

187.    The Maryland Constitution's Declaration of Rights states, "[t]hat monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered."  Md. Dec. of R. art. 41.

188.    Maryland courts have consistently held that a monopoly under the Maryland Declaration of Rights is a "privilege or power to . . . the operation of a trade or business to the exclusion of others, who otherwise would be at liberty to engage therein, necessarily implying the suppression of competition, and ordinarily causing a restraint of that freedom to engage in trade or commerce which the citizen enjoys by a common right."  *Levin v. Sinai Hosp. of Balt. City*, 186 Md. 174, 182 (1945).

189.    The 2021 Pet Store Ban creates an unconstitutional monopoly in Maryland by destroying competition and restraining the free availability of pets to the public.  *Id.* at 183.  Under the new Maryland legislation, all Maryland breeders, unregulated rescues or animal shelters will have the exclusive privilege and power to sell dogs and cats to Maryland consumers from their establishments in Maryland where consumers can inspect the animals before purchase.   Out-of-state breeders and brokers are unable to have their

animals sold in establishments in Maryland like retail pet stores since the animals were not born there.  For out-of-state breeders and brokers to try to sell direct to the Maryland consumers over the internet, the costs for such animals would likely double in cost due the expensive transportation and delivery costs.

190.    The 2021 Pet Store Ban suppresses the competition between pet marketplace in Maryland by not allowing out-of-state breeders and brokers to sell their animals in retail pet stores where consumers can have an opportunity to inspect the animal prior to the sale like they can do with Maryland breeders, rescues, and shelters.

191.    Under the new Maryland legislation, Maryland consumers will no longer have the freedom to engage in pet sales through Maryland pet stores where they had access to out-of-state breeders and brokers who provide a wide offering of desirable breeds to be able to meet and inspect the animals face to face before they make a decision to purchase. Maryland consumers are currently able to buy a variety of pets sold in Maryland pet stores due to the influx of pets provided by out-of-state breeders such as Ms. Baker, others breeders, and brokers.

192.    As a direct and proximate cause of the 2021 Pet Store Ban, all Plaintiffs will be economically impacted severely once the ban has taken effect.  The ban will suppress competition in the pet sale market and will cause a restraint of freedom to engage in trade of commerce which the citizens of Maryland have a common right to enjoy.

WHEREFORE, Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, Tara Baker d/b/a Valley View Kennel and Sobrad, LLC

d/b/a Pinnacle Pet,  respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, declare the Maryland Pet Store Ban is unconstitutional, and award preliminary and permanent injunctive relief,  award attorneys' fees, costs, and other such relief as this Court deems just and proper.

## COUNT VIII

## FEDERAL DECLARATORY JUDGMENT ACT (28 U.S.C. § 2201)

193.    Plaintiffs incorporate Paragraphs 1 through 192 above as fully set forth herein.

194.    Pursuant to Section 28 U.S.C. § 2201(a), any court of the United States may declare the rights and legal relations of any interested party seeking such declaration in a case of actual controversy within its jurisdiction.

195.    The Plaintiffs and Defendant are interested parties and an actual, real, and substantial controversy exists regarding the validity and enforceability of the 2021  Retail Pet Store Ban under the United States Constitution,  the Maryland Declaration of Rights, and as set forth above in each count in this Complaint which are all incorporated herein.

196.    The 2021 Pet Store Ban takes effect on July 1, 2021, all Plaintiffs were severely economically impacted, and Just Puppies and Charm City Puppies will not be able to continue to operate their business.  Plaintiffs seek declaratory relief from the Court to declare Maryland's Pet Store Ban unconstitutional and invalid.

WHEREFORE, Plaintiffs, Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc., d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a

Charm City Puppies & Boutique, Tara Baker d/b/a Valley View Kennel, and Sobrad, LLC d/b/a Pinnacle Pet, respectfully request that this Honorable Court enter judgment against Defendant, Brian E. Frosh, Attorney General for the State of Maryland, and:

A.    Declare that Sections 19-701 and 19-703 of the Maryland Business Regulation Code Annotated is unconstitutional under Article I, Section 8, Clause 3 of the United States Constitution, and the Fifth and Fourteenth Amendments of the United States Constitution, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201;

B.    Declare that Sections 19-701 and 19-703 of the Maryland Business Regulation Code Annotated is invalid and preempted under the Animal Welfare Act, 7 U.S.C. § 2131, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201;

C.    Declare that Sections 19-701 and 19-703 of the Maryland Business Regulation Code Annotated is unconstitutional under Maryland's Declaration of Rights, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201;

D.    Enter a preliminary and permanent injunction enjoining Defendant and its agents from enforcing Sections 19-701 and 19-703 of the 2021 Pet Store Ban;

E.    Award Plaintiffs their reasonable attorneys' fees and costs of this action pursuant to 42 U.S.C. § 1988; and

F.    Grant Plaintiffs such other relief as the Court deems just and proper.

Dated: May 24, 2021                Respectfully submitted,


_____ /s/  *Jonathan P. Kagan*_____
Jonathan P. Kagan
(D. Md. Bar No. 23181)
kagan@kaganstern.com


_____ /s/  *Meagan C. Borgerson*_____
Meagan C. Borgerson
(D. Md. Bar No. 13686)
borgerson@kaganstern.com


_____ /s/  *Heather K. Yeung*_____
Heather K. Yeung
(D. Md. Bar No. 20050)
yeung@kaganstern.com


KAGAN STERN MARINELLO & BEARD, LLC
238 West Street
Annapolis, Maryland 21401
Phone:          (410) 216-7900
Facsimile:      (410) 705-0836

*Counsel for Plaintiffs Just Puppies, Inc. d/b/a Just Puppies Towson, Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville, Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique, Tara Baker d/b/a Valley View Kennel, and Sobrad, LLC d/b/a Pinnacle Pet*