IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

JUST PUPPIES, INC., *et al.*,
*Plaintiffs*,

    v.

BRIAN E. FROSH,
*Defendant*.

Civil Action No. ELH-21-1281
Related Case No. ELH-19-2439

## MEMORANDUM OPINION

This case involves a constitutional challenge to a Maryland law that bans the sale of dogs and cats by retail pet stores and brokers. The statute, which went into effect on July 1, 2021, is titled "Retail Pet Stores and the Task Force to Study Canine Breeding Facilities and Sourcing Standards" (the "Act" or "2021 Act"). *See* Md. Code (2015 Repl. Vol, 2021 Supp.), § 19-701 *et seq.*, of the Business Regulation Article ("Bus. Reg." or "B.R.").

In response to the Act, which amends an earlier version of the law, three Maryland pet stores, a Missouri dog breeder, and a Missouri dog broker filed a 69-page "Complaint For Declaratory And Injunctive Relief" against Brian Frosh, the Maryland Attorney General (hereinafter, the "State"). Plaintiffs seek, *inter alia*, an injunction prohibiting enforcement of the Act and a declaration that the Act is unconstitutional under the Commerce Clause, the Equal Protection Clause, and the Due Process Clause of the Constitution, as well as Maryland law. ECF 1 ("Complaint"). The Complaint is supported by seven exhibits. ECF 1-1 to ECF 1-7.

The plaintiffs are Just Puppies, Inc. d/b/a Just Puppies Towson; Just Puppies of Maryland, Inc. d/b/a Just Puppies Rockville (collectively, "Just Puppies"); Charm City Puppies, LLC d/b/a Charm City Puppies & Boutique ("Charm City Puppies"); Tara Baker d/b/a Valley View Kennel, a licensed dog breeder in Missouri ("Valley View"); and Sobrad, LLC d/b/a Pinnacle Pet

("Pinnacle Pet"), a Missouri-based broker of dogs.  I shall sometimes refer to Just Puppies and Charm City Puppies collectively as the "Pet Stores" or the "Pet Store Plaintiffs."

Most of the current plaintiffs were parties to a prior challenge to the constitutionality of an earlier version of the Act, passed by the Maryland General Assembly in 2018.  Titled "No More Puppy-Mill Pups Act," that version of the law went into effect on January 1, 2020 (the "2020 Act"), and spawned related litigation in 2019 and 2020 ("2019-20 Litigation").  *See Just Puppies, Inc. v. Frosh*, ELH-19-2439 ("*Just Puppies I*").  Because this case concerns the 2021 version of the law, I shall refer to this case as "*Just Puppies II*" or the "2021 Litigation."

The Complaint contains eight counts. Count I is titled "Federal Preemption" and asserts that the 2021 Act is preempted by the Animal Welfare Act of 1966, 7 U.S.C. § 2131 *et seq.* ("AWA").  *See* ECF 1, ¶¶ 101-14. Counts II, III, and IV arise under the Commerce Clause, and generally allege that the Act violates the implied limits on state power imposed by the Commerce Clause. ECF 1, ¶¶ 115-53; *see* U.S. Const. art. I, § 8, cl. 3.  In particular, Count II is titled "Violation of Commerce Clause – The 2021 Pet Store Ban is Discriminatory in its Purpose And Effect Against Out-Of-State Breeders And Brokers."  Count III is titled "Violation Of Commerce Clause – The 2021 Pet Store Ban is Discriminatory in its Purpose And Effect Against In-State Retail Pet Stores." Count IV is titled "Violation Of The Commerce Clause – Undue Burden On Interstate Commerce (Pike Balancing) Against Retail Pet Stores, Out-Of-State Breeders And Brokers."  In Count V, plaintiffs allege that the Act violates the Equal Protection Clause of the Fourteenth Amendment to the Constitution.  *Id.* ¶¶ 154-69; *see* U.S. Const. amend. XIV.  Count VI is titled "Violation Of Due Process Clause (Void For Vagueness)." *Id.* ¶¶ 171-85. In Count VII, titled "Violation Of Maryland Declaration Of Rights Anti-Monopoly Clause," plaintiffs claim that the Act gives Maryland breeders and unregulated animal shelters a monopoly to sell pets to Maryland

consumers, in violation of the anti-monopoly clause in Article 41 of the Maryland Declaration of Rights. *Id.* ¶¶ 186-92. And, in Count VIII, plaintiffs seek a declaratory judgment, pursuant to the "Federal Declaratory Judgment Act," 28 U.S.C. § 2201, to the effect that the Act violates federal law. *Id.* ¶¶ 194-96.

Plaintiffs have also moved for a preliminary injunction, seeking to stay the enforcement of the 2021 Act pending resolution of this case. ECF 5. The motion is supported by a memorandum (ECF 5-1) (collectively, "Preliminary Injunction Motion" or "P.I. Motion") and several exhibits.[1] Plaintiffs contend that the 2021 Act "expanded the ban on the sales of dogs" and "was prematurely enacted without the benefit of the results of the task force study." ECF 5-1 at 4. Further, plaintiffs complain that the Pet Store Plaintiffs "will be forced out of business since they will be unable to sell dogs to Maryland consumers." *Id.* at 5.

The State has filed a combined opposition to the P.I. Motion and a motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6). ECF 9. Defendant's motion is supported by a memorandum (ECF 9-1) (collectively, "Motion to Dismiss" or "Motion") and several exhibits. It contends that the Complaint is "simply an attempt at a do-over of [plaintiffs'] unsuccessful 2019 litigation, under the auspices of a challenge to a new legislation…that did little more than close a perceived loophole" in the 2020 Act. ECF 9-1 at 6.[2] Thus, according to defendant, "the same result in the 2019 litigation should abide here." *Id.*

---

[1] Plaintiffs submitted the same exhibits in support of their Complaint and their P.I. Motion. I shall refer to the exhibits submitted with the Complaint.

[2] Plaintiffs have added a claim of vagueness under the Due Process Clause. The earlier version of the statute applied to pet stores "open to the public." Therefore, some pet stores began to use an appointment-only model, under the belief that this meant they were not "open to the public."

Plaintiffs have filed a combined opposition to the Motion to Dismiss and reply in support of the P.I. Motion. ECF 14. Defendant has replied. ECF 17.

The Humane Society of the United States ("HSUS" or "Humane Society") moved for leave to file an amicus curiae brief in support of the State. ECF 10. I granted that motion. ECF 12. The brief is docketed at ECF 13. The Humane Society maintains, *inter alia*, that the litigation involves "issues of vital importance to Maryland citizens," in order to combat "inhuman treatment of animals" by "unscrupulous commercial breeding facilities," referenced as "puppy mills." *Id.* at 2.

On August 9, 10, and 11, 2021, the Court held an evidentiary hearing and heard argument as to the motions. ECF 21; ECF 23; ECF 24. Numerous exhibits were introduced by plaintiffs ("Pl.'s Ex."). By stipulation, the parties also agreed to incorporate the evidence and argument presented during the 2019-20 Litigation. *See* ECF 22. To that end, the court transcripts from the hearings held on January 29 and January 30 of 2020 were introduced in this case as Joint Exhibits ("J.E.") 1A, 1B, and 1C.

For the reasons that follow, I shall deny the P.I. Motion and grant the Motion to Dismiss.

## I.   Procedural Background[3]

In 2019, in *Just Puppies I*, four pet stores, a dog breeder, and a dog broker filed suit against Frosh; the Consumer Protection Division of the Office of the Maryland Attorney General ("CPD"); and two committees of the Maryland General Assembly: the Maryland State Senate Finance Committee and the Maryland House Economic Matters Committee. *Just Puppies I*, ECF 1. The plaintiffs in that suit were Just Puppies; Charm City Puppies; Today's Pet, Inc., d/b/a Today's Pet ("Today's Pet"); Jodie Hancock, d/b/a 2 Mile Kennel, a dog breeder located in Missouri; and

---

[3] Throughout the opinion, I cite to the electronic pagination. That pagination does not always correspond to the page number that appears on a particular submission.

Pinnacle Pet.  Tara Baker has replaced Hancock in this suit.  Today's Pet, one of the retail pet stores involved as a plaintiff in *Just Puppies I*, is not involved in the 2021 Litigation.

In the 2019-20 Litigation, as in this suit, the plaintiffs claimed that the prohibition on the sale of dogs by retail pet stores is preempted by the AWA, and violates the dormant Commerce Clause, the Equal Protection Clause, and the Anti-Monopoly Clause of the Maryland Declaration of Rights. *Id.* The State moved to dismiss.  *See Just Puppies I*, ECF 5.

As noted, the Court held an evidentiary hearing in late January 2020, with respect to the 2019-20 Litigation.  *See* J.E. 1A, 1B, and 1C.  Thereafter, by Memorandum Opinion and Order of February 7, 2020, I granted the motion to dismiss and denied the preliminary injunction motion. *Just Puppies I*, ECF 49, ECF 50; *see* ECF 52.[4]  Thereafter, plaintiffs moved for leave to file an amended complaint. *Just Puppies I*, ECF 53. By Memorandum Opinion and Order of May 6, 2020, I concluded that plaintiffs' claims, even if amended, were plagued by incurable deficiencies, and I denied the motion. *Id.,* ECF 60; ECF 61.

Plaintiffs subsequently appealed to the Court of Appeals for the Fourth Circuit. *Id.*, ECF 62.  Shortly before oral argument was to be held in May 2021, the Maryland General Assembly amended the 2020 Act.  Therefore, on April 29, 2021, at the request of the State, and without opposition from plaintiffs, the Fourth Circuit vacated my rulings as to the 2020 Act and remanded the case to this Court to consider the claims in light of the 2021 Act. *Id.*, ECF 67; ECF 68.

---

[4] I determined that the Eleventh Amendment compelled the dismissal of the suit as to the CPD and the Maryland General Assembly, but I rejected the State's contention that sovereign immunity barred the suit altogether, observing that Mr. Frosh was a proper defendant.  *Just Puppies I*, ECF 52 at 29-35.

Westlaw subsequently designated the opinion for publication. Thereafter, on February 19, 2020, I docketed a revised version of the Memorandum Opinion, containing non-substantive, typographical and "Bluebook" corrections. *Just Puppies I*, ECF 52. I shall cite to ECF 52.

Thereafter, I stayed the 2019-20 Litigation, because it concerned the 2020 Act, pending resolution of the new suit, which concerns the 2021 Act.  *See Just Puppies I*, ECF 77.

## II.    Factual Background[5]

As noted, the hearings in regard to the 2019-20 Litigation culminated in two opinions.  ECF 52; ECF 61.  At the hearing in August 2021, as to the 2021 Litigation, I specifically asked plaintiffs' counsel if, from his perspective, the Court made any factual errors in its rulings in *Just Puppies I*.  Plaintiffs' counsel had no quarrel with the Court's factual summary.  Nor did he have any serious challenge to the Court's recitation of the applicable law.  Rather, plaintiffs' quarrel is with the Court's conclusions, *i.e.*, the application of the law to the facts.  Therefore, I incorporate here the summary of the facts as set forth in ECF 52 and ECF 61.  However, I shall restate many of the facts for context, and I shall amplify them, where appropriate.

### A.  The Plaintiffs

The plaintiffs consist of several Maryland pet stores, a Missouri dog breeder, and a Missouri dog broker.  The retail model for cats and dogs typically involves all three of these categories.  *Just Puppies I*, ECF 1, ¶¶ 89-90.  Breeders produce litters of puppies and kittens.  *See id.* ¶ 89.  Some breeders sell their inventory to retail stores or consumers, while others sell to brokers, who then re-sell the animals.  *Id.* ¶¶ 89-90.  At the end of the supply chain, brick-and-mortar pet stores typically sell cats and dogs to the public.  Plaintiffs assert, *Just Puppies II*, ECF 1, ¶ 66: "Annually, thousands of puppies freely flow into the Maryland marketplace from out-of-

---

[5] I do not have a transcript from the hearings held in August of 2021.  Therefore, I have relied on my notes.  Nevertheless, the facts are largely undisputed.

With regard to the Motion to Dismiss, I must assume the truth of plaintiffs' allegations.  A different standard applies to the P.I. Motion, discussed, *infra*.

state breeders to Maryland retail pet stores where Maryland consumers can meet, pet, examine, and interact with these domestic animals before the consumer makes a decision to purchase."

Just Puppies is a family-owned business that operates pet stores in Rockville, Maryland and Towson, Maryland. *Id.* ¶ 62.[6]  It sells only dogs, and alleges that roughly 90 to 95 percent of its gross sales derive from the sale of dogs. *Id.* ¶ 63.  In contrast, it derives just 5 to 10 percent of its revenue from the sale of pet accessories.  *Id.* Just Puppies purchases approximately 1,500 puppies per year from out-of-state breeders to sell at its Maryland retail stores. *Id.* ¶ 64. According to plaintiffs, puppies can "range in price from $1,500 to $4,500, and thus the revenues generated by the retail pet stores are in the millions annually." *Id.*

Charm City has been in business since 2012 and sells purebred dogs and designer breed puppies. *Id.* ¶ 68.  Like Just Puppies, Charm City derives nearly all of its revenue from selling dogs. *Id.* ¶ 69. It purchases approximately 600 puppies per year from brokers to sell at its Maryland retail store. *Id.* ¶ 70. These puppies, according to plaintiffs, can range in price from $2,500 to $6,500. *Id.*

The Pet Stores maintain that they source their dogs only from reputable breeders and brokers, licensed by the United States Department of Agriculture ("USDA").  *Id.* ¶¶ 64, 70. Further, they claim that the "demand for puppies by Maryland consumers generally exceeds the supply that retail pet stores are able to obtain from out-of-state breeders." *Id.*  And, they allege that they continue to comply with the "strict" requirements concerning sourcing, record maintenance, and health standards, as established by the 2012 and 2016 Maryland laws, even though those laws are no longer in effect. *Id.* ¶ 77.

---

[6] Just Puppies previously had a store in Laurel, Maryland.  But, that store closed in April 2009. ECF 1, ¶ 62.

Just Puppies and Charm City Puppies maintain websites. But, they do not sell dogs via the Internet. *Id.* ¶ 78. Moreover, "[a]ll transactions take place at the pet store locations by appointment only." *Id.* Notably, the Pet Stores implemented the appointment only method of sales after this Court issued its ruling in *Just Puppies I*, upholding the 2020 Act. *See* ECF 1, ¶ 38.

Plaintiff Baker is "[o]ne of the reputable breeders from whom Just Puppies obtains its dogs . . . ." *Id.* ¶ 65. Ms. Baker is a commercial dog breeder located in Missouri. *Id.* ¶ 7. She has been operating since 2019, "selling various breeds of dogs exclusively to Just Puppies for sale in Maryland," and is licensed by both the USDA and the State of Missouri. *Id.* ¶ 65. Just Puppies purchases puppies from Ms. Baker in her home state and transports them to Maryland. *Id.* ¶ 66. "Ms. Baker maintains full and accurate records of all pedigrees and dates of birth, as well as complete health and vaccination records." *Id.* ¶ 65. She also "routinely has her dogs treated and inspected by licensed veterinarians." *Id.*

Ms. Baker has never been found in violation of either USDA or Missouri regulations. *Id.* She does not maintain a website, nor does she sell directly to the public. *Id.* ¶ 67. According to plaintiffs, "selling directly to Maryland consumers would impose substantial and increased costs on Ms. Baker and all other similarly situated out-of-state breeders, as well as the Maryland consumer." *Id.* In particular, either the Maryland consumer or the out-of-state breeder would have to "incur expensive ground and/or air transportation charges and fees with a company to transport their puppies from out-of-state to Maryland." *Id.* Plaintiffs assert that transporting a puppy from Missouri to Maryland could cost "anywhere from $700.00 up to $2,000.00 per animal." *Id.* These costs would allegedly double the "costs of the dogs purchased for Maryland residents for puppies from out-of-state breeders." *Id.*

8

Pinnacle Pet is a Missouri-based dog broker licensed by the USDA and the State of Missouri. *Id.* ¶ 72. Pinnacle Pet purchases purebred and designer dogs from licensed breeders and resells them to pet stores, such as Charm City Puppies. *Id.* ¶¶ 70, 75. Although Pinnacle Pet maintains a website, it sells only to pet stores; it does not sell directly to the public. *Id.* ¶ 71. In its six years of business, Pinnacle Pet has never been found in violation of federal or state regulations. *Id.* ¶ 73. As part of USDA and state licensing requirements, Pinnacle Pet is subject to "random and unannounced inspections." *Id.* ¶ 72. Moreover, Pinnacle Pet maintains full and accurate records of pedigrees and dates of birth, as well as health and vaccination records, and routinely has its dogs treated and inspected by licensed veterinarians. *Id.* ¶ 74.

According to plaintiffs, once the 2021 Act takes effect, Just Puppies and Charm City Puppies will no longer be able to operate because the puppies they sell are not born in their stores. *Id.* ¶ 79. In contrast, Maryland licensed breeders and hobby breeders "will continue to operate and thrive in the new marketplace with less competition now in Maryland from pet stores…." *Id.* ¶ 80. Further, plaintiffs claim that, in the absence of retail pet stores, Maryland residents "seeking to purchase purebred and designer puppies will have to heavily rely on the unregulated internet and print advertising to try to locate such dogs." *Id.* ¶ 82. They assert that the online sales of pets has "a notoriously high incidence of fraud and scams which will only increase against Maryland residents now that the [2021 Act] has gone into effect." *Id.*

Further, plaintiffs assert that the 2021 Act interrupts the "stream of interstate commerce for the purchase of puppies that the consumers most desire and would ordinarily purchase in retail pet stores in Maryland and have face-to-face interaction like consumers can do with all Maryland breeders." *Id.* ¶ 83. And, they posit that the legislation will "disrupt the free market of professionally bred pets and instead favor Maryland breeders who are exempt…and cause

Maryland residents to have to utilize the unregulated internet…or try to find a dog or cat from the limited inventory available at nonprofit rescues and shelters." *Id.* ¶ 84.

Plaintiffs insist that the 2021 Act is misguided. They point to "scams" that have impacted consumers who have been forced to resort to online purchases. *Id.* ¶¶ 85-89. And, they reference instances of animal abuse by unregulated hobby breeders. *Id.* ¶¶ 90-94. In addition, they cite serious issues in regard to the sourcing of dogs from rescue organizations and animal shelters. *Id.* ¶¶ 95-99.

### B.  The Animal Welfare Act of 1966

Breeders and brokers who sell cats and dogs in interstate commerce must comply with the Animal Welfare Act of 1966, 7 U.S.C. § 2131 *et seq.*, and its implementing regulations, issued by the Secretary of the USDA. Notably, the AWA does not govern retail pet stores. But, retail pet stores in Maryland are subject to regulation under Maryland law.

Congress enacted the AWA, in part, to "insure that animals intended . . . for use as pets are provided humane care and treatment"; "to assure the humane treatment of animals during transportation in commerce"; and "to protect the owners of animals from the theft of their animals by preventing the sale or use of animals which have been stolen." 7 U.S.C. § 2131; *see also* ECF 1, ¶ 101. It also provides, 7 U.S.C. § 2131: "The Congress further finds that it is essential to regulate…the transportation, purchase, sale, housing, care, handling, and treatment of animals by carriers or by persons or organizations engaged in using them for research or experimental purposes or for exhibition purposes or holding them for sale as pets or for any such purpose or use."

To achieve this goal, the AWA regulates animal "dealers," which it broadly defines as "any person who, in commerce, for compensation or profit, delivers for transportation, or transports,

except as a carrier, buys, or sells, or negotiates the purchase or sale of . . . any dog or other animal whether alive or dead for research, teaching, exhibition, or use as a pet[.]"  7 U.S.C. § 2132(f). Notably, the AWA's definition of dealer excludes retail pet stores.  *Id.*

Under the AWA, a dealer must possess a valid license to buy, sell, or transport in commerce a cat or dog intended for use as a pet.  *See id.* § 2134.  But, the AWA does not establish a detailed regulatory scheme, instead authorizing the Secretary of the USDA to craft the details.  *See id.* § 2133 (granting authority to prescribe licensing process); *id.* § 2143(a)(1) (providing that "[t]he Secretary shall promulgate standards to govern the humane handling, care, treatment, and transportation of animals by dealers"); *id.* § 2146(a) (directing the Secretary to "make such investigations or inspections as he deems necessary to determine whether any dealer . . . has violated or is violating [the AWA]").

Pursuant to this authority, the USDA Secretary has created three licensing categories. 9 C.F.R. § 1.1.  Two are implicated here.  The "Class 'A' licensee" is any dealer subject to licensure under the AWA "whose business involving animals consists only of animals that are bred and raised on the premises."  *Id.*  The "Class 'B' licensee" is any regulated dealer "whose business includes the purchase and/or resale of any animal," including "brokers . . . [who] negotiate or arrange for the purchase, sale, or transport of animals in commerce."  *Id.* [7]  Breeders who have four or fewer breeding females and sell only the offspring of those females are exempt from the AWA's licensing requirements.  *Id.* § 2.1(a)(3)(iii).

Licensees must abide by certain standards of care.  *Id.* § 2.3(a). [8]  These requirements include housing dogs and cats in structurally appropriate enclosures, *id.* §§ 3.1-3.6; feeding them

---

[7] The third classification concerns exhibitors.  *See* 9 C.F.R. § 1.1.

[8] Some would say that the USDA sets a low bar, and is limited in its capacity to enforce its regulations.  ECF 10 at 6.  As the State points out, ECF 9-1 at 11 n.5, the issuance of a license by

at least once a day, *id.* § 3.9; and ensuring that their environment is sanitary and free of pests. *Id.* § 3.11. Licensees must also maintain detailed records of each animal they buy or sell, *id.* § 2.75, and they must provide the USDA Secretary with sales information on an annual basis. *Id.* § 2.7. In addition, licensees are subject to random inspections by USDA officials. *Id.* § 2.126. Licensees who violate the AWA or USDA regulations face civil penalties and the suspension or revocation of their license. 7 U.S.C. §§ 2147, 2149. In 9 C.F.R. § 2.10(c) it states: "Any person whose license has been suspended or revoked shall not buy, sell, transport, exhibit, or deliver for transportation, any animal during the period of suspension or revocation."

Significantly, the AWA expressly contemplates state and local regulation of commerce in animals. The statute authorizes the USDA Secretary "to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of this chapter and of any State, local, or municipal legislation or ordinance on the same subject." 7 U.S.C. § 2145(b). Further, the AWA provides that its grant of authority to the USDA Secretary to issue regulations "govern[ing] the humane handling, care, treatment and transportation of animals by dealers," *id.* § 2143(a)(1), "shall not prohibit any State (or a political subdivision of such State) from promulgating standards in addition to those standards promulgated by the Secretary under paragraph (1)." *Id.* § 2143(a)(8).

### C. Maryland Regulation of Pet Sales Prior to 2020

The term "puppy mill" is a pejorative one, used by the animal rights community to refer to a high-volume "'dog-breeding operation, which offers dogs for monetary compensation or

---

the USDA does not assure that the dealer is necessarily a responsible one. *See People for the Ethical Treatment of Animals v. USDA*, 861 F.3d 502, 505 n.4 (4th Cir. 2017) (referencing "disturbing" violations committed by entities that had passed USDA inspection, including a dog kennel with "over 100 hundred [sic] pages of violations").

remuneration, in which the physical, psychological and/or behavioral needs of the dogs are not being fulfilled due to inadequate housing, shelter, staffing, nutrition, socialization, sanitation, exercise, veterinary care, and/or inappropriate breeding.'" ECF 1, ¶ 14 (quoting "Pet Industry and Animal Welfare Organizations Join Forces to Address Puppy Mill Abuse," Business Wire, December 13, 2012). In 2012, twenty states, including Maryland, enacted legislation to regulate the sale of dogs in an effort to address the harms associated with so called "puppy mills." ECF 1, ¶ 13; *see* 2012 Md. Laws., Ch. 214; *see also* Rebecca F. Wisch, *Table of State Commercial Pet Breeder Laws*, Mich. St. U. C. of L.: Animal Legal & Historical Ctr. (2017), *archived at* https://perma.cc/G8XK-M7QM (cataloging states' breeder regulations).

Maryland sought to tackle this issue by imposing regulations on retail pet stores. ECF 1, ¶¶ 15-21. Title 19 of the Business Regulation Article is called "Miscellaneous State Business Regulation." Subtitle 7 is titled "Retail Pet Stores." A retail pet store was defined as "a for-profit establishment open to the public that sells or offers for sale domestic animals to be kept as household pets." Bus. Reg. § 19-701(j) (repealed eff. Jan. 1, 2020). Such stores had to maintain written records of the breeders and brokers they utilized, including the state in which the dealer was located and his or her USDA license number. *See id.* § 19-703 (repealed eff. Jan. 1, 2020). Stores were also required to "conspicuously" post each puppy's breed, age, date of birth, and medical history, and provide purchasers with a health certificate from a licensed veterinarian certifying that the animal was healthy. *Id.*

Maryland's regulations were not without force. State law provided that, within seven days of purchase, a dog could be returned if a veterinarian determined that it suffered from an illness, and within 180 days if diagnosed with a congenital or hereditary condition. Bus. Reg. § 19-705, (repealed eff. Jan. 1, 2020). Moreover, stores that violated the reporting requirements were subject

to penalties under Maryland's Consumer Protection Act, Md. Code (2015 Repl. Vol.), § 13-301 *et seq*. of the Commercial Law Article ("C.L."). *See* Bus. Reg. § 19-706 (repealed eff. Jan 1, 2020).

In 2016, the Maryland General Assembly imposed additional requirements on retail pet stores. ECF 1, ¶¶ 22-29; *see* 2016 Md. Laws., Ch. 572. A retail pet store could offer a dog or cat for sale only if the dog or cat was obtained from (1) an animal welfare organization; (2) an animal control unit; (3) the original breeder of the dog or cat if the breeder was licensed by the USDA; or (4) a dealer that obtained the dog or cat from a USDA licensed breeder. Bus. Reg. § 19-702.1(a) (repealed eff. Jan 1, 2020). According to plaintiffs, these requirements "effectively banned local breeders and/or hobby breeders from selling pets to Maryland pet stores because these types of breeders are unregulated and do not hold a USDA license." ECF 1, ¶ 24 (citing 7 U.S.C. § 2123). Further, Maryland prohibited pet stores from doing business with dealers who had received citations from the USDA for violations of the AWA. *See* Bus. Reg. § 19-702.1(b) (repealed eff. Jan 1, 2020).

### D.  The 2020 Act

Notwithstanding Maryland's passage in 2012 and 2016 of the statutes described above, animal welfare organizations continued to lobby for further action. ECF 1, ¶ 30. On February 9, 2018, then Delegate Benjamin Kramer, as a member of the Maryland House of Delegates, introduced House Bill 1662, the "No More Puppy-Mill Pups Act of 2018."[9] *See Legislation*: *HB1662*, Maryland General Assembly, *archived at* https://perma.cc/8RYA-D37X (hereafter, "H.B. 1662 Legislative Record"). The legislation sought to bar the sale of cats and dogs by pet stores and endeavored to promote the adoption of pets from animal welfare organizations.

---

[9] Kramer has since become a State Senator.

On March 12, 2018, the House Economic Matters Committee heard testimony concerning the Act. At the hearing, Senator Kramer spoke in support of the legislation.  ECF 9-2 (Transcript of Economic Matters Committee Meeting, 3/12/18) at 3-5 (Tr. at 6-12).[10]  He also presented several videos depicting the deplorable conditions of so called puppy mills.  And, he maintained that the USDA's regulations were inadequate to ensure the humane treatment of dogs.  *Id.* at 4-5 (Tr. at 8-11).  Delegate Kramer said, in part, *id.* (Tr. at 8-9):

> U-S-D-A regulations are nothing more than survival requirements. There is no limit to the number of dogs on the premises. A puppy mill could have hundreds and often thousands of dogs. There is no requirement on the number of staff that must be available to care for the dogs. Dogs are kept in stacked cages with wire mesh for flooring. Dogs are forced to relieve themselves in their cages. Dogs are confined in spaces only six inches─six inches larger than their bodies. Dogs are caged twenty-four hours a day for their entire lives only to be removed from the cage when being bred. There is no exercise requirement at all. If they are caged with other dogs, as you saw on the video, that's considered exercise when seven or eight of these dogs are crammed into a cage together. No human action at all is required by the USDA. And breeding females can be bred at their first heat and every heat cycle following that. The USDA leaves it up to the puppy mill owners to determine what is adequate food and water. The USDA currently has an estimated 110 inspectors to inspect all facilities under its supervision which is 8,000─almost 9,000 facilities which also includes the circuses, the zoos, the petting farms, wild life parks, research facilities and animal transporters. When audited a few years ago it was discovered that very few of the inspectors were taking any action against the puppy mills. And in fact, some of the most egregious conditions had been─for puppies had been visited just before the audit and no citations at all had been written up for the puppy mills.

Further, Delegate Kramer claimed that the laws concerning pet stores were insufficient to ensure that the animals sold in Maryland pet stores were sourced from reputable breeders.  He explained, *id.* at 5 (Tr. at 11): "As recently as this past December, Animal Welfare Advocates went out and visited every one of the retail pet stores still selling puppies and kittens. Not one store— not one store was in compliance with Maryland State Law on this issue."  Delegate Kramer stressed

---

[10] I use "Tr." to refer to the internal pagination of each transcript, as opposed to the ECF pagination.

that the legislation was necessary to prevent pet stores from "facilitating the abomination that is the puppy mills[.]" *Id.* (Tr. at 11-12).

The House Economic Matters Committee also heard from advocacy organizations that supported the Act. Emily Hovermale, the Maryland State Director of HSUS, testified that pet store puppies are often sick as a result of the squalid conditions in which are were raised. ECF 9-2 at 8-9 (Tr. at 24-27). As an example, she testified that the Centers for Disease Control recently linked a puppy purchased at a pet store to an outbreak of a drug-resistant bacteria that infected 113 people, including five Maryland residents. *Id.* (Tr. at 26). In addition, Ms. Hovermale asserted that "[t]he puppy store model is outdated and socially unacceptable," pointing out that of the largest twenty-five pet store chains in North America only one still sells cats and dogs. *Id.* And, she explained that the 2020 Act "will not impact responsible breeders because they do not already sell to pet stores and rather sell directly to the public so that they can meet prospective buyers in person." *Id.* (Tr. at 27).

Amy Jesse, the Policy Director for HSUS's Stop Puppy Mills Campaign, reaffirmed the points made by Delegate Kramer and Ms. Hovermale. Ms. Jesse testified that "Maryland's current law which requires pet stores to only source from USDA licensed breeders without certain violations of the animal welfare act is not working" because "it is based on a very broken USDA licensing and inspection program." *Id.* at 9 (Tr. at 28). She pointed out that the USDA had removed its inspection reports from the public domain, preventing consumers from verifying if a breeder held a valid license or had received any citations. *Id.* at 10 (Tr. at 29-30). She also testified that HSUS had recently visited Just Puppies and found that the stores were "buying from breeders with abysmal records," some of whom were "notorious" for running puppy mills. *Id.* (Tr. at 30-31).

Sharon Larkin, a Maryland resident, testified in favor of the 2020 Act. *Id.* at 10-11 (Tr. at 31-34). She told the committee members that pet stores are the "heart of the problem" because "they provide a coverup for the mill industry." *Id.* (Tr. at 31). She explained that Maryland's sourcing laws, which "strive for transparency," had been thwarted by the USDA's decision to remove inspection reports from public view. *Id.* (Tr. at 31-32). And, Ms. Larkin testified that during a recent visit to a Maryland pet store the store's owner had refused to furnish inspection reports. *Id.* (Tr. at 32).

The Committee also heard from Katie Flory, the Community Affairs Director with the Maryland Chapter of the American Society for the Prevention of Cruelty to Animals, better known as the ASPCA. ECF 9-2 at 12 (Tr. at 37-39). According to Ms. Flory, animal shelters in Baltimore City serve 17,000 animals. *Id.* (Tr. at 38). Along with the shelters in surrounding counties, the shelters hold an estimated 34,000 cats and dogs. *Id.* (Tr. at 37). Ms. Flory urged that the 2020 Act would promote adoptions while also preventing puppy-mill puppies from ending up in shelters. *Id.* (Tr. at 38-39).

Opponents of the 2020 Act also testified at the hearing. Becky Schmidt, the manager of Charm City Puppies, presented a slide show of the responsible breeders patronized by Charm City Puppies. *Id.* at 14 (Tr. at 47-51). She also explained that the store strives to serve the specific needs of its customers, such as those looking for an emotional support dog or service animal. *Id.* at 14-15 (Tr. at 47-48). In addition, Jeanea Thomson,[11] co-owner of Just Puppies, testified in opposition to the 2020 Act. *Id.* at 15 (Tr. at 51-54). Ms. Thomson stated that the store's "main focus" is the "health and quality" of the dogs. *Id.* (Tr. at 52). She denied that her dogs came from puppy mills. *Id.* Rather, she testified that she and her staff visit the breeders regularly and form

_____

[11] The name incorrectly appears as "Jania Thompson" in the transcript.

strong relationships with them to ensure that the dogs are treated humanely. *Id.* at 15-16 (Tr. at 52-53). And, she warned the committee members that the 2020 Act would "drive prospective pet owners to unregulated sources like the internet." *Id.* at 16 (Tr. at 54).

The owner of Today's Pet, Joseph Wagner, described a study by Cornell University School of Medicine, which found that pet store puppies were, on average, as healthy if not healthier than puppies from other sources. *Id.* at 16 (Tr. at 54-55). And, he explained that his store required breeders to send a copy of their USDA certification with each dog. *Id.* (Tr. at 56). Further, he disputed the contention that pet store puppies end up in animal shelters, pointing to a study that found that ninety-six percent of puppies sold at pet stores remain with the adopting family. *Id.*

Bob Likins testified on behalf of the Pet Industry Joint Advisory Council ("PIJAC"). *Id.* at 17 (Tr. at 57-61). He maintained that there was "absolutely zero evidence" that Maryland's regulations were ineffective. *Id.* (Tr. at 57). He also claimed that the dog breeds commonly found in shelters, like pit bulls, are not the same breeds sold by pet stores. *Id.* (Tr. at 58). And, he explained that the proposed legislation would have no impact on "bad breeders." *Id.* (Tr. at 60).

The House debated the Act on March 15 and 16, 2018. During the debate, Delegate Kramer argued that the Act would not force all pet stores out of business, highlighting that only seven of the 150 pet stores in Maryland sell cats or dogs. Pl.'s Ex. 6, HB1662_000448 (Tr. at 5). When asked about the law's effect on Maryland consumers, Delegate Kramer explained that, in addition to fostering adoption, the Act would "encourage . . . people to come to local breeders," who "will never sell to a retail store, because they want . . . to make sure that the puppies from t[heir] litters are going to good homes[.]" *Id.* at HB1662_000450 (Tr. at 12-13). Further, Delegate Kramer opposed a grandfather clause for the seven Maryland pet stores that were still selling cats and dogs, stating, *id.* at HB1662_000456 (Tr. at 8-9):

18

The issue is not that these puppies are being purchased from illegal sources, the puppy mills are in fact legal in many states. The problem is that they are absolute horror shows and sadly, there are states that permit this. So the retail stores pet stores are not doing something illegal when they buy from the puppy mills. It's legal, but its disgusting and so what we are seeking to do here is stop this disgusting trade that allows the puppy mills to thrive. Without retail pet stores, selling the products of the abomination that are the puppy mills, then they will have no place to sell their pups.

So we are looking to say, you know what, in the State or Maryland, if you want to adopt or if you want to get a breed-specific dog, then do so from a local breeder that actually cares about their breeding dogs and will meet you, get to know who you are, you get to know who they are, you meet the parents of the dog on site and that's what this bill is about.

H.B. 1662 was referred to the Senate Finance Committee, which held a public hearing on March 29, 2018. *See* H.B. 1662 Legislative Record. Delegate Kramer again spoke in favor of the statute, and Ms. Hovermale, Ms. Flory, and Ms. Jesse also testified in support of the 2020 Act. *See* ECF 9-3 (Transcript of Senate Finance Committee Meeting, 3/29/2018). Ms. Schmidt and Ms. Thomson again testified in opposition. *See id.* at 9-11 (Tr. at 28-33). Additionally, the Committee received testimony from Billy Castro, a certified master pet groomer, who spoke in favor of the legislation, *id.* at 7-8 (Tr. at 20-22); Laurie Newton, District Marketing Manager for Bark, who favored the bill, *id.*at 8 (Tr. at 22-25); Cheryl Winchill, a retired physician and "hobby breeder," who spoke in favor of the bill, *id.* at 9 (Tr. at 25-27); veterinarian Mel Davis and Ann Miller, a USDA licensed dog breeder, both of whom opposed the 2020 Act, *id.* at 11-12 (Tr. at 33-37); Steven VanGrack, an attorney representing "southern retail dog stores in Maryland" (ECF 9-2 at 13 (Tr. at 44)), who opposed the bill, ECF 9-3 at 12 (Tr. at 39-41); and Lisa Radoff, President of Maryland Votes for Animals, who supported it. *Id.* at 13 (Tr. at 41-43).

Delegate Kramer said, in part, *id.* at 3 (Tr. at 2-3): "[T]he puppy mill industry is an absolutely disgusting abomination that no one could possibly consider acceptable in the twenty-first century . . . just google puppy mill videos and you'll see what I'm talking about." Further, he

claimed, *id.* (Tr. at 3-4): "[T]he fuel for the puppy mills, the mechanism by which the puppy mills thrive is the retail pet stores that profit by selling the mass produced inventory of the puppy mills." And, he asserted, *id.* (Tr. at 4): "Federal regulations provide nothing more than bare survival standards and even those are typically ignored by the puppy mills." And, he characterized the sale of dogs by retail pet stores as a "barbaric" industry. *Id.* at 4, 5 (Tr. at 8-9). Even if the stores are "humane," stated Kramer, "that does not change the fact that they buy their inventory from the horrific puppy mills." *Id.* at 5 (Tr. at 9).

A fellow legislator asked Kramer to explain the difference between a puppy mill and a breeder. *Id.* at 5 (Tr. at 11-12). Kramer responded, in part, *id.*: "Puppy mills are facilities that have mass quantities of dogs on site that are bred for mass production . . . [A] small local breeder is someone that A, cares about their breeding dogs, they meet the people who are buying their dogs and they will never sell them to a pet store. Never."

The Maryland Senate unanimously approved the 2020 Act on April 6, 2018. *See* H.B. 1662 Legislative Record. The 2020 Act later passed the Maryland House of Delegates by a margin of 129 to 8. *Id.* On April 25, 2018, Maryland Governor Lawrence Hogan, Jr. signed H.B. 1662 into law. 2018 Md. Laws., Ch. 237; *see* ECF 1, ¶ 33; Md. Code (2015 Repl. Vol., 2019 Supp.), Bus. Reg. § 19-701 (repealed eff. July 1, 2021).

Title 19 of the Business Regulation Article of the Maryland Code is called "Miscellaneous State Business Regulation." Subtitle 7 is titled "Retail Pet Stores." The 2020 Act amended B.R. § 19-701, titled "Definitions." And, the 2020 Act repealed B.R. § 19-702.1, titled "Requirements for retail pet stores." The 2020 Act also substantially amended B.R. §§ 19-703, 19-704, 19-705, 19-706, and 19-707.

"Section 1" of the 2020 Act provided, in relevant part, B.R. § 19-703:

(a) *Prohibition*—A retail pet store may not offer for sale or otherwise transfer or dispose of cats or dogs.

(b) *Exception*—This section may not be construed to prohibit a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption.

2018 Md. Laws., Ch. 237, § 1; *see also* ECF 1, ¶ 34.[12]

The 2020 Act also contained two uncodified provisions.  *See* 2018 Md. Laws., Ch. 237, §§ 2-3 (repealed eff. July 1, 2021).  They provided, *id.*:

SECTION 2. AND BE IT FURTHER ENACTED, that it is the intent of the General Assembly that:

(1) animal welfare organizations initiate contact with retail pet stores, as provided under § 19–703(b) of the Business Regulation Article, as enacted by Section 1 of this Act, that will no longer be able to offer for sale cats and dogs, to facilitate collaboration to showcase cats and dogs for:

(i) adoption from an animal control unit or an animal welfare organization; or

(ii) purchase from local breeders; and

(2) the Senate Finance Committee and the House Economic Matters Committee monitor the implementation of this Act.

SECTION 3. AND BE IT FURTHER ENACTED, That Section 1 of this Act shall take effect January 1, 2020.

Of relevance here, a retail pet store was defined as "a for-profit establishment *open to the public* that sells or offers for sale domestic animals to be kept as household pets."  B.R. § 19-701(j) (emphasis added) (Repealed eff. July 1, 2021).  In B.R. § 19-701(f), the 2020 Act defined "offer for sale," as used in B.R. § 19-703(a), as follows: "'Offer for sale' includes to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of a

---

[12] Any reference to dogs in regard to the Maryland legislation should be understood to include dogs and cats.

domestic animal." (Repealed eff. July 1, 2021). Notably, the 2020 Act did not define the term "showcase," as used in Section 1 and Section 2 of the 2020 Act.

The 2020 Act defined "animal control unit" by reference to Md. Code, § 10-617 of the Criminal Law Article as a "local organization or governmental unit that the appropriate local governmental body designates to house, care for, and control domestic animals of unknown ownership." Bus. Reg. § 19-701(b).  An "animal welfare organization" is a tax-exempt nonprofit organization "whose mission and practice is the rescue of animals and the placement of those animals in permanent homes."  *Id.* § 19-701(c).

A violation of the 2020 Act constituted an unfair or deceptive trade practice within the meaning of Title 13 of the Commercial Law Article.  Bus. Reg. § 19-704(a)(1).  Stores in violation of the Act are subject to fines and civil penalties.  *Id.* § 19-704(a)(2).

According to plaintiffs, following the enactment of the 2020 Act, "a handful of retail pet stores," including Charm City Puppies and Just Puppies, "changed their business model such that they were no longer 'open to the public' and, therefore, were not [in their view] considered a 'retail pet store' covered by the statute." ECF 1, ¶ 38.  Rather, those stores operated under "an appointment-only model," by which customers could only come to the stores "after going through a preliminary screening process and booking a private appointment in advance." *Id.* Plaintiffs also claim that this appointment-only model is used by "certain Maryland USDA licensed breeders, such as Farmsteads Puppy Paradise, LLC, located in St. Mary's County . . . ." *Id.* ¶ 39.

Under this model, before a customer can book an appointment, the Pet Stores "require[] a non-refundable deposit" and "an extensive questionnaire" from a customer to determine if the individual "is in a position to afford and take care of a puppy sold by it."  *Id.* ¶¶ 40, 41. And, Charm City Puppies "has turned down many prospective consumers" who were not qualified. *Id.* ¶ 40.

The CPD has investigated whether the "appointment only" business model employed by the Pet Stores complies with the 2020 Act. ECF 1, ¶ 38 n.3. On June 17, 2021, CPD filed administrative charges against Just Puppies. *Consumer Protection Division v. Just Puppies of Maryland, Inc.*, CPD Case No.: 21-015-338499; ECF 9-1 at 17 n.13.

### E.  The 2021 Act

On January 13, 2021, State Senator Benjamin Kramer introduced Senate Bill 103, *i.e.*, the 2021 Act, to "close the loopholes" of the 2020 Act. ECF 1, ¶ 43.[13] According to plaintiffs, Senator Kramer sought to amend the law "to allow Maryland breeders to continue to operate, but to ensure that retail pet stores go out of business since they will be unable to sell, transfer, or dispose of puppies they acquire from reputable out-of-state USDA licensed breeders and brokers…." *Id.*

The Fiscal and Policy Note for the 2021 Act summarizes the changes from the earlier version of the statute.  ECF 1-6 at 1.  It states, *id.*: "The bill alters the definition of a 'retail pet store' that is prohibited from selling cats or dogs to (1) include brokers; (2) no longer specify that the store must be open to the public and (3) exclude an establishment at which the animals being sold were born. Additionally, the bill establishes a Task Force to Study Canine Breeding Facilities and Sourcing Standards to be staffed by the Maryland Department of Agriculture (MDA). **The bill takes effect July 1, 2021, and the task force terminates June 30, 2022**." (Bold in original).

The Economic Matters Committee held a hearing on the 2021 Act on March 23, 2021. *See* ECF 1-7 (Transcript). At the hearing, Senator Kramer explained the reasoning behind the amended version of the Act.  He said, in part, *id.* at 2-3 (Tr. at 3-9) (emphasis added):

---

[13] During the 2020 Legislative session, which began on January 8, 2020, Senator Kramer introduced a bill to consider the issues addressed by the 2021 Act. The legislation (Senate Bill 625) passed the Senate but the bill did not receive a vote on the House floor before the end of the legislative session. ECF 9-1 at 18 n.14.  The General Assembly had been scheduled to adjourn on April 6, 2020.  But, due to the coronavirus pandemic, it adjourned on or about March 18, 2020.

[T]his is the second part to two pieces of legislation to protect Maryland consumers from the puppy mill industry and the products that they produce.

\*   \*   \*

[T]he bill from 2018….address[ed] the first prong of how the puppy mill industry gets their products to the marketplace, and that's retail pet stores. *Retail pet stores purchase exclusively from puppy mill products* and they are the mechanism, one of the two big prongs, by which you know, the puppy mills survive.[14]

In 2018, this committee in its wisdom voted to stop the sale of puppies and kittens in retail pet stores in our stated and we joined California and now several others who have taken the same step because there is a greater understanding that dogs and cats are companion animals,….

And the fact of the matter is, puppy mills are just an abhorrent, horrible, nasty mechanism for mass production of companion animals…. And this committee said we're going to take a stand and we're not going to allow them to sell into the Maryland market place through our retail pet stores.

The second part or the second prong that I made reference to is through the brokers. Now, historically the puppy mill brokers were sort of the middle people. You had the retail pet stores, you had the puppy mills, and when the stores historically needed to get inventory, they would go to a broker…. And the brokers go out and contract with the puppy mills, find the inventory, and then it's shipped to the retail pet store.

Now, what the brokers have learned is that with the Internet, they can market for the puppy mills online. And so they set up elaborate websites with hundreds, thousands of photographs of adorable little puppies….So this is really the second major prong for getting puppy mill inventory to the marketplace.

So the bill before you now addresses that piece of it. The retail pet stores, we put in place in 2018 a prohibition on their selling puppies and kittens. The bill before you, Senate Bill 103, would now prohibit brokers from selling into the State of Maryland.

\*   \*   \*

---

14 Senator Kramer's sweeping assertion that *all* retail pet stores "purchase exclusively" from puppy mills seems to be unfounded hyperbole.  Nevertheless, the accuracy of the assertion is not germane to the issues.

[Puppy Mills are] brutal and it is time in the 21st Century that we take action to number one no longer facilitate this kind of operation, but to protect our consumers from the unhealthy animals that come out of these puppy mills.

Senator Kramer also addressed a provision that excluded from the ban the sale of animals born at the establishment.  He said, ECF 1-7 at 3 (Tr. at 7-9):

> Now, the bill does provide for clarification, and this was a concern that was brought to me last year by the American Kennel Club. They wanted it made clear that the kennels, for instance, that are here in Maryland or anywhere else that are responsible breeders can continue to operate. And I am fully supportive of that. That's what the purpose of this bill is. So the bill also includes language that reads the prohibition does not include an establishment at which the animal[s] sold at the establishment were born at the establishment and a completed sale . . . is conducted in person with both parties physically present at the same location.
>
> So what that encompasses is that the legitimate breeders, the quality breeders, the ones that operate the upstanding kennels around the country, it doesn't matter if it's in Maryland or elsewhere, the way they do business is that they won't sell a puppy to someone they have not met. They want you to come out, they want you to see the breeding dogs, they want you to see the dame and the sire, and they want you to see the conditions and they want to meet you.
>
> They want to make sure that . . . their puppies [are] going to a good home. They will never sell you a puppy either online or over the phone, put it in a crate, and ship it across the country . . . sight unseen . . . . [That is] the way the puppy mills do business.
>
> So the purpose of the bill is to ensure that Maryland consumers are protected and that we are also protecting our companion animals, our fur babies.

Further, Senator Kramer stated, *id.* at 4 (Tr. at 11-12): "The bill has strong support. The only opposition, of course, is from the industry that profits off the sale of puppy mill products…. And, again, you'll notice that no small breeder, no responsible breeder has sent you written opposition or is providing oral opposition. We are talking these [sic] big out of state breeders who sell by the thousands that are here in opposition. There isn't a single of all [sic], and there are hundreds of breeders here in Maryland and elsewhere across the country. None of those small

breeders are opposing this bill because they're the ones that are doing the right thing and they're the ones that we want consumers going to, not the puppy mills."

In response to a question from a fellow legislator about where an individual would buy a puppy if the bill were passed, Senator Kramer explained, ECF 1-7 at 4 (Tr. at 12-13): "[An individual] can buy a puppy from any of the hundreds of responsible breeders. It's not just in Maryland but across the country.... I know someone who recently went to Pennsylvania because they were looking for a particular breed. . . . But we've got hundreds of those in Maryland. And those…operations are not part of this bill. This [bill] deals with the out of state massive corporations that are just literally by the thousands turning over puppies every year and sourcing through the puppy mills."

A legislator suggested that the bill could restrict people's access to companion pets because some consumers are unable to travel out of state, due to cost and other reasons.  *Id.* at 5 (Tr. at 14). Kramer responded, *id.* (Tr. at 14-15): "[T]here is nothing that would restrict your ability, if you found a responsible breeder in Pennsylvania, Massachusetts, or California from selling you a . . . puppy . . . . What you won't be able to do is purchase them through a broker because the brokers are the ones dealing with the puppy mills."

And, Kramer reiterated, *id.* (Tr. at 15): "[T]here is nothing to prevent you from . . . having it shipped here, if they're willing to ship, but the bottom line is, the mass breeders are the ones that are addressed in this bill because [we are] making a policy statement that we do not think in the 21st Century that the cruelty that is occurring in order to produce these puppies is acceptable for purposes of convenience of owning a puppy."

In addition, Kramer stated, ECF 1-7 at 7 (Tr. at 22): "You could go to any breeder . . . There's nothing that would stop you from buying directly from a puppy mill if you

choose to do so . . . you just won't be able to buy from a broker."  Further, Kramer said, *id*.:  "I do want that to be clear, at the end of the day, anybody that wants to buy, you know, if there's a big Missouri puppy mill and you decided they've got a puppy you want, you'll still be able to buy directly from them.  They can ship to you."  He added, *id.* (Tr. at 22-23):  "But you can buy from any breeder that you choose regardless of size, scale, you know, certainly our small businesses, our local business[es] I'm guessing will hopefully benefit because if you want the Golden Retriever, you may go to – and all of our counties have lots of kennels and breeders in them. Some of them, you know, hundreds and, you know, hopefully they'll be beneficiaries and you'll go to, you know, Golden Retrievers of Timonium or Poodles of Salisbury. And then our local economy and our mom-and-pop businesses benefit."

Moreover, Kramer advised that the Pet Stores were flouting the earlier Act.  *Id.* at 4 (Tr. at 10-11).  In particular, they continued to operate., despite the ban  *Id.*

The Maryland Senate approved the Act in April 2021, by a margin of 43 to 4.  The House of Delegates approved it by a margin of 106 to 31.  S.B. 103 Legislative Record, https://mgaleg.maryland.gov/mgawebsite/legislation/details/sb0103?ys=2021rs.  On May 28, 2021, Governor Hogan indicated that a number of bills, including SB 103, would become law without his signature. *See* ECF 5-8.  The Pet Stores claim that they will go out of business if the 2021 Act is upheld.  ECF 1, ¶ 72.

The 2021 Act amended parts of B.R. §§ 19-701 and 19-703 and repealed the uncodified provision in Section 2 of the 2020 Act. *See* ECF 1, ¶¶ 50-52.  As to the definition of a "retail pet store" in B.R. § 19-701(g), the 2021 Act removed the "open to the public" language contained in the 2020 Act, and expanded the definition to include "a broker."  A "retail pet store" is now defined in B.R. § 19-701(g)(1) as follows:

(1) "Retail pet store" means:

    (I)    a for-profit establishment that sells or offers for sale domestic animals to be kept as household pets; or

    (II)    a broker.

And, a broker is defined in B.R. § 19-701(e) as "a person who transfers dogs or cats for resale by another person." The 2021 Act also carves out an exception to the pet store ban. B.R. § 19-701(g)(2) provides: "'Retail Pet Store' does not include an establishment at which the animals sold at the establishment were born at the establishment."

Although the definition of a retail pet store includes an establishment at which animals are "offer[ed] for sale," B.R. § 19-703 was amended to replace "offer for sale" with "sell," as follows[15]:

  (a) *Prohibition*—A retail pet store may not sell or otherwise transfer or dispose of cats or dogs.

(b) *Exception*—This section may not be construed to prohibit a retail pet store from collaborating with an animal welfare organization or animal control unit to offer space for these entities to showcase cats or dogs for adoption.

The new legislation also eliminated the uncodified Section 2 from the 2020 Act—the "statement of intent by the General Assembly." 2018 Md. Laws., Ch. 237, § 2. The 2021 Act adds a new Section 2, creating a task force to study canine breeding facilities and sourcing standards. 2018 Md. Laws., Ch. 237, §§ 2-3, Bus. Reg. 19-703. It states, *id.*:

SECTION 2. AND BE IT FURTHER ENACTED, That:

(a) There is a Task Force to Study Canine Breeding Facilities and Sourcing Standards.

***

---

[15] As noted, the 2020 Act defined "offer for sale" in B.R. § 19-701(f), as follows: "'Offer for sale' includes to sell, offer to transfer, offer for adoption, advertise for the sale, barter, auction, give away, or otherwise dispose of a domestic animal." (Repealed eff. July 1, 2021).

(h) On or before December 1, 2021, the Task Force shall report its findings and recommendations to the Governor and, in accordance with § 2-1257 of the State Government Article, the Senate Finance Committee and the House Economic Matters Committee.

SECTION 3. AND BE IT FURTHER ENACTED, That this Act shall take effect July 1, 2021. Section 2 of this Act shall remain effective for a period of 1 year and, at the end of June 30, 2022, Section 2 of this Act, with no further action required by the General Assembly shall be abrogated and of no further force and effect.

## F. Hearings[16]

As mentioned, the Court held motions hearings over the course of three days in August 2021. ECF 21, ECF 23, ECF 24. And, plaintiffs introduced numerous exhibits, including, *inter alia*, exhibits concerning the Act's legislative history, financial records of the Pet Store Plaintiffs, as well as licenses and inspection reports.

In addition, the Court heard testimony from two credible witnesses: Becky Schmidt, the manager of Charm City Puppies, and Christopher Fleming, the owner of Pinnacle Pet, a Missouri broker. ECF 21; ECF 23. And, by way of proffers, plaintiffs presented the testimony of five other witnesses: (1) Michael Bober, "President and CEO" of the Pet Industry Joint Advisory Council, a national non-profit trade association representing various segments of the pet industry; (2) Dr. Ernest Slovon, a veterinarian; (3) Dr. Muhammad Iqbal, a veterinarian; (4) Jeanea Thomson, co-owner of Just Puppies; and (5) Tara Baker, a Missouri dog breeder. *See* Pl.'s Ex. 51, 57-60. For the most part, the witnesses merely supplemented and updated the testimony and proffers provided in 2020.

---

[16] As discussed, *infra*, the testimony may be considered in resolving the P.I. Motion, but it may not be considered in resolving the Motion to Dismiss.

Ms. Schmidt, the long-time manager of Charm City Puppies, testified about the store's use of the appointment-only model since February 2020, and the way in which the store obtains dogs from Pinnacle Pet, which in turn only obtains dogs from responsible breeders. Schmidt also discussed the excellent record of the store, with very few customer complaints. She maintained that Charm City Puppies obtains dogs only from reputable and responsible breeders and brokers.

In 2020, Charm City Puppies sold 705 dogs. From January 1, 2021 to June 30, 2021, it sold 247 puppies. Approximately 94% of its revenue derives from the sale of puppies. Schmidt explained that the store cannot compete with large pet stores in the sale of accessories. Since the 2021 Act went into effect on July 1, 2021, however, Charm City Puppies only sells pet products and supplies.

Moreover, Schmidt recounted an experience with an unsavory, online scammer who used Charm City Puppies' address as if it were its own, thereby misleading unsuspecting customers to think they were dealing with a reputable business. In addition, she addressed the high costs of transporting dogs from out-of-state breeders and the limited availability of dogs in Maryland through licensed breeders, hobby breeders, and shelters. Further, Ms. Schmidt testified that Charm City Puppies will go out of business if the Act is not enjoined.

Jeanea Thomson is the wife of Mitch Thomson, who is the owner of Just Puppies. Pl.'s Ex. 59, ¶ 1. Ms. Thomson has been the manager of Just Puppies for over 15 years. *Id*. In her proffer, Ms. Thomson addressed Just Puppies' transition to the appointment-only model. *Id*. ¶¶ 3-9. To adapt to the new model, both of the Just Puppies stores changed their signage and online presence and made interior renovations to the stores. *Id.* ¶¶ 7, 9. Potential customers who inquired about appointments first had to answer a questionnaire and, beginning in July 2020, pay a deposit. *Id*. ¶ 8.

Thomson also provided sales data for each Just Puppies store. The Rockville location, for example, sold 1,080 dogs in 2018 and 911 dogs in 2019. And, after switching to the appointment only model on February 4, 2020, the store sold 947 dogs in 2020 and 312 dogs between January 1 and June 30, 2021. *Id.* ¶ 14. She averred that if the Act is not enjoined, Just Puppies "will go out of business." *Id.* ¶ 15.

Christopher Fleming, the CEO and owner of Pinnacle Pet, testified via Zoom from Missouri. He described the careful and responsible way in which he conducts his licensed dog broker business, including maintenance of detailed vaccination and other health records and verification that the breeders meet and exceed high standards. He also testified about the process of transporting puppies from his site in Missouri to pet stores across the country, and the increased costs associated with transporting puppies to individual consumers rather than pet stores. In particular, Mr. Fleming believes that it would cost Pinnacle Pet an additional $900 to $1000 per dog to transport a dog directly to a consumer's home.

In her proffer, breeder Tara Baker described her Missouri kennel, and averred that she keeps complete health and lineage records and has not been found in violation of any USDA or state regulations. Pl.'s Ex. 60, ¶¶ 1-2. She stated that she does not maintain a website or market her dogs for sale to the public. *Id.* ¶ 5. Rather, she sells her puppies directly to Just Puppies in Maryland. *Id.* Further, she proffered that selling directly to Maryland consumers "would impose substantial increased costs on her which would be passed along to the consumer." *Id.* ¶ 6. Unless Baker can offer for sale her puppies in Maryland stores, such as Just Puppies, "she would have no way" of showing her puppies to Maryland consumers. *Id.* ¶ 7. Rather, a Maryland consumer would have to come to her kennel in Missouri to meet the puppies prior to purchase. *Id.*

31

In his Affidavit, Michael Bober stated that, prior to the 2020 Act, Maryland "had some of the strictest sourcing requirements for pet stores to purchase their dogs." Pl's Ex. 51, ¶ 13. Yet, rescues, shelters, and the Internet are not subject to the same requirements as pet stores. *Id.* ¶¶ 14, 18. He asserted that, given demand, "millions" of dogs must come from sources besides shelters, and "millions of prospective dog owners would be denied the benefits of the human-animal bond were it not for breeders," particularly for "purebred and designer-bred dogs" rarely found in shelters. *Id.* ¶¶ 11, 15.

Bober also averred that the 2021 Act "will have a disproportionate effect on families who lack the ability to travel…to find their ideal companion animal." *Id.* ¶ 17. Further, he claimed that "there is a high likelihood that Marylanders will instead turn to less regulated sources, such as online marketplaces which are known to have a high incidence of fraud." *Id.* ¶ 18. And, he proffered that the 2021 Act has a misguided view in equating all large breeders with puppy mills, *id.* ¶¶ 20-21, and it targets "responsible pet stores." *Id.* ¶ 21.

Veterinarians Ernest Slovon and Muhammad Iqbal proffered that puppies obtained by Maryland pet stores, including Just Puppies, are of very good quality. Pl.'s Ex. 57; Pl.'s Ex. 58. Further, they stated that the puppies they examined have had limited health problems. *Id.* Dr. Slovon averred that when he examines puppies from Just Puppies, "it does not appear to [him] that those puppies have been sourced from 'puppy mills,'" and he saw no evidence of abuse, malnourishment, or medical and behavioral issues he often notes in puppy mill puppies. Pl.'s Ex. 57, ¶¶ 13-14. He also said: "The health guarantee provided by Just Puppies . . . is far and away better than any guarantee I have seen provided from any other source." *Id.* ¶ 7. For his part, Dr. Iqbal averred that he was "pleasantly surprised" at the very good health of Just Puppies puppies, despite his previous skepticism of pets coming from retail pet stores. Pl.'s Ex. 58, ¶ 4.

### III.    Standards of Review

### A.  Rule 12(b)(6)

A defendant may test the legal sufficiency of a complaint by way of a motion to dismiss under Rule 12(b)(6).  *Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 317 (4th Cir. 2019); *In re Birmingham*, 846 F.3d 88, 92 (4th Cir. 2017); *Goines v. Valley Cmty. Servs. Bd.*, 822 F.3d 159, 165-66 (4th Cir. 2016); *McBurney v. Cuccinelli*, 616 F.3d 393, 408 (4th Cir. 2010), *aff'd sub nom.*, *McBurney v. Young*, 569 U.S. 221 (2013); *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999).  A Rule 12(b)(6) motion constitutes an assertion by a defendant that, even if the facts alleged by a plaintiff are true, the complaint fails as a matter of law "to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).

Whether a complaint states a claim for relief is assessed by reference to the pleading requirements of Fed. R. Civ. P. 8(a)(2).  That rule provides that a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  The purpose of the rule is to provide the defendants with "fair notice" of the claims and the "grounds" for entitlement to relief.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007).

To survive a motion under Rule 12(b)(6), a complaint must contain facts sufficient to "state a claim to relief that is plausible on its face."  *Twombly*, 550 U.S. at 570; *see Ashcroft v. Iqbal*, 556 U.S. 662, 684 (2009) ("Our decision in *Twombly* expounded the pleading standard for 'all civil actions' . . . ." (citation omitted)); *see also see also Fauconier v. Clarke*, 996 F.3d 265, 276 (4th Cir. 2020); *Paradise Wire & Cable*, 918 F.3d at 317; *Willner v. Dimon*, 849 F.3d 93, 112 (4th Cir. 2017).  To be sure, a plaintiff need not include "detailed factual allegations" in order to satisfy Rule 8(a)(2).  *Twombly*, 550 U.S. at 555.  Moreover, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted."

*Johnson v. City of Shelby, Miss.*, 574 U.S. 10, 10 (2014) (per curiam).   But, mere "'naked assertions' of wrongdoing" are generally insufficient to state a claim for relief.   *Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009) (citation omitted).

In other words, the rule demands more than bald accusations or mere speculation. *Twombly*, 550 U.S. at 555; *see Painter's Mill Grille, LLC v. Brown*, 716 F.3d 342, 350 (4th Cir. 2013).   If a complaint provides no more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," it is insufficient.   *Twombly*, 550 U.S. at 555.   "[A]n unadorned, the-defendant-unlawfully-harmed-me accusation" does not state a plausible claim of relief.   *Iqbal*, 556 U.S. at 678.   Rather, to satisfy the minimal requirements of Rule 8(a)(2), the complaint must set forth "enough factual matter (taken as true) to suggest" a cognizable cause of action, "even if . . . [the] actual proof of those facts is improbable and . . . recovery is very remote and unlikely."   *Twombly*, 550 U.S. at 556 (internal quotation marks omitted).

In reviewing a Rule 12(b)(6) motion, "a court 'must accept as true all of the factual allegations contained in the complaint,' and must 'draw all reasonable inferences [from those facts] in favor of the plaintiff.'"   *Retfalvi v. United States*, 930 F.3d 600, 605 (4th Cir. 2019) (alteration in *Retfalvi*) (quoting  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011)); *see Semenova v. Md. Transit Admin.*, 845 F.3d 564, 567 (4th Cir. 2017); *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015).   However, "a court is not required to accept legal conclusions drawn from the facts."   *Retfalvi*, 930 F.3d at 605 (citing *Papasan v. Allain*, 478 U.S. 265, 286 (1986)); *see Glassman v. Arlington Cty.*, 628 F.3d 140, 146 (4th Cir. 2010). "A court decides whether [the pleading] standard is met by separating the legal conclusions from the factual allegations, assuming the truth of only the factual allegations, and then determining whether those allegations allow the court to reasonably infer" that the plaintiff is entitled to the legal remedy

34

sought.  *A Society Without a Name v. Virginia*, 655 F.3d 342, 346 (4th. Cir. 2011), *cert. denied*, 566 U.S. 937 (2012).

Courts ordinarily do not "'resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses.'"  *King v. Rubenstein*, 825 F.3d 206, 214 (4th Cir. 2016) (quoting *Edwards*, 178 F.3d at 243).  But, "in the relatively rare circumstances where facts sufficient to rule on an affirmative defense are alleged in the complaint, the defense may be reached by a motion to dismiss filed under Rule 12(b)(6)."  *Goodman v. Praxair, Inc.,* 494 F.3d 458, 464 (4th Cir. 2007) (en banc); *accord Pressley v. Tupperware Long Term Disability Plan,* 553 F.3d 334, 336 (4th Cir. 2009).  Because Rule 12(b)(6) "is intended [only] to test the legal adequacy of the complaint," *Richmond, Fredericksburg & Potomac R.R. Co. v. Forst,* 4 F.3d 244, 250 (4th Cir. 1993), "[t]his principle only applies . . . if all facts necessary to the affirmative defense 'clearly appear[] *on the face of the complaint.*'"  *Goodman,* 494 F.3d at 464 (emphasis in *Goodman*) (quoting *Forst,* 4 F.3d at 250).

"Generally, when a defendant moves to dismiss a complaint under Rule 12(b)(6), courts are limited to considering the sufficiency of allegations set forth in the complaint and the 'documents attached or incorporated into the complaint.'"  *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (quoting *E.I. du Pont de Nemours & Co.*, 637 F.3d at 448).  Ordinarily, the court "may not consider any documents that are outside of the complaint, or not expressly incorporated therein[.]"  *Clatterbuck v. City of Charlottesville*, 708 F.3d 549, 557 (4th Cir. 2013), *abrogated on other grounds by Reed. v. Town of Gilbert*, 575 U.S. 155 (2015); *see Bosiger v. U.S. Airways*, 510 F.3d 442, 450 (4th Cir. 2007).

But, under limited circumstances, when resolving a Rule 12(b)(6) motion, a court may consider documents beyond the complaint without converting the motion to dismiss to one for

summary judgment. *Goldfarb v. Mayor & City Council of Balt.*, 791 F.3d 500, 508 (4th Cir. 2015). In particular, a court may properly consider documents that are "explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." *Goines*, 822 F.3d at 166 (citation omitted); *see also Six v. Generations Fed. Credit Union*, 891 F.3d 508, 512 (4th Cir. 2018); *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014); *U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014); *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 234 (4th Cir. 2004), *cert. denied*, 543 U.S. 979 (2004); *Phillips v. LCI Int'l Inc.*, 190 F.3d 609, 618 (4th Cir. 1999).

However, "before treating the contents of an attached or incorporated document as true, the district court should consider the nature of the document and why the plaintiff attached it." *Goines*, 822 F.3d at 167 (citing *N. Ind. Gun & Outdoor Shows, Inc. v. City of S. Bend*, 163 F.3d 449, 455 (7th Cir. 1998)); *see USA Eng. Language Ctr. v. Accrediting Council for Continuing Educ. & Training, Inc.*, __ F. App'x __, 2021 WL 3162671, at *2 (4th Cir. July 27, 2021). Of import here, "[w]hen the plaintiff attaches or incorporates a document upon which his claim is based, or when the complaint otherwise shows that the plaintiff has adopted the contents of the document, crediting the document over conflicting allegations in the complaint is proper." *Id*. Conversely, "where the plaintiff attaches or incorporates a document for purposes other than the truthfulness of the document, it is inappropriate to treat the contents of that document as true." *Id.*

A court may also "consider a document submitted by the movant that [is] not attached to or expressly incorporated in a complaint, so long as the document was integral to the complaint and there is no dispute about the document's authenticity." *Id.* at 166 (citations omitted); *see also Fusaro v. Cogan*, 930 F.3d 241, 248 (4th Cir. 2019); *Woods v. City of Greensboro*, 855 F.3d 639, 642 (4th Cir. 2017), *cert. denied*, ___ U.S. ___, 138 S. Ct. 558 (2017); *Kensington Volunteer Fire*

*Dep't. v. Montgomery Cty.*, 684 F.3d 462, 467 (4th Cir. 2012).  To be "integral," a document must be one "that by its 'very existence, *and not the mere information it contains*, gives rise to the legal rights asserted.'" *Chesapeake Bay Found., Inc. v. Severstal Sparrows Point, LLC*, 794 F. Supp. 2d 602, 611 (D. Md. 2011) ) (emphasis in original) (citation omitted).  *See also* Fed. R. Civ. P. 10(c) ("A copy of a written instrument that is an exhibit to a pleading is a part of the pleading for all purposes.").

In addition, "a court may properly take judicial notice of 'matters of public record' and other information that, under Federal Rule of Evidence 201, constitute 'adjudicative facts.'" *Goldfarb*, 791 F.3d at 508; *see also Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007); *Katyle v. Penn Nat'l Gaming, Inc.,* 637 F.3d 462, 466 (4th Cir. 2011), *cert. denied*, 565 U.S. 825 (2011); *Philips v. Pitt Cty. Mem'l Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009). However, under Fed. R. Evid. 201, a court may take judicial notice of adjudicative facts only if they are "not subject to reasonable dispute," in that they are "(1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."

As mentioned, the Complaint is supported by several exhibits. ECF 1-1 to ECF 1-7. These include a 265-page report produced by the United States Department of Agriculture on the Animal Welfare Act and Animal Welfare Regulations, known as the "Blue Book" (ECF 1-1); Maryland's pet store statutes from 2012 to 2018 (ECF 1-2); the 2020 Act (ECF 1-3); pages from the website of Farmstead Puppies (ECF 1-4); the text of the 2021 Act (ECF 1-5); the Fiscal and Policy Note for the 2021 Act (ECF 1-6); and a transcript of the hearing held by the Senate Economic Matters Committee on March 23, 2021 (ECF 1-7). Plaintiffs submitted the same seven exhibits in support of their P.I. Motion (ECF 5-2 to ECF 5-7; ECF 5-9). In addition, in support of the P.I. Motion,

plaintiffs submitted the list of bills, including SB103, that became law without Governor Hogan's signature in May 2021 (ECF 5-8); a directory of Maryland dog breeders (ECF 5-10); the Missouri Breeder Standards (ECF 5-11); the list of USDA licensed Maryland breeders (ECF 5-12); and the list of USDA licensed Missouri breeders (ECF 5-13).

The recordings and documents related to the Act's legislative history (ECF 1-6; ECF 1-7; ECF 5-8) are accessible on the website of the Maryland General Assembly. Similarly, the Blue Book (ECF 1-1) and the lists of licensed breeders (ECF 5-12; ECF 5-13) are available on the website of the USDA. The remaining exhibits (ECF 5-10; ECF 5-11; ECF 1-4) are also taken from publicly available websites. Therefore, I may take judicial notice of these exhibits.

As to the many exhibits introduced by plaintiffs, the parties agree that I may consider plaintiffs' exhibits 1 through 13 in resolving the Motion to Dismiss. These concern the Act's legislative history, including the transcripts of the floor debates. But, as to the Motion to Dismiss, I may not consider the witness testimony adduced at the hearing, the plaintiffs' proffers, or the exhibits concerning, among other things, the plaintiffs' business practices, without converting the Motion to Dismiss to one for summary judgment. *See E.I. du Pont de Nemours & Co.*, 637 F.3d at 448-49. Because "[s]uch conversion is not appropriate where the parties have not had an opportunity for reasonable discovery," *id.* at 448, I shall not consider the testimony or plaintiffs' exhibits 14 through 60 in resolving the Motion to Dismiss. But, those exhibits may be considered in regard to the P.I. Motion.

**B.  Rule 65**

Rule 65 of the Federal Rules of Civil Procedure governs preliminary injunctions. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Benisek v. Lamone*, ____ U.S. ____, 138

S. Ct. 1942, 1944 (2018); *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021) (en banc); *Roe v. Dep't of Defense*, 947 F.3d 207, 219 (4th Cir. 2020); *In re Search Warrant Issued June 13, 2019*, 942 F.3d 159, 170-71 (4th Cir. 2019); *Centro Tepeyac v. Montgomery Cty.*, 722 F.3d 184, 188 (4th Cir. 2013) (en banc).  Rather, a preliminary injunction is "'granted only sparingly and in limited circumstances.'"  *Micro Strategy, Inc. v. Motorola, Inc.*, 245 F.3d 335, 339 (4th Cir. 2001) (quoting *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 816 (4th Cir. 1991)).  "This principle reflects the reality that courts are more likely to make accurate decisions after the development of a complete factual record during the litigation." *Leaders of a Beautiful Struggle v. Baltimore Police Dep't*, 979 F.3d 219, 225 (4th Cir. 2020), *rev'd on other grounds*, 2 F.4th 330 (4th Cir. 2021) (en banc).

To qualify for a preliminary injunction, a plaintiff bears the burden to satisfy four requirements.  First, a plaintiff "must establish that he is likely to succeed on the merits[.]"  *Winter*, 555 U.S. at 20; *see Leaders of a Beautiful Struggle*, 979 F.3d at 226.  Although that standard does not require "a 'certainty of success,'" the plaintiff "must make a clear showing that he is likely to succeed at trial.'"  *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (citation omitted).  However, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."  *Benisek*, 138 S. Ct. at 1943-44 (citing *Winter*, 555 U.S. at 32).  "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20, 129 S.Ct. 365); *see also Centro Tepeyac*, 722 F.3d at 188.

The irreparable harm factor is satisfied if there is a likely constitutional violation.  *Leaders of a Beautiful Struggle*, 2 F.4th at 346.  Moreover, when a state is precluded from enforcing

restrictions that are likely to be deemed unconstitutional, then "the balance of the equities favors preliminary relief . . . ." *Id.* (citing *Centro Tepeyac*, 722 F.3d at 191; *Giovani Carandola, Ltd. v. Bason*, 303 F.3d 507, 521 (4th Cir. 2002)).

A preliminary injunction cannot issue absent a "clear showing" that all four requirements are satisfied. *Leaders*, 979 F.3d at 226; *Pashby v. Delia*, 709 F.3d 307, 320 (4th Cir. 2013). And, the "'[p]laintiff bears the burden of establishing that each of these factors supports granting the injunction.'" *Direx Israel*, 952 F.2d at 812 (quoting *Tech. Publ'g Co. v. Lebhar-Friedman, Inc.*, 729 F.2d 1136, 1139 (7th Cir. 1984); *Shaffer v. Globe Prod, Inc.*, 721 F.2d 1121, 1123 (7th Cir. 1983)); *see Winter*, 555 U.S. at 22 (recognizing that because a preliminary injunction is "an extraordinary remedy," it "may only be awarded upon a clear showing that plaintiff is entitled to such relief"). Moreover, a court need not address all four factors if one or more factors is not satisfied. *Henderson ex rel. NLRB*, 902 F.3d at 439.

Notably, at the motions hearing on August 9, 2021, plaintiffs' counsel acknowledged that the breeder and broker plaintiffs are not alleging irreparable harm. Therefore, as to Baker and Pinnacle Pet, there would be no basis for a preliminary injunction.

"[P]reliminary injunction proceedings are informal ones designed to prevent irreparable harm before a later trial governed by the full rigor of usual evidentiary standards . . . ." *G.G. ex rel. Grimm v. Gloucester Cty. Sch. Bd.*, 822 F.3d 709, 725–26 (4th Cir. 2016), *vacated on other grounds*, __ U.S. __, 137 S. Ct. 1239 (2017); *see Profiles, Inc. v. Bank of Am. Corp.*, 453 F. Supp. 3d 742, 753 (D. Md. 2020). Therefore, "district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted." *Grimm*, 822 F.3d at 726.

### C.  Principles of Statutory Construction

The Fourth Circuit has instructed that, when interpreting a state statute, a federal court should "apply the statutory construction rules applied by the state's highest court."  *In re DNA Ex Post Facto Issues*, 561 F.3d 294, 300 (4th Cir. 2009); *see Carolina Trucks & Equip., Inc. v. Volvo Trucks of N. Am., Inc.*, 492 F.3d 484, 489 (4th Cir. 2007).  Notably, Maryland "follows the general principles of statutory interpretation."  *Johnson v. Mayor & City Council of Balt.*, 430 Md. 368, 377, 61 A.3d 33, 38 (2013).  Therefore, I shall reference federal and Maryland cases.

In general, the task of interpreting a statute starts with the text.  *Murphy v. Smith*, __ U.S. ___, 138 S. Ct. 784, 787 (2018) ("As always, we start with the specific statutory language in dispute."); *accord United States v. Bryant*, 949 F.3d 168, 174-75 (4th Cir. 2020).  To ascertain a statute's meaning, "'the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'"  *Gundy v. United States*, ___ U.S. ___, 139 S. Ct. 2116, 2126 (2019) (quoting *Nat'l Ass'n of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).  Terms that are not defined are "'interpreted as taking their ordinary, contemporary, common meaning.'"  *Sandifer v. U.S. Steel Corp.*, 571 U.S. 220, 227 (2014) (citation omitted); *accord United States v. George*, 946 F.3d 643, 645 (4th Cir. 2020).  Courts may also consider a statute's history and purpose to give effect to its language.  *See Gundy*, 139 S. Ct. at 2126.  However, courts may "not resort to legislative history to cloud a statutory text that is clear."  *Ratzlaf v. United States*, 510 U.S. 135, 147-48 (1994); *see Raplee v. United States*, 842 F.3d 328, 332 (4th Cir. 2016) ("If the meaning of the text is plain . . . that meaning controls.").

In Maryland, the "'cardinal rule of statutory interpretation is to ascertain and effectuate the real and actual intent of the General Assembly.'"  *Conaway v. State*, 464 Md. 505, 523, 212 A.3d 348, 358 (2017) (citation omitted); *see Deville v. State*, 383 Md. 217, 223, 858 A.2d 484, 487

(2004).  To that end, the Maryland Court of Appeals follows a two-step approach.  *See Johnson*, 430 Md. at 377-78, 61 A.3d at 38.  Courts first examine "'the plain meaning of the statutory language[.]'"  *Id.* at 377, 61 A.3d at 38 (citation omitted).  If the language "'is clear and unambiguous, and consistent with both the broad purposes of the legislation, and the specific purpose of the provision being interpreted, [the] inquiry is at an end.'"  *Id.* (citation omitted).  However, if the statute's "'language is ambiguous or unclear, [courts] seek to discern the intent of the legislature from surrounding circumstances, such as legislative history, prior case law, and the purposes upon which the statutory framework was based.'"  *Id.* (citation omitted).

At the first step, courts "'do not read statutory language in a vacuum,'" nor do they "'confine [their] interpretation of a statute's plain language to the isolated section alone.'"  *Williams v. Peninsula Reg'l Med. Ctr.*, 440 Md. 573, 580-81, 103 A.3d 658, 663 (2014) (citation omitted); *see Gundy*, 139 S. Ct. at 2126; *Bryant*, 2020 WL 398849, at *4.  Rather, the statutory language "'must be viewed within the context of the statutory scheme to which it belongs, considering the purpose, aim, or policy of the Legislature in enacting the statute.'"  *In re J.C.N.*, 460 Md. 371, 391, 190 A.3d 329, 341 (2018) (citation omitted).

As the Maryland Court of Appeals has explained, however, courts may "'neither add nor delete language so as to reflect an intent not evidenced in the plain and unambiguous language of the statute.'"  *McCloud v. Dep't of State Police, Handgun Permit Review Bd.*, 426 Md. 473, 480, 44 A.3d 993, 997 (2012) (citation omitted).  Moreover, the statute must be read "'as a whole to ensure that no word, clause, sentence or phrase is rendered surplusage, superfluous, meaningless or nugatory.'"  *Conaway*, 464 Md. at 523, 212 A.3d at 358; *see Bourgeois v. Live Nation Ent's, Inc.*, 430 Md. 14, 27, 59 A.3d 509, 516 (2013).  And, a court should strive to "avoid a construction

of the statute that is unreasonable, illogical, or inconsistent with common sense." *Bellard v. State*, 452 Md. 467, 481-82, 157 A.3d 272, 280-81 (2017).

Of import here, words in a statute are assigned their "ordinary meaning." *Balt. City Det. Ctr. v. Foy*, 461 Md. 627, 645, 197 A.3d 1, 11 (2018). Dictionary definitions may provide a "'useful starting point'" to determine an undefined term's meaning in common parlance. *Montgomery Cty. v. Deibler*, 423 Md. 54, 67, 21 A.3d 191, 198 (2011) (citation omitted); *see also Foy*, 461 Md. at 645, 197 A.3d at 11; *Bottini v. Dep't of Fin.*, 450 Md. 177, 195, 147 A.3d 371, 382 (2016) (using dictionary definition to construe the meaning of the term "money" in a statute). However, dictionary definitions are not necessarily dispositive. *Deibler*, 423 Md. at 67, 31 A.3d at 198. And, when a court turns to a dictionary to clarify a statutory term, the court should endeavor to consult an edition that was extant at the time that the challenged statute was enacted. *Harvey v. Marshall*, 389 Md. 243, 260 n.11, 884 A.2d 1171, 1181 n.11 (2005).

Maryland recognizes the interpretive canon of *expressio unius est exclusio alterius*, which means "the expression of one thing is the exclusion of another." *See Griffin v. Lindsey*, 444 Md. 278, 288, 119 A.3d 753, 758 (2015); *see also Hudson v. Hous. Auth. of Balt. City*, 402 Md. 18, 30, 935 A.2d 395, 402 (2007) (observing that the doctrine is a "fundamental principle of construction, long recognized in Maryland"). Under this canon, "statutory lists are often interpreted as exclusive, so that a court will draw the negative inference that no other items may be added." *Potomac Abatement, Inc. v. Sanchez*, 424 Md. 701, 712, 37 A.3d 972, 978 (2012); *see Griffin*, 444 Md. at 288, 119 A.3d at 759 (discussing cases applying the canon); *see also N.L.R.B. v. SW Gen., Inc.*, ___ U.S. ___, 137 S. Ct. 929, 940 (2017); 2A SUTHERLAND STATUTORY CONSTRUCTION § 47:23 (7th ed) (describing the canon's application); ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 107-11 (2012). That said, the Maryland

43

Court of Appeals has cautioned that the doctrine is merely an interpretive tool that should "'never be applied to override the manifest intention of the Legislature.'"  *State v. Neiswanger Mgmt. Servs., LLC*, 457 Md. 441, 479, 179 A.3d 941, 964 (2018) (quoting *Kirkwood v. Provident Sav. Bank of Balt.*, 205 Md. 48, 55, 106 A.2d 103, 107 (1954)).

## IV.    Claims for Relief

As noted, plaintiffs bring a federal preemption claim (Count I); three claims under the Commerce Clause (Counts II, III, and IV); an equal protection claim (Count V); a claim under the Due Process Clause, asserting that the Act is void for vagueness (VI); and a claim under Article 41 of the Maryland Declaration of Rights (VII).

The State has moved to dismiss the Complaint. First, the State argues that plaintiffs' preemption claim fails because the 2021 Act does not obstruct the AWA's licensing scheme.  ECF 9-1 at 23. Second, the State contends that plaintiffs have failed to plead plausible claims under the Commerce Clause because the 2021 Act neither discriminates against nor burdens interstate commerce.  *Id.* at 30.  Third, the State urges dismissal of plaintiffs' equal protection claim, arguing that plaintiffs have failed to allege a similarly situated comparator group and, further, that the Act survives rational basis scrutiny because plaintiffs are not part of a "protected class."  *Id.* at 43. Fourth, the State posits that plaintiffs have failed to meet the high burden of a facial challenge to the Act under the Due Process Clause. *Id.* at 51. Last, the State maintains that plaintiffs have not stated a plausible claim under the Maryland Declaration of Rights, as the Act does not grant an exclusive privilege to sell cats or dogs to any particular market participant.  *Id.* at 54.

## A.  Preemption (Count I)

Count I alleges that the Act is preempted by the AWA.  ECF 1, ¶¶ 100-114.  According to plaintiffs, one purpose of the AWA is to eliminate interstate burdens on commerce with respect to

animals. *Id.* ¶ 109. And, they assert that the 2021 Act is "an impermissible obstacle to the [AWA's] clearly stated purpose…by creating undue burdens on the free flow of commerce…." *Id.* ¶ 114. Further, plaintiffs claim that the Act "does not attempt to promulgate any additional or complimentary standards to those set forth under the AWA." *Id.* ¶ 112. Rather, plaintiffs complain that the effect of the 2021 Act "is to completely eradicate USDA licensed brokers (Class B Dealers) from the Maryland market…." *Id.* ¶ 113.

"The Supremacy Clause provides a clear rule that federal law 'shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any state to the Contrary notwithstanding.'" *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2); *see also Va. Uranium, Inc. v. Warren*, ___ U.S. ___, 139 S. Ct. 1894, 1901 (2019) ("The Supremacy Clause supplies a rule of priority."). As a result, "[w]here state and federal law 'directly conflict,' state law must give way." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 617 (2011) (citation omitted); *see also Merck Sharp & Dohme Corp. v. Albrecht*, ___ U.S. ___, 139 S. Ct. 1668, 1668 (2019) (observing that "'state laws that conflict with federal law are without effect'") (citation omitted); *Mutual Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 480 (2013). "Put simply, federal law preempts contrary state law." *Hughes v. Talen Energy Mktg., LLC*, ___ U.S. ___, 136 S. Ct. 1288, 1297 (2016).

"Federal law may preempt state law under the Supremacy Clause in three ways—by 'express preemption,' by 'field preemption,' or by 'conflict preemption.'" *Anderson v. Sara Lee Corp.*, 508 F.3d 181, 191 (4th Cir. 2007) (citation omitted); *see also Cox v. Duke Energy Inc.*, 876 F.3d 625, 635 (4th Cir. 2017); *Decohen v. Capital One, N.A.*, 703 F.3d 216, 223 (4th Cir. 2012). Express preemption occurs when federal law explicitly preempts state law. *See, e.g.*, *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 95-98 (1983). Field preemption applies where "'Congress has

legislated comprehensively to occupy an entire field of regulation, leaving no room for the States to supplement federal law.'"  *Hughes*, 136 S. Ct. at 1297 (citation omitted); *see, e.g.*, *Arizona*, 567 U.S. at 401-02.  And, conflict preemption arises where state law "actually conflicts with federal law."  *English v. Gen. Elec. Co.*, 496 U. S. 72, 79 (1990).  These three types of preemption are forms of "ordinary preemption" that serve as federal defenses to a state law claim.  *Lontz v. Tharp*, 413 F.3d 435, 441 (4th Cir. 2005); *see Wurtz v. Rawlings Co., LLC*, 761 F.3d 232, 238 (2d Cir. 2014).  Plaintiffs argue that the 2021 Act should be invalidated under both field and conflict preemption. ECF 5-1 at 11.

Obstacle preemption, a subset of conflict preemption, occurs "where state law 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'"  *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995) (quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)); *see also Wyeth v. Levine*, 555 U. S. 555, 563-64 (2009); *Anderson*, 508 F.3d at 191-92.  Typically, obstacle preemption arises when a state law "'interferes with the *methods* by which the federal statute was designed to reach [its] goal.'"  *Columbia Venture, LLC v. Dewberry & Davis, LLC*, 604 F.3d 824, 829-30 (4th Cir. 2010) (emphasis and brackets in original) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 103 (1992)); *see also Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 141-43 (1963).

Every preemption case is governed by "the two cornerstones of . . . preemption jurisprudence."  *Wyeth*, 555 U.S. at 565.  First, preemption of state law "is 'fundamentally . . . a question of congressional intent.'"  *Cox*, 876 F.3d at 635 (quoting *English*, 496 U.S. at 79); *see Hughes*, 136 S. Ct. at 1297 (observing "'the purpose of Congress is the ultimate touchstone in every pre-emption case'") (citation omitted).  Second, respect for our federalist system of government demands that courts presume that Congress did not intend to displace state law.

*Wyeth*, 555 U.S. at 565 n.3; *see Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008).  The presumption against preemption is especially strong "when Congress has legislated in a field traditionally occupied by the States."  *Altria Grp.*, 555 U.S. at 77; *see Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947) ("[Courts] start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress."); *cf. Hillman v. Maretta*, 569 U.S. 483, 490 (2013) (applying presumption against preemption in case concerning domestic relations, a field historically occupied by the states).  In such a case, the statute cannot be set aside absent "clear evidence" of a conflict.  *Geier v. Am. Honda Motor Co., Inc.*, 529 U.S. 861, 885 (2000).  These principles apply whether the allegedly preemptive federal law is a statute or a regulation.  *See id.* at 874.

In *Armstrong v. Exceptional Child Center, Inc.*, 575 U.S. 320 (2015), the Supreme Court said that "the Supremacy Clause is not the 'source of any federal rights,'" and it "certainly does not create a cause of action."  *Id.* at 324-25 (quoting *Chapman v. Hous. Welfare Rights Org.*, 441 U.S. 600, 613 (1979)).  Accordingly, as a general matter, the Supremacy Clause does not "give affected parties a constitutional . . . right to enforce federal law against the States."  *Id.* at 325.

Instead, the Supremacy Clause "instructs courts what to do when state and federal law clash[.]"  *Id.*  For example, "a court may not convict a criminal defendant of violating a state law that federal law prohibits."  *Id.* (citation omitted).  Similarly, "a court may not hold a civil defendant liable under state law for conduct federal law requires."  *Id.*  Thus, although federal preemption cannot be wielded offensively, it can serve as an equitable defense against a state enforcement action.  *See Armstrong*, 575 U.S. at 327 ("The ability to sue to enjoin unconstitutional actions . . . is the creation of courts of equity[.]"); John Harrison, *Ex parte Young*, 60 STAN. L. REV. 989, 997-99 (2008).

The law does not compel a plaintiff to wait until he faces prosecution to challenge an allegedly unconstitutional state or local law.  Rather, a plaintiff threatened with liability may seek pre-enforcement review.  *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128-29 (2007).  In such cases, a preemption claim also functions as a shield, because it is "nothing more than the pre-emptive assertion in equity of a defense that would otherwise have been available in the State's enforcement proceedings at law."  *See Va. Office for Protection and Advocacy v. Stewart*, 563 U.S. 247, 262 (2011) (Kennedy, J., concurring).  Such a claim is precisely the cause of action that the Supreme Court recognized in *Ex parte Young*, 209 U.S. 123 (1908); *see Armstrong*, 575 U.S. at 326-27 (citing *Ex parte Young*, 209 U.S. at 155-56); *Shaw*, 436 U.S. at 96 n.14 (collecting cases); *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841 F.3d 133, 144 (2d Cir. 2016); RICHARD H. FALLON JR. ET AL., HART AND WECHSLER'S THE FEDERAL COURTS AND THE FEDERAL SYSTEM 934 (7th ed. 2015).

In *Just Puppies I*, I rejected plaintiffs' preemption claim.  ECF 52 at 54-61.  Nothing has changed since then to alter my view.

Although the AWA references burdens on interstate commerce, the "Congressional Statement of Policy" clarifies that Congress sought to "eliminate burdens upon [animal] commerce" as a means to an end. 7 U.S.C. § 2131. Specifically, Congress sought to regulate interstate animal commerce "in order—(1) to insure that animals intended for use in research facilities or for exhibition purposes or for use as pets are provided humane care and treatment; (2) to assure the humane treatment of animals during transportation in commerce; and (3) to protect the owners of animals from the theft of their animals by preventing the sale or use of animals which have been stolen." *Id.*

In short, the AWA's purpose is to ensure the humane treatment of animals. *See Zimmerman v. Wolff*, 622 F. Supp. 2d 240, 248 (E.D. Pa. 2008) ("The objective of the AWA is not to permit an owner to practice in interstate commerce; it is to protect the animals that are bought, sold and transported in interstate commerce."). But, the AWA certainly does not dominate the field of the purchase and sale of cats and dogs. Indeed, the AWA specifically contemplates state and local regulation of animal sales, which counsels against the view that Congress intended to dominate the field of pet commerce. 7 U.S.C. § 2145(b).

Here, plaintiffs posit that the AWA dominates the "field of the purchase and sale of dogs" and precludes states from also regulating that field. ECF 14 at 8. Further, plaintiffs contend that the 2021 Act "stands in direct conflict with the goal of eliminating burdens upon interstate commerce because breeders and brokers from outside Maryland can no longer sell their dogs face-to-face with Maryland consumers, thus imposing a substantial burden in the marketplace." *Id.*; *see id.* at 12. The State counters that plaintiffs' preemption claim fails for the same reasons that it failed in the 2019-20 Litigation. ECF 9-1 at 23. In particular, the State argues that plaintiffs misunderstand the purpose of the AWA and manufacture an illusory conflict between the 2021 Act and the AWA. *Id.* at 25-30.

Evaluating whether a state law stands as an obstacle to federal law "requires 'a two-step process of first ascertaining the construction of the two statutes and then determining the constitutional question [of] whether they are in conflict.'" *H&R Block E. Enter., Inc. v. Raskin*, 591 F.3d 718, 723 (4th Cir. 2010) (alteration in *H&R Block*) (quoting *Chi. & N.W. Transp. Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317 (1981)). Mere "tension" between the federal and state law is insufficient. *Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 256 (1984). Rather, a conflict exists "only where the repugnance or conflict is so 'direct and positive' that the two acts cannot

'be reconciled or consistently stand together.'" *Jones v. Rath Packing Co.*, 430 U.S. 519, 544 (1977) (Rehnquist, J., dissenting in part and concurring in part) (quoting *Kelly v. Washington*, 302 U.S. 1, 10 (1937)).

Plaintiffs rely, *inter alia*, on *Puppies 'N Love v. City of Phoenix*, 116 F. Supp. 3d 971 (D. Ariz. 2015), *vacated on other grounds by*, *Puppies 'N Love v. City of Phoenix*, 238 F. Supp. 3d 815 (D. Ariz. 2017), to support their argument that the AWA precludes states from enacting laws that affect interstate commerce. But, in that case the court was addressing an argument as to the dormant Commerce Clause, not federal preemption. In particular, the defendant in that case argued that the AWA affirmatively allowed states and local governments to enact regulations that discriminate against interstate commerce, so the plaintiff's Commerce Clause claim should fail. The district court rejected that contention, noting that the "AWA's savings clause does not clearly and unambiguously authorize Phoenix to enact an ordinance that discriminates against interstate commerce." *Puppies 'N Love*, 116 F. Supp. 3d at 983. But, contrary to what plaintiffs posit, the court did not hold that the AWA precludes any law that affects interstate commerce under *a federal preemption claim*.

In *N.Y. Pet Welfare Ass'n, Inc. v. City of New York*, 850 F.3d 79 (2d Cir. 2017), the Second Circuit examined a preemption challenge in an analogous setting. In that case, the plaintiffs, a collection of pet stores, challenged a New York City ordinance requiring pet shops to sell only animals acquired from dealers holding Class A licenses. They argued, *inter alia*, that the ordinance interfered with the AWA's licensing system. *Id.* at 86. Whether the ordinance clashed with the AWA, the Second Circuit explained, turned on whether it "block[ed] the licensure system from fulfilling the specific role that Congress and the Secretary of Agriculture intended to play in advancing the goals of the AWA." *Id.* at 87.

The court found that "careful analysis" of the AWA revealed that it was "best understood as a system of compulsory registration designed to require dealers to provide information that would facilitate the Act's objective of creating a nationwide system of animal welfare inspections." *Id.* at 88.  The ordinance posed no obstacle to this scheme because "[b]reeder's and distributor's ability to sell to City pet shops has no bearing on the licensing scheme's ability to facilitate federal enforcement activities." *Id.*  As the court noted, "[d]istributors will still have to get licenses, will still have to provide information to federal officials, and will still have to open their facilities to federal inspection," while "exempt breeders will still be excluded from the licensing system as a matter of federal law." *Id.* at 88-89.  Thus, the Second Circuit affirmed the district court's dismissal of the plaintiffs' preemption claim.  *Id.* at 89.

For the same reasons outlined in *N.Y. Pet Welfare*, plaintiffs have failed to identify an "actual conflict between the two schemes of regulation." *Fla. Lime*, 373 U.S. at 141.  The AWA's purpose is to foster the humane treatment of animals, not to protect the commercial interests of breeders and brokers.  *See* 7 U.S.C. § 2131; *see also Zimmerman*, 622 F. Supp. 2d at 248. To effectuate this purpose, the AWA directs the USDA Secretary to create a licensure system, issue regulations governing the treatment and transportation of animals, and proactively to conduct inspections of breeding facilities. 7 U.S.C. §§ 2133, 2143, 2146.

Prohibiting Maryland pet stores from selling dogs or cats has no effect on the operation of the AWA. *See Zimmerman*, 622 F. Supp. 2d at 248 ("AWA does not create an absolute right to be able to buy, sell and transport dogs in every state by virtue of having a federal license to operate in interstate commerce.").  The 2021 Act's impact on pet stores does not clash with the AWA, because pet stores are explicitly exempt from the AWA.  *See* 7 U.S.C. § 2132(f).  Moreover, breeders and brokers who sell to Maryland consumers and who fall within the AWA's sweep "will

51

still have to get licenses, will still have to provide information to federal officials, and will still have to open their facilities to federal inspection." *N.Y. Pet Welfare*, 850 F.3d at 88. Thus, the Act in no way stands as an obstacle to the AWA's system of licensing and inspection.

Moreover, as noted, the AWA specifically contemplates state and local regulation of animal sales. *See* 7 U.S.C. §§ 2143(a)(8), 2145(b). Plaintiffs argue that the savings clause in § 2143(a)(8) provides only a narrow authorization for states to enact legislation. ECF 14 at 9. Specifically, plaintiffs posit that the savings clause only permits states to promulgate standards relating to the regulations and certification process with respect to the humane handling, care, treatment, and transportation of animals. In their view, it does not confer authority on states to regulate in the area of interstate commerce.

However, "'[t]he case for federal pre-emption is particularly weak where Congress has indicated its awareness of the operation of state law in a field of federal interest, and has nonetheless decided to stand by both concepts and to tolerate whatever tension there is between them.'" *Wyeth*, 555 U.S. at 575 (alteration and citation omitted). That is precisely the situation here. The AWA states: "The Secretary is authorized to cooperate with the officials of the various States or political subdivisions thereof in carrying out the purposes of [the AWA] and of any State, local, or municipal legislation or ordinance on the same subject." 7 U.S.C. § 2145(b). And, the AWA unambiguously envisions state and local action, providing that the USDA's regulations "shall not prohibit any State (or political subdivision of such State) from promulgating standards in addition" to its own. *Id.* § 2143(a)(8). Moreover, "because the States are independent sovereigns in our federal system [and] we have long presumed that Congress does not cavalierly pre-empt state-law causes of action," *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996), courts "have a duty to accept the reading that disfavors pre-emption." *Bates v. Dow Agrosciences LLC*,

544 U.S. 431, 449 (2005). Therefore, I decline to interpret the savings clause with the same narrow lens that plaintiffs propose. *See N.Y. Pet Welfare*, 850 F.3d at 89 ("Significantly, the text of the AWA unambiguously envisions continuing state animal welfare regulation.").

In addition, the AWA addresses a matter historically within the police power of the states, which also weighs against preemption.  *Cf. Reid v. Colorado*, 187 U.S. 137, 148 (1902) (upholding state statute regulating trade in cattle and horses); *N.Y Pet Welfare.*, 850 F.3d at 88–89 (noting that animal welfare regulation is an area within the states' traditional police powers); *DeHart v. Town of Austin*, 39 F.3d 718, 720–21 (7th Cir. 1994) (noting that animal welfare is an "area of regulation within the historic police powers of a municipality").  And, the USDA, the agency authorized to promulgate rules under the statute, 7 U.S.C. § 2151, has encouraged local governments to enact laws related to animal protection. *See* APHIS Fact Sheet (Feb. 2014), available at www.aphis.usda.gov/publications/animal_welfare/content/printable_version/faq_animal_dealers. pdf ("States and local governments may create and enforce their own laws and regulations to protect animals, which may exceed the AWA standards.").

Moreover, courts have consistently rejected the claim that the AWA preempts a state or local animal law, even those that ban activity otherwise permitted under the AWA.  *See N.Y. Pet Welfare*, 850 F.3d at 89; *DeHart*, 39 F.3d at 722 (ordinance prohibiting the possession of exotic animals); *Mo. Pet Breeders Ass'n v. Cnty. of Cook*, 106 F. Supp. 3d 908, 918 (N.D. Ill. 2015) (ordinance limiting pet stores to selling animals sourced from Class A licensees with fewer than five female animals); *Zimmerman*, 622 F. Supp. 2d at 247-48 (state law precluding plaintiff from breeding dogs); *Am. Canine Found. v. Sun*, C-06-4713 MMC, 2007 WL 4208358, at *5 (N.D. Cal. Nov. 27, 2007) (spaying and neutering ordinance); *Kerr v. Kimmell*, 740 F. Supp. 1525, 1529-30 (D. Kan. 1990) (state licensing scheme for dog breeders).

Accordingly, I shall dismiss plaintiffs' preemption claim in Count I.

## A. Commerce Clause (Counts II, III, and IV)

In Counts II, III, and IV, plaintiffs allege that the Act violates the Constitution's dormant Commerce Clause, because it discriminates between Maryland breeders and brokers and those located out-of-state, who make up the majority of breeders and brokers who do business in Maryland.  In contrast to the 2019-20 Litigation, plaintiffs do not contend that the Act is facially discriminatory; the 2021 Act treats in-state and out-of-state breeders and brokers the same. But, plaintiffs assert that the Act discriminates in effect and purpose.

Specifically, in Count II, plaintiffs claim that the Act discriminates against out-of-state breeders and brokers. ECF 1, ¶¶ 115-28.  Count III alleges that the Act discriminates against Maryland retail pet stores.  *Id.* ¶¶ 129-36.  And, in Count IV, plaintiffs allege that even if the Act is not discriminatory, it violates the Commerce Clause because it fails what has come to be known as the *Pike* balancing test.  *Id.* ¶¶ 137-53; *see Pike v. Bruce Church, Inc*., 397 U.S. 137, 142 (1970).

### 1.  The Dormant Commerce Clause

The Commerce Clause of the Constitution grants Congress the power "[t]o regulate Commerce . . . among the several States."  U.S. Const. art. I, § 8, cl. 3.  Although this text is an affirmative grant of power to Congress, the Supreme Court has long held that the Commerce Clause contains a "negative" corollary that "prohibits state laws that unduly restrict interstate commerce."  *Tenn. Wine & Spirits Retailers Assoc. v. Thomas*, ___ U.S. ___, 139 S. Ct. 2449, 2459 (2019); *see South Dakota v. Wayfair*, ___ U.S. ___, 138 S. Ct. 2080, 2090-91 (2018); *Oregon Waste Sys., Inc. v. Dep't of Envtl. Quality of State of Oregon*, 511 U.S. 93, 99 (1994); *City of Philadelphia v. New Jersey*, 437 U.S. 617, 623-24 (1978).  This aspect of the Commerce Clause, generally referred to as the "dormant Commerce Clause," is principally aimed at "prevent[ing] the

States from adopting protectionist measures and thus preserves a national market for goods and services." *Tenn. Wine & Spirits*, 139 S. Ct. at 2459; *see Wayfair*, 138 S. Ct. at 2090-91; *Dep't of Revenue of Ky. v. Davis*, 553 U.S. 328, 337-38 (2008). By prohibiting state laws that impede interstate commerce, the dormant Commerce Clause acts as an antidote to the "economic Balkanization" that "'had plagued relations among the Colonies and later among the States under the Articles of Confederation.'" *Davis*, 553 U.S. at 338 (quoting *Hughes v. Oklahoma*, 441 U.S. 322, 325-26 (1979)).[17]

Laws that discriminate against interstate commerce face "'a virtually *per se* rule of invalidity.'" *Wayfair*, 138 S. Ct. at 2091 (quoting *Granholm v. Heald*, 544 U.S. 460, 476 (2005)). The Supreme Court has adopted "a two-tiered approach to analyzing state economic regulation under the Commerce Clause." *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 578-79 (1986); *accord Colon Health Ctrs. of Am., LLC v. Hazel* ("*Hazel II*"), 813 F.3d 145, 152, 156 (4th Cir. 2016); *Sandlands C&D LLC v. Cty. of Horry*, 737 F.3d 45, 51, 53 (4th Cir. 2013); *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 785 (4th Cir. 1996). First, a court must "ask whether the challenged law discriminates against interstate commerce." *Davis*, 553 U.S. at 338; *see Sandlands C&D*, 737 F.3d at 51. In the context of the dormant Commerce Clause, discrimination "simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter." *Or. Waste Sys.*, 511 U.S. at 99.

A state law "may discriminate against interstate commerce in one of three ways: 'facially, in its practical effect, or in its purpose.'" *Hazel II*, 813 F.3d at 155 (quoting *Envtl. Tech. Council*,

---

[17] The restraints of the dormant Commerce Clause do not apply when a "local government enters the market as a participant." *White v. Mass. Council of Const. Employers, Inc.*, 460 U.S. 204, 208 (1983). Nor are they applicable when Congress has authorized "regulations that burden or discriminate against interstate commerce." *Hillside Dairy Inc. v. Lyons*, 539 U.S. 59, 66 (2003).

98 F.3d at 785). And, a "discriminatory measure is 'virtually *per se* invalid,' and will survive strict scrutiny only if it 'advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives.'" *Hazel II*, 813 F.3d at 152 (quoting *Or. Waste Sys.*, 511 U.S. at 99) (cleaned up). If the law is not discriminatory, the court considers whether the law nonetheless violates the dormant Commerce Clause under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137 (1970). *See Hazel II*, 813 F.3d at 155; *Sandlands C&D*, 737 F.3d at 53; *Envtl. Tech. Council*, 98 F.3d at 785.

By its text, a law may expressly discriminate against out-of-state businesses or give in-state businesses a competitive advantage. *See, e.g.*, *Tenn. Wine & Spirits*, 139 S. Ct. at 2474 (two-year residency requirement to obtain a liquor license); *Granholm*, 544 U.S. at 476 (state law allowing in-state wineries, but not out-of-state wineries, to sell wine through the mail); *Lewis v. BT Inv. Managers, Inc.*, 447 U.S. 27, 37 (1980) (statute barring out-of-state banks from owning investment advisory businesses within the state). And, a facially neutral law may also be discriminatory if the law's purpose or effect is to favor in-state businesses. *See, e.g.*, *W. Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 193 (1994) (milk pricing statute was unconstitutional where its "avowed purpose and its undisputed effect" was to benefit in-state dairy farmers); *Hunt v. Wash. State Apple Advert. Com'n*, 432 U.S. 333 (1947) (statute imposing labeling requirements on produce discriminated in practical effect).

However, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp. v. Governor of Md.*, 437 U.S. 117, 127 (1978). Nor is a statute discriminatory simply because it imposes burdens on a particular business method or operation. *See id.* Although the discrimination test affords courts "some latitude to determine for themselves the practical impact of a state law,"

it is not unbounded; courts must be careful "not [to] cripple the States' 'authority under their general police powers to regulate matters of legitimate local concern.'"  *Hazel II*, 813 F.3d at 152 (quoting *Maine v. Taylor*, 477 U.S. 131, 138 (1986)).

When evaluating whether a law is discriminatory, "a court should focus on discrimination against *interstate commerce*—not merely discrimination against the specific parties before it." *Colon Health Ctrs. of Am., LLC v. Hazel* ("*Hazel I*"), 733 F.3d 535, 543 (4th Cir. 2013) (emphasis in *Hazel I*) (citing *Exxon Corp.*, 437 U.S. at 127).  The "principal focus of inquiry must be the practical operation of the statute, since the validity of state laws must be judged chiefly in terms of their probable effects."  *Lewis*, 447 U.S. at 37.  Therefore, discerning whether a statute is discriminatory may "require[] looking behind the statutory text to the actual operation of the law." *Hazel I*, 733 F.3d at 544.

Where "a state law discriminates against out-of-state goods or nonresident economic actors, the law can be sustained only on a showing that it is narrowly tailored to 'advanc[e] a legitimate local purpose.'"  *Tenn. Wine & Spirits*, 139 S. Ct. at 2461 (alteration in *Tenn. Wine & Spirits*) (quoting *Davis*, 553 U.S. at 338).  And, to pass constitutional muster, the local purpose must be one "that cannot be adequately served by reasonable nondiscriminatory alternatives."  *Or. Waste Sys.*, 511 U.S. at 99.  Furthter, to be legitimate, the law's purpose must be "unrelated to economic protectionism."  *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992).

A law that is not discriminatory but which nonetheless indirectly burdens interstate commerce is subject to *Pike* balancing.  *See Hazel II*, 813 F.3d at 155 (citing *Sandlands C&D*, 737 F.3d at 53).  Under *Pike* balancing, a court must uphold the challenged law if it "regulates even-handedly to effectuate a legitimate local public interest . . . unless the burden imposed on such commerce is clearly excessive in relation to the putative local benefits."  *Pike*, 397 U.S. at 142.

The *Pike* Court instructed, *id.*: "If a legitimate local purpose is found, then the question becomes one of degree. And the extent of the burden that will be tolerated will of course depend on the nature of the local interest involved, and on whether it could be promoted as well with a lesser impact on interstate activities."

*Pike* balancing is a delicate inquiry.  *See Hazel II*, 813 F.3d at 155; *see also Davis*, 553 U.S. at 354 (describing *Pike* as a "very subtle exercise"); ERWIN CHEMERINSKY, CONSTITUTIONAL LAW: PRINCIPLES AND POLICIES § 5.3.5 at 462 (5th ed. 2015) (lamenting that *Pike* "gives courts enormous discretion").  The analysis "frequently requires judges to make highly subjective calls." *Hazel II*, 813 F.3d at 155.  And, it is sometimes made "complicated by the difficulty of determining by what criteria benefits and burdens ought to be assessed."  *Id.*  As Justice Scalia colorfully put it, *Pike* balancing is often "a matter not of weighing apples against apples, but of deciding whether three apples are better than six tangerines."  *Davis*, 553 U.S. at 360 (Scalia, J., concurring); *see* CHEMERINSKY, § 5.3.5 at 462 (describing *Pike* balancing as requiring a court to "compar[e] two very different things").  Moreover, even where the alleged benefits and burdens are clearly identified, it may be difficult from the judicial perch to conduct the balancing that *Pike* demands. *See Hazel II*, 813 F.3d at 156 ("Judges are, for better or worse, not often economists or statisticians. . . . Simply put, there are cases in which 'the Judicial Branch is not institutionally suited to draw reliable conclusions of the kind that would be necessary . . . to satisfy a *Pike* burden.'") (quoting *Davis*, 553 U.S. at 353).

The fact-intensive nature of *Pike* balancing "counsels against a premature dismissal" of a complaint.  *Hazel I*, 733 F.3d at 546.  That said, a complaint alleging a violation based on *Pike* balancing is not inherently immune from judicial scrutiny at the motion to dismiss stage.  As the Seventh Circuit has explained, to satisfy Rule 12(b)(6), a plaintiff must "plead specific facts" that

the challenged law burdens commerce and that those burdens outweigh the law's benefits. *Park Pet Shop, Inc. v. City of Chicago*, 872 F.3d 495, 503 (7th Cir. 2017). Therefore, "conclusory allegations of disparate impact are not sufficient" to survive a motion to dismiss. *Id.*; *accord Rosenblatt v. City of Santa Monica*, 940 F.3d 439, 452 (9th Cir. 2019) (dismissing *Pike* claim where "the complaint fail[ed] to sufficiently allege that the ordinance's effect on interstate commerce clearly outweighs the ordinance's local benefits"); *N.Y. Pet Welfare*, 850 F.3d at 91 (holding that the plaintiff "fail[ed] sufficiently to allege that the burden of selling directly to City pet shops, rather than through distributors, will fall disproportionately on out-of-state breeders").

### 2. Discrimination Against Out-Of-State Breeders and Brokers

#### a. Discriminatory Effect

In Count II, plaintiffs allege that the 2021 Act is invalid under the Commerce Clause because it discriminates against out-of-state breeders and brokers in its purpose and effect. ECF 1, ¶¶ 120-128, 134; *see* ECF 5-1 at 16. In particular, plaintiffs claim that the Act discriminates against out-of-state breeders and brokers because "the practical and intended effect…is to unduly increase cost and expense for sales to the Maryland consumer and interfere with the free flow of dogs and cats into the Maryland marketplace." ECF 1, ¶ 122; *see* ECF 5-1 at 18. This, according to plaintiffs, "does not serve to advance any legitimate local State interest whatsoever." *Id.* In response, the State contends that plaintiffs' dormant Commerce Clause claims fail for the same reasons they failed in the 2019-20 Litigation. ECF 9-1 at 33-34.[18]

---

[18] According to the non-profit organization Best Friends Animal Society, as of June 2021, 383 jurisdictions in the United States have banned retail pet stores from selling cats and dogs from some or all sources. *See Jurisdictions with Retail Pet Sale Bans*, BEST FRIENDS, https://resources.bestfriends.org/article/jurisdictions-humane-pet-sales-laws?ga= 2.165897982.1161213403.1623690597-869465564.1623690597.

According to plaintiffs, because this suit involves a state-wide ban, and not merely a local ban, it is a case of first impression. Plaintiffs contend that this case is distinguishable from those in which courts have upheld restrictions on pet sales because those cases involved city-wide limitations, in contrast with the state-wide ban in the 2021 Act. ECF 14 at 16; *see Park Pet Shop*, 872 F.3d 495 (Chicago ordinance); *N.Y. Pet Welfare*, 850 F.3d at 91 (New York City law).

As noted, a law discriminates against interstate commerce when it provides differential treatment to similarly situated "in-state and out-of-state economic interests" in a way "that benefits the former and burdens the latter." *Or. Waste Sys., Inc.*, 511 U.S. at 99. And, these benefits and burdens must be more than *de minimis*. Although the Supreme Court has found discriminatory state and local laws that were facially neutral, based on their purpose and/or effect, the "Court never has articulated clear criteria for deciding when proof of a discriminatory purpose and/or effect is sufficient for a state or local law to be deemed discriminatory." E. Chemerinsky, *Constitutional Law, Principles and Policies*, 457–58 (5th ed. 2015).

"Courts examining a 'practical effect' challenge must be reluctant to invalidate a state statutory scheme ... simply because it *might* turn out down the road to be at odds with our constitutional prohibition against state laws that discriminate against Interstate Commerce." *Black Star Farms, LLC v. Oliver*, 600 F.3d 1225, 1233 (9th Cir. 2010) (emphasis in original). Furthermore, "[t]he fact that the burden of a state regulation falls on some interstate companies does not, by itself, establish a claim of discrimination against interstate commerce." *Exxon Corp.*, 437 U.S. at 126. Nor does the Commerce Clause protect "the particular structure or methods of operation in a retail market." *Id.* at 127. Rather, plaintiffs must show that "the effect of [the] regulation is to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market." *Id.* at 126 n.16 (citing *Dean Milk Co.*

*v. Madison*, 340 U.S. 349, 354 (1951); *Hunt v. Washington Apple Adver. Comm.*, 432 U.S. 333, 352 (1977)); *see also Polar Ice Cream & Creamery Co. v. Andrews*, 375 U.S. 361, 376–77 (1964); *Baldwin v. G.A.F. Seelig, Inc.*, 294 U.S. 511, 519 (1935).

In *Just Puppies I*, plaintiffs claimed, in part, that the 2020 Act was invalid because it discriminated against out-of-state dog breeders and brokers in its purpose and effect. *Just Puppies I*, ECF 52 at 41. I disagreed, concluding that the 2020 Act did not discriminate in its effect because it did "not prevent breeders and brokers located outside of Maryland from selling cats and dogs to Maryland consumers." *Id.* at 48. Rather, breeders and brokers had "many options for reaching the Maryland pet market, including selling their inventory directly to Maryland residents through the internet, print advertising or by showcasing animals in pet stores." *Id.*

Further, I rejected the claim that plaintiffs were disadvantaged because they would have to switch their retail model, explaining that the "Commerce Clause does not protect 'particular structure or methods of operation in a retail market.'" *Id.* (quoting *Exxon Corp.*, 437 U.S. at 127). Of particular relevance, I concluded that the 2020 Act did not "confer a competitive advantage to in-state breeders and brokers." ECF 52 at 48. Rather, "in-state and out-of-state breeders [were] 'similarly disadvantaged' by the Act's across-the-board prohibition on the sale of cats and dogs by retail stores." *Id.* (quoting *Park Pet Shop*, 827 F.3d at 502).

As plaintiffs concede, the 2021 Act does not prevent breeders and brokers located outside of Maryland from selling cats and dogs to Maryland consumers, such as by way of the Internet. *See* ECF 1, ¶ 120; ECF 5-1 at 18.  But, plaintiffs complain that the 2021 Act excludes from the retail ban "an establishment at which the animals sold at the establishment were born at the establishment."  Bus. Reg. § 19-703; *see* ECF 14 at 14. Under this provision, a Maryland breeder, whether a hobby breeder, a licensed breeder, or even a puppy mill, can readily sell its dogs and

cats to Maryland consumers through in-person, face-to-face interactions. In contrast, argue plaintiffs, the out-of-state breeder has no avenue in Maryland for a face-to-face sale prior to purchase and can only sell to a Maryland consumer via the internet or if the Maryland consumer is willing to travel out-of-state. According to plaintiffs, the "practical and intended effect [of this provision] on out-of-state breeders is to unduly increase cost and expense for sales to the Maryland consumer and interfere with the free flow of dogs and cats into the Maryland marketplace." ECF 5-1 at 18. Further, plaintiffs posit that the "market gap will be filled by in-state breeders, who face less challenges to get their dogs into the Maryland market and now will have less out-of-state competition through Maryland's retail pet stores." ECF 14 at 16.

Plaintiffs' argument is similar to the one that was addressed in *Park Pet Shop*, 872 F.3d at 495-89. In that case, two Chicago pet stores and a Missouri dog breeder challenged a Chicago ordinance that limited the particular animals that pet stores could sell to those sourced from animal shelters and animal control units. *Id.* at 497. Among other claims, the plaintiffs asserted that the ordinance violated the dormant Commerce Clause, arguing that "Chicagoans will respond to the…ordinance in part by turning directly to breeders for their purebred pets." *Id.* at 498. The court acknowledged that the effect of the ban might be to cause city residents to seek dogs directly from "nearby" breeders, thus giving those "nearby" breeders a "competitive advantage." *Id.* at 502-03. But, it also recognized that "those breeders are as likely to be located in nearby Wisconsin or Indiana as they are in suburban Chicago or downstate Illinois." *Id.* at 503. Thus, the court concluded: "[T]he supposition that Chicagoans will turn directly to breeders for their pure-bred pets does not establish that the ordinance has a discriminatory effect on breeders located out of state" *Id.* And, in sum, the court found that "breeders in Illinois enjoy no competitive advantage

over their counterparts outside of the state because "[a]ll breeders [we]re similarly disadvantaged" by the ordinance. *Id.* at 502.

Likewise, here the Act may result in Maryland residents turning to nearby, local breeders over those that are located farther away. But, that will not necessarily result in a disadvantage for out-of-state breeders over in-state breeders. Maryland borders the states of Virginia, West Virginia, Delaware, and Pennsylvania, as well as the District of Columbia. And, it is a short ride from the Maryland border to New Jersey. Residents in Maryland who seek "nearby" breeders are just as likely to find them in those states as in Maryland. *Id.* at 503. *See Mo. Pet Breeders Ass'n*, 106 F. Supp. 3d at 923 ("[P]laintiffs argue that consumers will be less likely to travel to an out-of-state breeder than an in-state breeder. But a Cook County resident can visit a breeder in Indiana or Wisconsin just as quickly (if not more quickly) as he can travel to many breeders in Illinois.").

Even if the Act results in some Maryland consumers shifting to in-state sources, or causes some out-of-state brokers or breeders to leave the Maryland market, that does not necessarily mean that the Act has violated the dormant Commerce Clause. *See Exxon Corp.*, 437 U.S. at 126-27. An incidental burden on out-of-state interests and a "*de minimis* benefit" to local interests is "insufficient to trigger strict scrutiny." *Black Star*, 600 F.3d at 1235; *see Puppies 'N Love*, 116 F. Supp. 3d at 990 ("[A]n abstract competitive advantage for in-state businesses is not discrimination under the dormant Commerce Clause."). In other words, "the mere fact that a statutory regime has a discriminatory potential is not enough to trigger strict scrutiny under the dormant commerce clause." *Cherry Hill Vineyard, LLC v. Baldacci*, 505 F.3d 28, 38 n.7 (1st Cir. 2007).

Plaintiffs' position is belied by their own assertions as to the marketplace for pets within Maryland. Plaintiffs have repeatedly explained that the Pet Store Plaintiffs buy all of their puppies from out-of-state breeders. *See, e.g.*, ECF 1, ¶ 64. Further, they contend that the in-state breeders

and shelters have a "limited inventory" of pets.  ECF 1, ¶ 81; *see also* ECF 5-12. Indeed, as of May 2021 there were only ten USDA Class A licensed breeders in Maryland. *See* ECF 5-12.  In contrast, there are approximately 800 USDA Class A licensed breeders in Missouri. *See* ECF 5-13. Accordingly, even if Maryland residents wanted to turn to local, in-state breeders, their options would be limited. Rather, as plaintiffs allege, Maryland residents seeking to purchase "purebred and designer puppies will have to heavily rely on the unregulated internet and print advertising to try to locate such dogs…." ECF 1, ¶ 82.

Plaintiffs may have shown the flawed logic behind the Act, because it leaves Maryland consumers with fewer options and protections than they previously had in regard to obtaining dogs. But, this does not equate to a disadvantage to out-of-state breeders in regard to the Maryland marketplace. *See Mo. Pet Breeders Ass'n*, 106 F. Supp. 3d at 923 (reasoning that the limited supply of breeder-provided animals in Illinois makes it unlikely that consumers would buy from Illinois breeders, to the disadvantage of out-of-state breeders).

Out-of-state brokers and breeders may need to change their sales strategy. But, as noted, the Act does not prevent breeders and brokers located outside of Maryland from selling cats and dogs to Maryland consumers. Indeed, they can still reach the Maryland pet market in various ways, such as the Internet and via advertising. And, as I discussed at length in the 2019-20 Litigation, that plaintiffs might have to alter or revise their business model is not, on its own, a violation of the dormant Commerce Clause.  *See Exxon Corp.*, 437 U.S. at 126-27; *see Brown v. Hovatter*, 561 F.3d 357, 364-65 (4th Cir. 2009) (noting that dormant Commerce Clause "does not protect the participants in intrastate or interstate markets, nor the participants' chosen way of doing business" and rejecting challenge where the plaintiffs' "complaints about the regulation center around either the inconveniences presented to them personally or the restrictions on how they would prefer to

run their businesses"); *compare Assoc. for Accessible Medicines. v. Frosh*, 887 F.3d 664, 666, 673 (4th Cir. 2018) (finding dormant Commerce Clause violation as to state law prohibiting price gouging in sale of prescription drugs, because the law "directly regulates the price of transactions that occur outside Maryland[]"; the law "requires manufacturers and wholesale distributors to do more than alter their distribution channels").

For the same reason, plaintiffs' contentions as to the expenses and logistical headaches of transporting dogs from out-of-state into Maryland, directly to consumers, are of no moment. The Court aptly explained in *N.Y. Pet Welfare*, 850 F.3d at 91: "The cost of doing business in many markets is higher for faraway sellers than for nearby ones, and the Sourcing Law does not violate the Commerce Clause merely because of that fact. Where the cost of compliance with the Sourcing Law would be the same in Pittsburgh as in Buffalo, the Law cannot be said to impose a special burden on *interstate* commerce.") (emphasis in original); *see also Rocky Mountain Farmers Union v. Corey*, 730 F.3d 1070, 1092 (9th Cir. 2013) (observing that "the dormant Commerce Clause does not guarantee that [the plaintiffs] may compete on the terms they find most convenient"); *see also Baldacci*, 505 F.3d at 38 n. 7 ("An effect is not discriminatory, in violation of the dormant Commerce Clause, if it results from natural conditions."). Moreover, the burden of those increased costs will also fall on Maryland consumers, and not only (if at all) on interstate commerce. *See, e.g.*, ECF 1, ¶ 168. But, "a complaint about this burden 'relates to the *wisdom* of the [Maryland] statute, not to its burden on [interstate] commerce.'" *Brown*, 561 F.3d at 366 (quoting *Exxon Corp.*, 437 U.S. at 128) (alterations and emphasis in *Brown*).

Plaintiffs suggest that this case is "akin" to *Family Winemakers of Cal. v. Jenkins*, 592 F.3d 1 (1st Cir. 2010). ECF 5-1 at 20. There, the First Circuit struck down a Massachusetts statute establishing differential methods by which wineries distribute wine in that state. That statute

differentiated between "small" wineries producing 30,000 gallons or less of grape wine a year and "large" wineries producing more than 30,000 gallons of such wine annually. The small wineries could sell their wines in Massachusetts in three ways: "by shipping directly to consumers, through wholesaler distribution, and through retail distribution." 592 F.3d at 4. Because all Massachusetts wineries were "small," they could use all of these methods. However, "large" wineries, all of which were located in other states, were required to "choose between relying upon wholesalers to distribute their wines [in Massachusetts] or applying for a 'large winery shipping license' to sell directly to Massachusetts consumers. They cannot, by law, use both methods to sell their wines in Massachusetts, and they cannot sell wines directly to retailers under either option." *Id.*

The First Circuit concluded that the law was discriminatory in effect because it conferred "a clear competitive advantage to 'small' wineries, which includes all Massachusetts's wineries, and creates a comparative disadvantage for 'large' wineries, none of which are in Massachusetts." *Id.* at 11 (citing *Baldacci*, 505 F.3d at 36–37). The evidence adduced by *Family Winemakers* demonstrated that the effect of Massachusetts's law was "'to cause local goods to constitute a larger share, and goods with an out-of-state source to constitute a smaller share, of the total sales in the market.'" *Id.* at 10 (quoting *Exxon Corp.*, 437 U.S. at 126 n.16).

In contrast to the statute at issue in *Family Winemakers*, the 2021 Act does not differentiate between small and large brokers or breeders in regard to permissible distribution methods. Rather, all Maryland retail pet stores are barred from selling cats and dogs, except if the animal was born at the establishment. And, because a retail pet store is defined to include brokers, all brokers are also barred from selling cats and dogs. Therefore, all brokers, regardless of size or location, are prohibited from selling animals to Maryland pet stores.

The 2021 Act ultimately may cause some business to shift to Maryland breeders, who perhaps can more readily sell dogs born at their establishments.  But, such "[f]avoritism … does not pose a constitutional problem...." *Baude v. Heath*, 538 F.3d 608, 615 (7th Cir. 2008). "[I]nterstate commerce is not subjected to an impermissible burden simply because an otherwise valid regulation causes some business to shift from one [ ] supplier to another." *Exxon*, 437 U.S. at 127. And, any financial burden that the Act imposes on pet stores, breeders, and brokers is an argument that relates "to the wisdom of the statute, not its burden on commerce." *Id.* at 128.

Plaintiffs are correct that this suit involves a state-wide ban, as opposed to a local ordinance. However, this is a distinction without a difference.  That the laws at issue in *Park Pet Shop* and *N.Y. Pet Welfare* were local rather than state-wide was not dispositive in either case. For example, in *Park Pet Shop*, 872 F.3d at 503, in determining that the ordinance did not present a constitutional problem, the court recognized that the ordinance may have the effect of "shifting sales among different sources of pets *without regard to location.*" (Emphasis added).

Plaintiffs also argue that the 2021 Act discriminates against interstate commerce because brokers, like pet stores, are barred from selling cats and dogs in Maryland, and the brokers are largely located outside of Maryland.  That Maryland apparently has no brokers in the State is of no legal consequence.  This does not mean that the law has "fenced out" brokers from other states. *Baude*, 538 F.3d at 615.

When a market has more out-of-state than in-state participants, the Supreme Court has squarely rejected the argument that a "statute is discriminatory because it will apply most often to out-of-state entities." *CTS Corp. v. Dynamics Corp. Of Am.*, 481 U.S. 69, 88 (1987); *see Exxon Corp.*, 437 U.S. at 125-26 (finding that a law that restricts a market consisting entirely of out-of-state interests is not discriminatory because there is no local market to benefit); *Nat'l Ass'n of*

*Optometrists & Opticians LensCrafters, Inc. v. Brown*, 567 F.3d 521, 523 (9th Cir. 2009) (upholding a California law impacting mostly out-of-state businesses); *N.Y. Pet Welfare*, 850 F.3d at 91 (rejecting the same argument lodged here). Rather, what matters is that any in-state brokers that do exist will be treated exactly the same as out-of-state brokers.

In sum, plaintiffs' contentions concerning the Act's effect on out-of-state breeders and brokers do not amount to a plausible violation of the dormant Commerce Clause.

### b.  Discriminatory Purpose

According to plaintiffs, the purpose of the Act "is to interfere with the supply of dogs and cats from out-of-state breeders and brokers in Maryland through retail pet stores." ECF 1, ¶ 123. As evidence of discriminatory purpose, plaintiffs point to Senator Kramer's comments in advocating for passage of the Act, in which he said that the bill targets "big out-of-state breeders" and "out-of-state massive corporations" and that local businesses may benefit from the retail pet store ban.  ECF 1-7 at 4 (Tr. at 12-13); *see* ECF 14 at 17.

Conversely, the State argues that "the legislative record demonstrates that the purpose of the 2021 Act was to build on the purposes of the" 2020 Act. ECF 9-1 at 39. And, this Court previously found that the 2020 Act was not enacted for the purpose of intentionally discriminating against out-of-state businesses. *Id.*

Indeed, as to the 2020 Act, I rejected plaintiffs' claim that the 2020 Act was driven by economic protectionism. *Just Puppies I*, ECF 52 at 50. Rather, I determined that the Act's text and legislative history clearly demonstrated concern about Maryland consumers and animal welfare. *Id.*  As even plaintiffs acknowledged, the avowed purpose of the 2020 Act was to combat puppy mills. *Id.*

The Supreme Court has stated that "[a] finding that state legislation constitutes 'economic protectionism' may be made on the basis of either discriminatory purpose *or* discriminatory effect." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 270-71 (1984) (emphasis added) (internal citations omitted). And, the Court has invalidated statutes where it concluded that the law had both a discriminatory purpose and a discriminatory effect. *See, e.g.*, *W. Lynn Creamery*, 512 U.S. at 194; *Bacchus Imports*, 468 U.S. at 270-71; *Hunt*, 432 U.S. at 352-53. However, it is not entirely clear whether sinister purpose *alone* suffices to violate the dormant Commerce Clause.

I am not aware of a case in which the Supreme Court struck down a statute solely on the ground that it was motivated by a discriminatory purpose. And, it would seem to be contrary to the fundamental principle that the Commerce Clause "regulates effects, not motives[.]" *Comptroller of Treasury of Md. v. Wynne*, 575 U.S. 542, 561 n.4 (2015). Thus, there is good reason to doubt that discriminatory purpose alone suffices to invalidate a statute. *See Puppies 'N Love*, 116 F. Supp. 3d at 993 ("The Court finds it incongruous to say that a law violates the dormant Commerce Clause merely by having a discriminatory purpose."); *see also All. of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 36 n.3 (1st Cir. 2005); Caleb Nelson, *Judicial Review of Legislative Purpose*, 83 N.Y.U. L. REV. 1784, 1856 (2008) (noting that "courts rarely have to decide whether a statute can be held unconstitutional solely because of its purpose if the statute does not actually have the effects that the legislature intended" and that "[s]tatutes that raise this question are presumably rare, and litigants with standing to challenge them might be even rarer").

Even if discriminatory purpose by itself were sufficient to strike down the 2021 Act, plaintiffs have not adequately alleged such a purpose. Plaintiffs take Senator Kramer's statements out of context. He was unequivocal that the intent of the legislation is to prohibit "massive corporations," wherever they are located, from selling dogs in Maryland, because of the belief that

such entities operate puppy mills.  ECF 1-7 at 4 (Tr. at 13).  The legislative goal is to promote adoption and sales from "responsible breeder[s]." *Id.* Further, he "made clear that the kennels, for instance, that are here in Maryland *or anywhere else* that are responsible breeders can continue to operate." *Id.* at 3 (Tr. at 7) (emphasis added).  And, he underscored that consumers are free to purchase dogs from breeders and brokers anywhere in the country.

The legislative objective was to close a perceived loophole in the 2020 Act, by which some pet stores were circumventing the ban on the sale of cats and dogs.  As noted, the 2020 Act defined a retail pet store as a for-profit entity "open to the public . . . ."  B.R. 19-701(j).  Indeed, the Pet Store Plaintiffs shifted to an appointment-only model after this Court upheld the 2020 Act, based on their belief that such a method does not qualify as being open to the public. *See* ECF 1-7 at 3-4 (Tr. at 9-11).  The 2021 Act deleted that "loophole."  ECF 9-1 at 6.

Even if Senator Kramer's conception of "responsible breeder[s]" is misguided or inaccurate, it is not the Court's function to assess the soundness of such beliefs.  Rather, based on the testimony at the legislative hearings in 2018 and 2021, it is clear that the General Assembly was motivated by the interest in protecting Maryland consumers and animal welfare.  And, plaintiffs have failed plausibly to allege that the Act discriminates against out-of-state breeders and brokers in its effect or in its purpose.

Therefore, I shall dismiss Count II.  *See Rosenblatt*, 940 F.3d at 452; *Park Pet Shop*, 872 F.3d at 504; *N.Y. Pet Welfare*, 850 F.3d at 91.

### 3.  Discrimination Against In-State Retail Pet Stores

In Count III, plaintiffs assert that the 2021 Act "discriminates against in-state pet stores because it cuts off their supply of puppies from all brokers and out-of-state breeders to be able to sell in person to the Maryland consumer, and severely limits the options for Maryland consumers

to see these pets before they buy them only from Maryland breeders, rescue, and shelters." ECF 1, ¶ 134.

Plaintiffs' claim as to in-state pet stores is not actionable under the Commerce Clause. The dormant Commerce Clause is concerned with preventing states from unfairly boosting in-state business, not impeding it. *See, e.g.*, *Dep't of Revenue of Ky.,* 553 U.S. at 337-38 ("The dormant Commerce Clause is driven by concern about 'economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'") (citation omitted). Even if the Act will result in hardships for retail pet stores in Maryland, these effects are not interstate in nature. *See Perfect Puppy, Inc. v. City of E. Providence*, 98 F. Supp. 3d 408, 415 (D.R.I. 2015) (noting that, because the purpose of the dormant Commerce Clause is to prevent states from *favoring in-state* businesses, the argument that the law violated the dormant Commerce Clause by discriminating against in-state entities was "truly barking up the wrong tree"); *Mo. Pet Breeders Ass'n.*, 106 F. Supp. 3d at 922 ("A regulation that shifts business to out-of-state firms at the expense of in-state firms is not the type of harm the Commerce Clause prohibits.") (citing *New Energy Co. of Ind. v. Limbach*, 486 U.S. 269, 273 (1988)).

Thus, the claim of discrimination as to in-state pet stores under Count III must fail.

### 4.  *Pike* **Balancing**

Count IV alleges that the 2021 Act violates the dormant Commerce Clause under *Pike* balancing.  ECF 1, ¶ 138.

As noted, a statute that does not discriminate against interstate commerce may nonetheless violate the Commerce Clause if it fails *Pike* balancing.  *See Pike*, 397 U.S. at 142; *see also United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth*., 550 U.S. 330, 346 (2007); *Hazel I*, 733 F.3d at 535; *Yamaha Motor Corp. v. U.S.A. Jim's Motorcycle, Inc.*, 401 F.3d 560, 569 (4th

Cir. 2005).  Under the *Pike* balancing test, if a law "effectuate[s] a legitimate public interest," the court must uphold the law unless "the burden imposed on [interstate] commerce is *clearly excessive* in relation to the putative local benefits."  *Pike*, 397 U.S. at 142 (emphasis added).

To determine if a statute has a legitimate purpose, courts "consider whether the legislature had a rational basis for believing there was a legitimate purpose that would be advanced by the statute."  *Yamaha*, 401 F.3d at 560.  This inquiry is analogous to rational basis review.  *See Hazel I*, 733 F.3d at 535("The putative benefits of a challenged law are evaluated under the rational basis test, though 'speculative' benefits will not pass muster.") (internal citations omitted); *Antietam Battlefield KOA v. Hogan*, 461 F. Supp. 3d 214, 240 (D. Md. 2020).  Nevertheless, assessing a law's burdens requires "closer examination . . . especially when the burdens fall predominantly on out-of-state interests."  *Yamaha*, 401 F.3d at 560. The plaintiffs bear the burden of showing that the burden on interstate commerce outweighs the local benefits.

"[O]nly a small number of cases" have invalidated a law under *Pike* balancing, and those cases generally involved state "regulation of activities that are inherently national or require a uniform system of regulation," such as interstate transportation.  *Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir. 2012); *see also Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d 937, 952 (9th Cir. 2013).  The 2021 Act does not interfere with activity that is inherently national or that requires a uniform system of regulation.  Indeed, as this case illustrates, the sale of cats and dogs is subject to overlapping local, state, and federal regulation.

With respect to the Act's benefits, plaintiffs contend that "any alleged legitimate local Maryland interest served by the [2021 Act] is illusory" because "there is and was no studies, reports, surveys, audits, or any other factual evidence to support any connection between

72

Maryland's retail pet stores and the unlicensed and uninspected 'puppy mills,' or breeders who are breeding in substandard conditions." ECF 1, ¶ 147; *see id.* ¶ 148. However, this is the same contention I rejected in the 2019-20 Litigation.  *See* ECF 52 at 52-53.

As I indicated, under *Pike* balancing, the Act need only advance a "putative" benefit; hard evidence is not required. And, as plaintiffs acknowledge, the Act furthers numerous putative benefits: "to eradicate so-called 'puppy mills'"; "reduce the number of animals in shelters"; and "protect[] consumers from purchasing unhealthy animals."  ECF 1, ¶¶ 147, 148. These are plainly legitimate state interests, without regard to the accuracy of the views. *See, e.g., N.Y. Pet Welfare*, 850 F.3d at 92 ("Requiring pet shops to purchase directly from Class A breeders protects consumers by making it impossible to obscure the source of an animal by using a middleman, enhances animal welfare by reducing the incidence of disease and behavioral problems associated with irresponsible breeding, and alleviates the burden of providing care in public shelters for animals abandoned because of such problems.").

As to the burdens, plaintiffs claim that the Act imposes "an excessive undue burden on out-of-state regulated USDA licensed breeders and all brokers who will be prohibited from selling to any retail pet stores in Maryland because their animals are not born at an in-state establishment." ECF 1, ¶ 139.  They also assert a burden on "pet stores, which will not be able to stay in business as storefronts for local nonprofit rescues, and shelters to show their dogs and cats, whereby they can only try to earn a profit on accessories." *Id.* ¶ 146.

These are not burdens for Commerce Clause purposes.  The Act forecloses one business strategy, but it does not impair the free flow of goods—out-of-state breeders and brokers can sell their animals directly to Maryland consumers by way of the Internet and through various forms of advertising.  *Nat'l Ass'n of Optometrists*, 682 F.3d at 1151 (finding that set of laws did not burden

interstate commerce because they simply regulated a "method of operating in a retail market," and the "dormant Commerce Clause does not protect this method of operation, nor guarantee Plaintiffs their preferred method of operation, in the eyewear retail market."). As mentioned, the Commerce Clause does not serve as a safety-net for individual firms, nor protect a firm's preferred business methods. *Exxon Corp.*, 437 U.S. at 127. Thus, compared to the Act's putative benefits, plaintiffs have not plausibly alleged that the Act imposes burdens on interstate commerce that can be deemed clearly excessive.

In short, plaintiffs have not adequately alleged that the 2021 Act is the rare statute that regulates evenhandedly but nonetheless imposes significant burdens on interstate commerce. Because plaintiffs have failed to plead sufficient facts to state a claim under the *Pike* framework, I shall dismiss Count IV.

## B.  Equal Protection (Count V)

Count V alleges that the 2021 Act deprives plaintiffs of their constitutional right to the equal protection of the law, in violation of the Fourteenth Amendment to the Constitution. ECF 1, ¶¶ 155-69. Plaintiffs assert that the Act violates the Equal Protection Clause because it "treats Plaintiffs and other Maryland retail pet stores, out-of-state breeders, and brokers, differently than others similarly situated," such as Maryland rescues and shelters, and "there is no rational basis to treat these entities differently…." *Id.* ¶ 158. According to plaintiffs, Maryland retail pet stores and out-of-state breeders and brokers are similarly situated to "Maryland rescues and shelters" because they "are all part of the national pet market," ECF 5-1 at 28, and rescues and shelters "charge fees" for placing dogs into consumers' homes. ECF 14 at 22-23. Yet, they are treated quite distinctly under the Act.

The Fourteenth Amendment's Equal Protection Clause states: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV, § 1. This guarantee "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985).  To prevail on an equal protection challenge, a plaintiff '"must first demonstrate that he has been treated differently from others with whom he is similarly situated and that the unequal treatment was the result of intentional or purposeful discrimination.'"  *Kolbe v. Hogan*, 849 F.3d 114, 146 (4th Cir. 2017) (en banc) (quoting *Morrison v. Garraghty*, 239 F.3d 648, 654 (4th Cir. 2001)).  If that showing is made, the court "'proceeds to determine whether the disparity in treatment can be justified under the requisite level of scrutiny.'"  *Kolbe*, 849 F.3d at 146 (quoting *Morrison*, 239 F.3d at 654).

Classifications that occur along the axis of race, alienage, or national origin are subject to strict scrutiny because such factors are "seldom relevant to the achievement of any legitimate state interest" and, instead, more likely "reflect prejudice and antipathy—a view that those in the burdened class are not as worthy or deserving as others."  *City of Cleburne*, 473 U.S. at 440.  A law survives strict scrutiny "only if [it is] suitably tailored to serve a compelling state interest." *Id.*  Laws that apply to a quasi-suspect class, such as gender, receive intermediate scrutiny.  *Id.*

In contrast, a classification that neither proceeds along suspect lines nor impinges on a fundamental right does not ordinarily raise concerns.  *See Armour v. City of Indianapolis*, 566 U.S. 673, 680 (2012); *FCC v. Beach Commc'ns*, 508 U.S. 307, 314-15 (1993); *Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 487 (1955); *accord Pulte Home Corp. v. Montgomery Cty.*, 909 F.3d 685, 693 (4th Cir. 2018); *Seina Corp. v. Mayor & City Council of Rockville Md.*, 873 F.3d 456, 465 (4th Cir. 2017); *Kolbe*, 849 F.3d at 146 n.17; *Tri-Cty. Paving, Inc. v. Ashe Cty.*, 281 F.3d 430, 438 (4th Cir. 2002).  Notably, "[w]hen social or economic legislation is at issue, . . . the

Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *City of Cleburne*, 473 U.S. at 440 (internal citations omitted). Thus, such classifications receive only rational basis review. *Beach Commc'ns*, 508 U.S. at 313; *see also City of Cleburne*, 473 U.S. at 440; *Kolbe*, 849 F.3d at 146; *Pulte Home*, 909 F.3d at 693.

Under the rational basis standard, the challenged statute is entitled to a "strong presumption of validity." *Beach Commc'ns*, 508 U.S. at 315; *City of Cleburne*, 473 U.S. at 440. The statute need only be "'rationally related to a legitimate state interest.'" *Pulte Home*, 909 F.3d at 693 (quoting *Seina Corp.*, 873 F.3d at 465). A law clears this hurdle "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Beach Commc'ns*, 508 U.S. at 313. Given this low bar, invalidating a statute subject to rational basis review is a tall order: the plaintiff must "'negate every conceivable basis which might support the legislation.'" *Giarratano v. Johnson*, 521 F.3d 298, 303 (4th Cir. 2008) (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)); *see also Armour*, 566 U.S. at 681.

To satisfy rational basis scrutiny, "a government entity 'need not actually articulate at any time the purpose or rationale supporting its classification,' and it is not required to produce evidence showing the rationality of its classification." *Pulte Home*, 909 F.3d at 693 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). Rather, the government's legitimate interest "may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315. This test "is not a subjective one." *Pulte Home*, 909 F.3d at 693.

Rational basis review is a "paradigm of judicial restraint." *Beach Commc'ns*, 508 U.S. at 314. Because "'[p]erfection in making the necessary classifications is neither possible nor necessary,'" *Schweiker v. Wilson*, 450 U.S. 221, 234 (1981) (citation omitted), a statute "does not offend the Constitution simply because the classification 'is not made with mathematical nicety or

because in practice it results in some inequality.'" *Dandridge v. Williams*, 397 U.S. 471, 485 (1970) (citation omitted). And, "it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature." *Beach Commc'ns*, 508 U.S. at 315; *see Tri-Cty. Paving*, 281 F.3d at 439.

Of relevance here, rational basis review "is not license for courts to judge the wisdom, fairness, or logic of the legislative choices." *Beach Commc'ns*, 508 U.S. at 313. As I have suggested, there is certainly much to question about the wisdom of the 2020 Act and the 2021 Act, including the underlying premises on which these statutes are based. But, "[a]s long as the classificatory scheme chosen by [the legislature] rationally advances a reasonable and identifiable governmental objective, [judges] must disregard the existence of other methods of allocation that we, as individuals, perhaps would have preferred." *Schweiker*, 450 U.S. at 235.

Despite this deference, the scrutiny required by rational basis review "is not a toothless one." *Mathews v. Lucas*, 427 U.S. 495, 510 (1976). To pass muster, the law "must find some footing in the realities of the subject addressed by the legislation." *Heller*, 509 U.S. at 321. And, the government "may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational." *City of Cleburne*, 473 U.S. at 446; *Bankers Life & Cas. Co. v. Crenshaw*, 486 U.S. 71, 83 (1988) ("[A]rbitrary and irrational discrimination violates the Equal Protection Clause under even our most deferential standard of review."). Moreover, some interests, such as "irrational prejudice," *City of Cleburne*, 473 U.S. at 450, or a "desire to harm a politically unpopular group," *U.S. Dep't of Agric. v. Moreno*, 413 U.S. 528, 534 (1973), are simply not legitimate.

Of course, at the Rule 12(b)(6) stage, the plaintiff need not prove that the challenged statute, in fact, violates equal protection. *Giarratano*, 521 F.3d at 304. But, the Fourth Circuit has

instructed that, to withstand a motion to dismiss, a plaintiff "'must plead sufficient facts to overcome the presumption of rationality that applies to government classifications.'" *Id.* (quoting *Wroblewski v. City of Washburn*, 965 F.2d 452, 460 (7th Cir. 1992)).  For example, the Fourth Circuit has said that a plaintiff's "conclusory allegation" that the challenged action was irrational was "insufficient to plausibly state a claim for relief in light of the strong presumption in favor of the legislation's rationality and the readily apparent justification for the legislation." *Giarratano*, 521 F.3d at 304.  And, this approach comports with that adopted by other circuits.  *See, e.g.*, *Progressive Credit Union v. City of New York*, 889 F.3d 40, 50 (2d Cir. 2018); *In re City of Detroit*, 841 F.3d 684, 701 (6th Cir. 2016); *Dixon v. District of Columbia*, 666 F.3d 1337, 1342 (D.C. Cir. 2011); *Flying J. Inc. v. City of New Haven*, 549 F.3d 538, 546 (7th Cir. 2008); *Teigen v. Renfrow*, 511 F.3d 1072, 1083 (10th Cir. 2007).

Moreover, a court "is not confined to the particular rational or irrational purposes that may have been raised in the pleadings." *Progressive Credit Union*, 889 F.3d at 50.  The Fifth Circuit has said: "When applying rational basis doctrine to a dismissal for failure to state a claim, a legislative classification must be treated as valid 'if a court is able to hypothesize a legitimate purpose to support the action.'" *Glass v. Paxton*, 900 F.3d 233, 244-45 (5th Cir. 2018) (citation omitted); *cf. Applegate, LP v. City of Frederick*, 179 F. Supp. 3d 522, 5333 (D. Md. 2016) (dismissing an equal protection claim "because the City can articulate a rational basis for its classification").

Plaintiffs rely here on the same premise that I rejected previously, despite their attempt to recast their equal protection challenge.  Thus, although I consider plaintiffs' contentions anew, my analysis is ultimately quite similar.

The parties agree that rational basis review is the appropriate standard.  *See* ECF 1, ¶ 162; ECF 9-1 at 44.  And, the parties do not dispute the basic formulation of the test—that a statute will be upheld if it "is rationally related to a legitimate state interest."  *City of Cleburne*, 473 U.S. at 440.  Yet, plaintiffs also claim that the 2021 Act is "subject to a heightened rational basis test," ECF 5-1 at 30, because the Act was motivated by "bare animus against out-of-state breeders and brokers and Maryland retail pet stores—all of which were improperly labeled 'puppy mills' to garner political support."  *Id.*; *accord* ECF 1, ¶ 162.

To support their position, plaintiffs rely on the Act's legislative history, which they claim "reflects the fact that the real and actual intent of the 2021 Ban…was to favor Maryland breeders to the exclusion of out-of-state breeders…." *Id.* at 31. Additionally, according to plaintiffs, they constitute an "animal enterprise," as defined under the Animal Enterprise Terrorism Act ("AETA"), 18 U.S.C. § 43, so they should be considered "a suspect and protected class for the purpose of constitutional analysis under the Equal Protection clause." ECF 1, ¶ 157; ECF 5-1 at 30.  The AETA defines "animal enterprise" as a "commercial…enterprise that…sells animals…for profit…" and a "pet store…" 18 U.S.C. § 43(d)(1).  The State counters that heightened scrutiny is unwarranted because plaintiffs are not part of a protected class and the Act advances numerous legitimate interests.  ECF 9-1 at 47.

Plaintiffs invoke a line of cases in which the Supreme Court struck down state or federal statutes concerning non-suspect groups because the laws were motivated by animus. ECF 5-1 at 29-31. In these cases, the Court departed from conventional rational basis review to scrutinize the motivations behind the challenged laws, giving rise to a standard of review that has been variously characterized as "heightened rational-basis review," "rational basis with bite," "rational basis with

teeth," or "rational basis plus." *Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014) (Holmes, J., concurring) (citations and internal quotation marks omitted).

The animus cases trace their origin to *Moreno*, 413 U.S. 528.  There, the Supreme Court declared that an amendment to the Food Stamp Act of 1964, which made food stamps available to households of related persons but not to households of unrelated persons, violated equal protection because the amendment's legislative history revealed that Congress passed it "to prevent so called 'hippies' and 'hippie communes' from participating in the food stamp program." *Id.* at 534.  The Court explained that, "if the constitutional conception of equal protection of the laws means anything, it must at the very least mean that a bare congressional desire to harm a politically unpopular group cannot constitute a legitimate governmental interest." *Id.*  Given the "purpose to discriminate against hippies," the law could not "in and of itself and without reference to some independent considerations in the public interest, justify the [classification].'" *Id.* at 534-35 (citation omitted).

Likewise, in *City of Cleburne*, 473 U.S. 432, the Court struck down a municipal zoning ordinance requiring special-use permits for the operation of a group home for the intellectually disabled.  *Id.* at 448.  The Court ruled that mental disability was not a suspect or quasi-suspect class.  *Id.* at 442-47.  Nonetheless, the Court found that the permitting requirement was unconstitutional because "mere negative attitudes" and "irrational prejudice" were not permissible bases for distinguishing between the group home and other dwellings.  *Id.* at 448, 450.

The Supreme Court has also applied this "more searching form of rational basis review" to laws that discriminated against homosexuals.  *Lawrence v. Texas*, 539 U.S. 558, 580 (2003) (O'Connor, J., concurring).  In *Romer v. Evans*, 517 U.S. 620 (1996), for example, the Court struck down an amendment to the Colorado Constitution repealing any ordinance or law prohibiting

discrimination against gays and lesbians.  *Id.* at 624, 636.  The amendment's "sheer breadth [wa]s so discontinuous with the reasons offered"—protecting landlords and employers religiously opposed to homosexuality—that the Court concluded that the amendment was "inexplicable by anything but animus toward the class it affects[.]"  *Id.* at 632.  Similarly, in *United States v. Windsor*, 570 U.S. 744 (2013), the Supreme Court invalidated Section 3 of the Defense of Marriage Act ("DOMA"), which defined marriage for the purposes of federal law as a heterosexual union. *Id.* at 775.  Observing that DOMA's purpose was to "identify a subset of state-sanctioned marriages and make them unequal," *id.* at 772, the Court ruled that the law violated the equal protection component of the Fifth Amendment because "no legitimate purpose overcomes the purpose and effect to disparage and to injure those whom the State, by its marriage laws, sought to protect in personhood and dignity."  *Id.* at 775.

The upshot of these cases is that neither unfounded antipathy nor outright hostility may serve as the basis for a law.  *Compare City of Cleburne*, 473 U.S. at 448, *with Moreno*, 413 U.S. at 534.  Thus, if the law's sole rationale is animus, it *ipso facto* fails to advance a legitimate interest and must fall.  In contrast, where there is no evidence that the law is infected with animus, heightened rational basis review is inappropriate.  *See, e.g.*, *Gallinger v. Becerra*, 898 F.3d 1012, 1021 (9th Cir. 2018) (declining to apply heightened rational basis where plaintiffs failed to plausibly plead that the legislature acted with a desire to harm); *Carney v. Okla. Dep't of Pub. Safety*, 875 F.3d 1347, 1354 (10th Cir. 2017) (state sex offender registration law "is not an aberrational law indicative of hostile lawmaking," and therefore the court's "analysis rests upon traditional rational basis review").  And, some courts have determined that heightened rational basis review is inapplicable where the legislature had an independent justification for the law.  *See Flying J*, 549 F.3d at 547 ("It is only when courts can hypothesize no rational basis for the action

that allegations of animus come into play."); *Gallagher v. City of Clayton*, 699 F.3d 1013, 1020 (8th Cir. 2012) (stating that "a *Romer*-type analysis only applies where there is no other legitimate state interest for the legislation that survives scrutiny" and thus, because ordinance banning outdoor smoking has health-based justification, it "is not the product solely of animus so as to fall within the *Romer* ambit").

This case shares little in common with *Moreno*, *Cleburne*, *Romer*, or *Windsor*. Applying the principles outlined above, plaintiffs' equal protection claim is subject to traditional principles of rational basis review. The Act does not implicate an immutable characteristic, such as mental disability or sexual orientation. *See* Raphael Holoszyc-Pimentel, Note, *Reconciling Rational-Basis Review: When Does Rational Basis Bite*?, 90 N.Y.U. L. REV. 2070, 2085-89 (2015) (finding that heightened rational basis is generally limited to cases involving immutable traits). The Act's effect—banning a particular class of vendors from selling certain products—is not "unprecedented in our jurisprudence." *Romer*, 517 U.S. at 633; *see, e.g.*, *Chinatown Neighborhood Ass'n, v. Harris*, 794 F.3d 1136 (9th Cir. 2015) (banning the sale of shark fins); *Ass'n. de Eleveurs*, 729 F.3d at 952 (banning the sale of foie gras); *Empacadora de Carnes de Fresnillo v. Curry*, 476 F.3d 326, 336 (5th Cir. 2001) (banning the sale of horsemeat). It does not have the "peculiar property" of stripping a particular group of special privileges or protections afforded to others. *Romer*, 517 U.S. at 632. Whereas DOMA intruded on the states' traditional police power, the 2021 Act is an exercise of Maryland's core police powers. *See Windsor*, 570 U.S. at 768-72. And, it simply cannot be said that the Act is "inexplicable by anything but animus," *Romer*, 517 U.S. at 632, because the State has advanced what it believes are legitimate interests to justify the Act.

The State's interests are similar to those seen in legislation throughout the country. Again, the State may be wrong to believe that all large breeders and brokers are either puppy mills or buy from them. But, it is that belief that animates the Act.

Plaintiffs' claim that they constitute a protected class because they qualify as "animal enterprises" under AETA does not change the calculus. The fact that a statute provides protections to a particular group does not mean that the group *ipso facto* receives heightened scrutiny under the Equal Protection Clause. For instance, individuals over 40 are a "protected class" under the Age Discrimination in Employment Act, even though "age is not a suspect classification under the Equal Protection Clause." *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996). And, plaintiffs do not present any case law that supports a different conclusion.

Under traditional rational basis review, plaintiffs have failed to plead a plausible equal protection violation. In fact, plaintiffs' claim fails at the first step of the analysis because they do not identify a comparator group that is similarly situated. ECF 5-1 at 28; ECF 9-1 at 45.

 "The 'similarly situated' standard requires a plaintiff to identify persons materially identical to him or her who has received different treatment." *Kolbe*, 813 F.3d at 185. Although different courts describe this requirement in different ways, "[h]owever the test is written, the basic point is the same: the 'evidence must show an extremely high degree of similarity.'" *Id.* (quoting *Willis v. Town of Marshall, N.C.*, 275 F. App'x. 227, 233 (4th Cir. 2008)); *see also LaBella Winnetka, Inc. v. Village of Winnetka*, 628 F.3d 937, 942 (7th Cir. 2010) ("The similarly situated analysis is not a precise formula, but ... what is clear is that similarly situated individuals must be very similar indeed.").

According to plaintiffs, they are similarly situated to Maryland rescues and shelters, and they assert that the rescues and shelters receive more favorable treatment under the Act. However, on the most basic level, there is a clear difference between (1) rescues and shelters and (2) retail pet stores, brokers, and breeders. Plaintiffs are for-profit businesses that sell cats and dogs, while the entities to which plaintiffs compare themselves are not-for-profit entities that rescue and shelter cats and dogs. At least two other district courts have considered the comparison of for-profit pet stores and non-profit animal rescues and rejected the contention that they are similarly situated because both participate in the pet market. As the court aptly said in *Perfect Puppy, Inc.*, 98 F. Supp. 3d at 419, comparing for-profit pet stores with non-profit rescues "is like saying a homeless shelter is similarly situated to a luxury hotel because provide rooms to sleep in." *See also Maryeli's Lovely Pets, Inc. v. City of Sunrise*, 14-61391-CIV, 2015 WL 11197773, at *3 (S.D. Fla. June 25, 2015) (finding that "to compare [the for-profit pet store] with animal shelters and rescues is to compare apples to oranges").

Plaintiffs counter that just because rescues and shelters are technically non-profits does not mean that "such entities are not profitable." ECF 5-1 at 29. Rather, according to plaintiffs, rescues "claim to rescue puppies from 'puppy mills,' but continue to obtain pets from breeders, brokers, and dog auctioneers." *Id.* (citing ECF 1, ¶ 98 n.5). And, rescues, like retail pet stores, bring in significant profits through "adoption fees." ECF 5-1 at 29. Plaintiffs also claim that rescues "effectively act[] as" brokers because they "source their pets to other animal shelters around the country." *Id.*

However, charging fees for adoption or spending money to rescue dogs and cats does not wash away the stripes on the tiger. Pursuant to Bus. Reg. § 19-701(c), a rescue or shelter's "mission and practice is the rescue of animals and the placement of animals in permanent homes,"

and such an entity may not "obtain[] animals from a breeder or broker in exchange for payment or compensation."

As I noted in the 2019-20 Litigation, "breeders and pet stores occupy opposite ends of the pet supply chain, are subject to different degrees of regulatory oversight, and present distinct consumer protection issues." ECF 52 at 71.  Pet stores are not federally regulated.  Thus, I concluded, *id.*: "[C]omparing pet stores to breeders is like saying a tiger is similarly situated to a chihuahua because both have four legs and are carnivores." Similarly here, rescues and shelters also occupy an entirely different end of the pet supply chain than both breeders and pet stores and are therefore subject to different laws and degrees of regulatory oversight.

Even assuming, *arguendo*, that pet stores, breeders, and brokers are all similar to rescues and shelters for purposes of this analysis, plaintiffs' claim still fails because the record contains ample facts that provide a rational basis for the 2021 Act.  The legislature heard testimony in support of the 2021 Act that retail pet stores and brokers drive the puppy mill industry and that Maryland's prior regulatory scheme was insufficient to protect consumers or animal welfare because of certain perceived loopholes in the Act. *See* ECF 5-5. As with the 2020 Act, the General Assembly also heard testimony regarding the consequences of irresponsible dog breeding.

Protecting consumers and addressing irresponsible animal breeding are indisputably legitimate state interests.  *See United States v. Stevens*, 558 U.S. 460, 469 (2010) ("[T]he prohibition of animal cruelty itself has a long history in American law, starting with the early settlement of the Colonies."); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 538 (1993) (recognizing that "protecting the public health and preventing cruelty to animals" are legitimate state interests); *Park Pet Shop*, 872 F.3d at 504 ("The City's policy goals are to reduce financial support for mill breeders, curb the emotional and financial burdens on consumers

who unwittingly buy mill-bred pets, and reduce the cost of sheltering and euthanizing unwanted problem pets. These are unquestionably legitimate governmental interests . . . ."); *N.Y. Pet Welfare Ass'n., Inc. v. City of New York*, 143 F. Supp. 3d 50, 65 (E.D.N.Y. 2015) (reducing pet homelessness and euthanasia are legitimate interests), *aff'd*, 850 F.3d 79 (2d Cir. 2017); *Perfect Puppy*, 98 F. Supp. 3d at 420 ("A government's interest in preventing the evils associated with 'puppy mills' that both parties cite to, including inhumane treatment of animals and overpopulation, are plainly legitimate ends."); *see also Puppies 'N Love*, 116 F. Supp. 3d at 997; *Mo. Pet Breeders Ass'n*, 106 F. Supp. 3d at 920.

The Maryland General Assembly could rationally conclude that the sale of cats and dogs in Maryland by retail pet stores, to include brokers, advances the State's interests. A law need not completely eliminate the perceived problem to satisfy the rational-basis standard. *See Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 466 (1981). A government entity may implement legislation "step by step" by "adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations." *City of New Orleans v. Dukes*, 427 U.S. 297, 303 (1976).

By removing pet stores and brokers from the supply chain for cats and dogs, the Act makes it more difficult to acquire these pets from perceived puppy mills. *Mo. Pet Breeders Ass'n*, 106 F. Supp. 3d at 920 ("If the purpose of the ordinance is to ensure that animals are raised in humane conditions, it makes sense to remove barriers between the consumer and the place where the pet was raised."). By eliminating these purveyors of cats and dogs, the Act may nudge consumers towards shelters, thereby increasing adoptions and reducing the euthanasia rate. At a minimum, the Act removes Maryland pet stores as a source of income for puppy-mills, thereby advancing the General Assembly's goal of preventing animal cruelty. *See Park Pet Shop*, 872 F.3d at 504; *N.Y.*

*Pet Welfare*, 143 F. Supp. 3d at 65; *Perfect Puppy*, 98 F. Supp. 3d at 420; *see also Ass'n de Eleveurs*, 729 F.3d at 952; *Empacadora de Carnes de Fresnillo*, 476 F.3d at 336.

Plaintiffs vigorously attack the 2021 Act's efficacy and evidentiary basis. ECF 1, ¶¶ 165-68. There are certainly grounds to support plaintiffs' belief that, in effect, the cure is worse than the disease. As I observed in *Just Puppies I*, the Act appears premised on the belief that all small breeders are caring ones and that large breeders are inherently puppy mills. ECF 52 at 73 n.12. And, the Act will shutter the few Maryland retail pet stores that previously sold cats and dogs. In turn, this will result in the loss of jobs, deprive the State of income tax and sales tax revenue, and affect landlords who own the buildings housing the stores. Further, it will cause some Maryland residents to travel to other states to obtain the pets of their choice. And, far from protecting consumers from puppy mills and wayward small breeders, it will drive some to the Internet, where pet sales are not regulated.

But, whatever the Act's soundness, that is a judgment committed to the legislature. *Clover Leave Creamery Co.*, 449 U.S. at 464 (noting that the court may not assess the "correctness" of "legislative judgments" as part of rational basis review). Rational basis review merely asks whether a law is founded on a "conceivable state of facts," not whether it is empirically correct or effective in practice. *Beach Commc'ns*, 508 U.S. at 313 ("[E]qual protection is not license for courts to judge the wisdom, fairness, or logic of the legislative choices."); *Dukes*, 427 U.S. 303 ("Legislatures may implement their program step by step, in . . . economic areas, adopting regulations that only partially ameliorate a perceived evil and deferring complete elimination of the evil to future regulations.") (citation omitted); *Brown*, 561 F.3d at 369. Nor does absence of empirical data render the Act defective. *Beach Commc'ns*, 508 U.S. at 315.

Therefore, for the reasons stated above, Count V is subject to dismissal.

### C.  Due Process Clause & Vagueness (Count VI)

In Count VI, plaintiffs claim that the "undefined terms of the 2021 Pet Store ban make the Maryland statute void for vagueness and the Court should declare the law unconstitutional on that basis." ECF 1, ¶ 183. In particular, plaintiffs complain about three terms in the 2021 Act that are not defined:  (1) "offer to sell"; (2) "transfer"; and (3) "showcase." *Id.* ¶¶ 175, 176.

The void for vagueness doctrine arises under the Due Process Clause of the Fifth Amendment, which states that no person may "be deprived of life, liberty or property, without due process of law."  *See*, *e.g.. United States v. Miselis*, 972 F.3d 518, 544 (4th Cir. 2020); *Manning v. Caldwell for City of Roanoke,* 930 F.3d 264, 272 (4th Cir. 2019); *Doe v. Cooper*, 842 F.3d 833, 842 (4th Cir. 2016); *Martin v. Lloyd*, 700 F.3d 132, 135 (4th Cir. 2012); *United States v. Caputo*, 201 F. Supp. 3d 65, 72 (D. D.C. 2016).  This guarantee has a procedural as well as a substantive component.  *See Troxel v. Granville,* 530 U.S. 57, 65 (2000); *County of Sacramento v. Lewis*, 523 U.S. 833, 856 (1998); *Doe ex rel. Johnson v. S.C. Dep't of Soc. Servs.*, 597 F.3d 163, 170 (4th Cir. 2010).

A statute is unconstitutionally vague if it "'fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement.'"  *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (quoting *United States v. Williams*, 554 U.S. 285, 304 (2008)); *see also Holder v. Humanitarian Law Project*, 561 U.S. 1, 19 (2010); *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).  The "void for vagueness doctrine addresses at least two connected but discrete due process concerns: first, that regulated parties should know what is required of them so they may act accordingly; second, precision and guidance are necessary so that those enforcing the law do not act in an

arbitrary or discriminatory way." *Fox Television Stations, Inc.*, 567 U.S. at 253; *see Miselis*, 972 F.3d at 544.

In assessing whether a statute is unconstitutionally vague, "a court must consider both whether it provides notice to the public and whether it adequately curtails arbitrary enforcement." *United States v. Hammoud*, 381 F.3d 316, 330 (4th Cir. 2004). In *Village of Hoffman Estates v. The Flipside*, 455 U.S. 489 (1982), the Supreme Court enumerated various factors pertinent to a vagueness inquiry, noting that they should not be "mechanically applied." *Id.* at 498. The Court said, *id.*: "The degree of vagueness that the Constitution tolerates—as well as the relative importance of fair notice and fair enforcement—depends in part on the nature of the enactment." The Court observed that economic regulations are generally subject to a less strict vagueness test, because "businesses . . . can be expected to consult relevant legislation in advance of action.[]" *Id.* The Court added, *id.*: "Indeed, the regulated enterprise may have the ability to clarify the meaning of the regulation by its own inquiry, or by resort to an administrative process.[]" Further, the Court is more tolerant of "enactments with civil rather than criminal penalties . . ." *Id.* at 499. Moreover, "a scienter requirement" may mitigate vagueness. *Id.* But, "perhaps the most important factor affecting the clarity that the Constitution demands of a law is whether it threatens to inhibit the exercise of constitutionally protected rights." *Id.*

The State characterizes the challenge as a facial one. ECF 9-1 at 51-52. Plaintiffs do not dispute that description. A facial challenge presents "a claim that the statute is unconstitutional *not* as it applies to [the party's] own conduct, but rather 'on its face,' as it applies to the population generally." *Miselis*, 972 F.3d at 530 (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008). Ordinarily, a facial challenge requires a showing that "no set of circumstances exists under which the Act would be valid . . . .", *Wash. State Grange*, 552 U.S. at

449 (cleaned up), or that the statute "lacks any plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 472 (2010) (cleaned up).  But, such claims are "'disfavored.'" *Miselis*, 972 F.3d at 530 (citation omitted).

When considering a facial challenge, "courts first determine whether the enactment implicates a substantial amount of constitutionally protected conduct." *Martin*, 700 F.3d at 135 (citing *Village of Hoffman Estates*, 455 U.S. at 494).  "If it does not, then the challenge should only succeed if the law is 'impermissibly vague in all of its applications.'" *Martin*, 700 F.3d at 135 (quoting *Village of Hoffman Estates*, 455 U.S. at 494-95). And, "a facial challenge is ineffective if the statute has a 'plainly legitimate sweep.'" *Martin*, 700 F.3d at 135 (citation omitted). Moreover, "in assessing whether a statute meets one of these high bars, courts must typically take care 'not to ... speculate about hypothetical or imaginary cases.'" *Miselis*, 972 F.3d at 530 (citation omitted).

Because plaintiffs bring a facial attack, the first question is whether the 2021 Act implicates constitutionally protected conduct. Plaintiffs' claims, which primarily relate to their ability to engage in the sale of dogs, clearly do not "implicate[] a substantial amount of constitutionally protected conduct." *Martin*, 700 F.3d at 135-136 (finding that a statute that imposed regulations on gambling did not implicate constitutionally protected conduct); *see N.Y. Pet Welfare*, 143 F. Supp. 3d at 69 (finding pet shops did not have a constitutionally protected right to sell animals); *Perfect Puppy, Inc.*, 98 F. Supp. 3d at 422 (finding no fundamental right at stake under due process in suit brought by a pet store). And, plaintiffs do not contend otherwise.

Moreover, plaintiffs do not allege that the law is vague in all of its applications.  And, a law cannot be facially vague simply "because it is unclear in some of its applications...." *Village of Hoffman Estates*, 455 U.S. at 495.

As noted, plaintiffs focus on three terms in the 2021 Act that are undefined. First, plaintiffs highlight that the definition of "offer for sale" was eliminated in the 2021 version of the Act. ECF 1, ¶¶ 174-75. Although "offer for sale" is no longer a prohibited activity in Bus. Reg. § 19-703, plaintiffs assert that the phrase is still relevant because it remains in the definition of a retail pet store in B.R. § 19-701. Second, plaintiffs point to the lack of definition for "transfer," which is a prohibited activity under B.R. § 19-703.  ECF 1, ¶ 176.  Third, they complain about the inclusion of the term "showcase," which appears in § 19-703(b) as an activity in which a retail pet store can engage, in collaboration with a shelter or rescue. ECF 1, ¶ 178.  Plaintiffs seek clarification on how a retail pet store can "showcase" or "offer to sell" an animal if it is prohibited from selling or transferring animals. *Id.*; *see* ECF 5-1 at 34.

However, the mere lack of statutory definition does not establish a violation of the Due Process Clause. "It is beyond cavil that a criminal statute need not define explicitly every last term within its text, for as the Supreme Court has repeatedly explained, where "terms used in a statute are undefined, we give them their ordinary meaning."  *United States v. Day*, 700 F.3d 713, 725 (4th Cir. 2012).  Looking to the ordinary meaning of the terms that plaintiffs highlight, they are not beyond comprehension. As to showcasing, for example, it seems obvious from the plain reading of the relevant provision that animal welfare organizations may display animals that are available for adoption. B.R. § 19-703(b). In particular, the provision clarifies that retail pet stores will not be considered engaged in prohibited conduct if they allow animal welfare organizations to display their animals on pet store property.  *Id.*  In contrast, the Act prohibits selling, or transferring.

The Act may not be a model of clarity.  But, it is not so vague as to render it unconstitutional. Moreover, based on the allegations throughout most of the Complaint, it seems

clear that plaintiffs understand how the law applies to their conduct. *See, e.g.*, ECF 1, ¶¶ 43, 52, 57, 58, 67, 79, 83, 121, 128, 136, 140, 146, 152, 153, 164, 165, 182, 189, 192.

Accordingly, plaintiffs' due process claim must fail.

### D.  Maryland Declaration of Rights (Count VII)

Count VII asserts that the Act creates a monopoly prohibited by Article 41 of the Maryland Declaration of Rights.  ECF 1, ¶¶ 187-92; *see* Md. Decl. of R. art. 41.  Article 41 declares: "That monopolies are odious, contrary to the spirit of a free government and the principles of commerce, and ought not to be suffered."

According to plaintiffs, the 2021 Act "creates an unconstitutional monopoly in Maryland by destroying competition and restraining the free availability of pets to the public." ECF 1, ¶ 189. They maintain that the Act suppresses competition between the "pet marketplace in Maryland" by prohibiting out-of-state breeders and brokers from selling their animals in retail pet stores "where consumers can have an opportunity to inspect the animal prior to the sale like they can do with Maryland breeders, rescues, and shelters." *Id.* ¶ 190. The result, argue plaintiffs, is that "Maryland consumers will no longer have the freedom to engage in pet sales through Maryland pet stores." *Id.* ¶ 191.

Article 41 has been part of the Maryland Constitution since 1776.  But, the Maryland Court of Appeals has recognized that there is "some question as to whether its ban extends to anything other than monopolies in the strict sense, that is, an exclusive right or privilege granted by the sovereign."  *Grempler v. Multiple Listing Bureau of Harford Cty., Inc.*, 258 Md. 419, 424, 266 A.2d 1, 4 (1970); *see also Supermarkets Gen. Corp. v. State*, 286 Md. 611, 626, 409 A.2d 250, 258 (1979). A survey of pertinent cases helps to illuminate the contours of Article 41.

92

To my knowledge, the Maryland Court of Appeals first opined on the meaning of Article 41 in the case of *Broadway & Locust Point Ferry Company v. Hankey*, 31 Md. 346 (1869).  There, the court rejected a challenge to a State law granting a ferry boat company the exclusive right to use a wharf.  *Id.* at 349.  The court found that the charter "[wa]s not a monopoly in any sense; but a privilege conferred on the company to be exercised for the public benefit[.]"  *Id.*  "[S]uch a grant by this Legislature," the court stated, "has never been considered as creating a monopoly[.]"  *Id.*

The court next addressed Article 41 in *Wright v. State*, 88 Md. 436, 41 A. 795 (1898). There, the State prosecuted Peter Wright for violating a statute prohibiting the production and sale of oleomargarine.  On appeal, Wright argued, *inter alia*, that the statute violated Article 41 because it conferred a monopoly on dairy farmers.  *See id.* at 41 A. at 796, 798.  The Maryland Court of Appeals observed that in the case of *United States v. E.C. Knight Co*., 156 U.S. 1, 15 (1895), Chief Justice Fuller had described a monopoly as "an institution or allowance by the king [the state], by his grant, commission, or otherwise, to any person or persons, bodies politique or corporate, of or for the sole buying, selling, making, working, or using of anything, whereby any person or persons, bodies politique or corporate, are sought to be restrained of any freedome or liberty that they had before, or hindered in their lawful trade."  *Wright*, 88 Md. 436, 41 A. at 798 (alteration in *Wright*). Embracing this definition, the court found that "[t]o constitute a monopoly within the meaning of this definition, there must be an allowance or grant by the state to one or several of a sole right; that is, a right to the exclusion of all others than the grantee or grantees."  *Id.* at 41 A. at 798.  The court rejected Wright's argument, reasoning that the statute was "a grant to none," but rather "a prohibition to all," because it banned anyone from manufacturing or selling oleomargarine.  *Id.*

The Maryland Court of Appeals expounded on Article 41 in *Raney v. Montgomery County Commissioners*, 170 Md. 183, 183 A. 548 (1936).  That case involved a challenge to a local

ordinance that required "'[e]very notice, report, return, schedule, list of delinquent taxpayers or any official publication whatsoever'" to be published in a newspaper that was printed in the county. *Id.* at 183 A. 550.  The term "monopoly," the court explained, "ordinarily connotes a privilege connected with commerce in commodities because, historically, it was more often used to describe a condition which resulted from an exclusive privilege to engage in such commerce[.]" *Id.* at 183 A. at 551.  However, the court observed that the term "has long had a broader meaning more in harmony with the spirit of the Constitution, and in determining the sense in which it is used in that instrument, it should be given that meaning that its general intent may be served, rather than thwarted or confined by any narrow or overnice construction." *Id.*

Under this broader meaning, the court explained that "when the creation or grant of such a privilege is needed to aid some governmental function or purpose essential to the protection of the public security, health, or morals, it may not be obnoxious to the constitutional condemnation of monopolies." *Id.* at 183 A. at 553.  Conversely, "when the public derives no benefits from the privilege, or it is in respect to a common calling, or a matter of common right, and is not necessary to the protection of the public health, morals, or safety, an exclusive privilege to deal in a commodity, to operate a business, to traffic or to engage in any activity for gain, or to sell a given service, may constitute a monopoly within the meaning of that provision." *Id.*  Turning to the facts of the case at hand, the court had no trouble concluding that because the ordinance's purpose was to grant a monopoly to the county's newspapers, it ran afoul of Article 41.  *Id.*

In 1946, the Maryland Court of Appeals was asked to decide whether the Sinai Hospital of Baltimore, which received State funding, violated Article 41 by denying hospital privileges to a physician.  *See Levin v. Sinai Hosp. of Balt. City*, 186 Md. 174, 46 A.2d 298 (1946).  The court stated, *id.* at 182-83, 46 A.2d at 302:

> A monopoly within the prohibition of our Declaration of Rights, is a privilege or power to command and control traffic in some commodity, or the operation of a trade or business to the exclusion of others, who otherwise would be at liberty to engage therein, necessarily implying the suppression of competition, and ordinarily causing a restraint of that freedom to engage in trade or commerce which the citizen enjoys by common right. A monopoly is more than a mere privilege to carry on a trade or business or to deal in a specified commodity. It is an exclusive privilege which prevents others from engaging therein. A grant of privileges, even though monopolistic in character, does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right.

Based on this definition, the court found it "obvious" that the hospital's admitting privileges did not violate Article 41 because they "do not restrain interstate trade or commerce" and their "purpose was not to destroy competition or to restrain the free availability of hospital or medical services to the public." *Id.* at 183, 46 A.2d at 303.

It appears that the Maryland Court of Appeals last addressed the meaning of Article 41 in 1973, in the case of *Supermarkets General Corporation v. State*, 286 Md. 611, 409 A.2d 250 (1979), which involved a challenge to Sunday closing laws. The court reaffirmed the *Levin* Court's definition of "monopoly." *Id.* at 626, 46 A.2d at 258. And, it rejected the plaintiffs' contention that the law violated Article 41 because it gave larger establishments an advantage over small ones, finding that the laws "simply provides, uniformly, conditions under which [stores] may operate." *Id.* at 627, 46 A.2d at 258. Thus, the laws did not violate Article 41 because they "are not and do not result in a grant to one to the exclusion of others[.]" *Id.* at 627, 46 A.2d at 259.

Several principles emerge from these decisions. First, Article 41 does not preclude a State or locality from prohibiting an activity in toto. *See, e.g.*, *Supermarkets Gen.*, 286 Md. 611, 409 A.2d 250; *Wright*, 88 Md. 436, 41 A. 795. Second a monopoly for the purpose of Article 41 is an "exclusive privilege." *Levin*, 186 Md. at 182-83, 46 A.2d at 302; *Raney*, 170 Md. 183, 183 A. 552. And, an exclusive privilege is "an allowance or grant by the state to one or several of a sole

right; that is, a right to the exclusion of all others than the grantee or grantees." *Wright*, 88 Md. 436, 41 A. at 798.   Third, an exclusive privilege "does not constitute a monopoly in the constitutional sense when reasonably required for protection of some public interest, or when given in return for some public service, or when given in reference to some matter not of common right." *Levin*, 186 Md. at 182-83, 46 A.2d at 302.

Applying these principles to the case *sub judice*, plaintiffs have not pleaded a plausible claim under Article 41.   The 2021 Act does not constitute an exclusive right to sell cats and dogs in Maryland.   Although the Act prohibits brick-and-mortar stores from the sale of cats and dogs, consumers still have a plethora of choices when seeking to obtain a pet, including rescue shelters, animal control units, USDA licensed breeders, and unregulated hobby breeders.   Further, the Act is not a monopoly "in the constitutional sense" because its purpose is "not to destroy competition or restrain the free availability of [pets] to the public."   *Levin*, 186 Md. at 183, 46 A.2d at 303. Rather, as explained, *supra*, the Act's legislative history demonstrates that Maryland's ban on the sale of cats and dogs by retail stores is intended to further the public interest by preventing animal cruelty and protecting consumers from irresponsible dog breeders.

Thus, I shall dismiss Count VII.

## V.   The P.I. Motion

As noted, to qualify for a preliminary injunction, the plaintiffs must establish that they are "likely to succeed on the merits[.]"   *Winter*, 555 U.S. at 20.   Although that standard does not require "a 'certainty of success,'" the plaintiffs "must make a clear showing that [they are] likely to succeed at trial.'"   *Di Biase*, 872 F.3d at 230 (quoting *Pashby*, 709 F.3d at 321).   However, "a preliminary injunction does not follow as a matter of course from a plaintiff's showing of a likelihood of success on the merits."   *Benisek*, 138 S. Ct. at 1943-44 (citing *Winter*, 555 U.S. at

96

32).  "Rather, a court must also consider whether the movant has shown 'that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest.'"  *Benisek*, 138 S. Ct. at 1943-44 (quoting *Winter*, 555 U.S. at 20); *see also Centro Tepeyac*, 722 F.3d at 188 (applying the standard for preliminary injunctions set forth in *Winter*).  A preliminary injunction cannot issue unless all four factors are satisfied.  *See Pashby,* 709 F.3d at 320.

Because plaintiffs have not stated plausible claims, they have failed to establish that they are likely to succeed on the merits, the first *Winter* element.  Accordingly, plaintiffs do not qualify for the "extraordinary relief" of a preliminary injunction.  *Winter*, 555 U.S. at 24.

## VI.    Conclusion

Plaintiffs appear to be exemplary breeders, brokers, and pet stores owners. They work hard to ensure that their puppies are raised and transported in humane, caring environments and purchased by responsible owners. But, it is not the Court's place to judge the wisdom or fairness of the State's decision to pass the Act. Rather, the Court may judge only whether the Act conflicts with the legal provisions that plaintiffs have cited.

I have found no such conflict.  Therefore, I shall grant the State's Motion to Dismiss (ECF 9) and deny the P.I. Motion (ECF 5).

An Order follows, consistent with this Memorandum Opinion.


Date: September 17, 2021

                                                          /s/
                                                  _____
                                                  Ellen Lipton Hollander
                                                  United States District Judge